

# Thompson's Station, Tennessee
## Land Development Ordinance
*10 SEP 2015*
*Amendments 13 SEP 2016*



**Article 1 General Provisions . . . . . . . . . . . 01**
1.1 Authority and Applicability . . . . . . . . . . . . . . . 01
1.2 Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 01
1.3 Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 05

**Article 2 Sector Plan . . . . . . . . . . . . . . . . . 24**
2.1 Sector Plan Adopted. . . . . . . . . . . . . . . . . . . . 24
Table 2.1 Community Types Permitted in Sectors24
2.2 Community Types. . . . . . . . . . . . . . . . . . . . . . . 24
Table 2.2 Community Types, Criteria. . . . . . . . . . 25
Table 2.3 Community Types, Areas and Civic Space . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Article 3 Subdivision Regulations . . . . . . 28**
3.1 General Provisions. . . . . . . . . . . . . . . . . . . . . . . 28
3.2 Character of the Land . . . . . . . . . . . . . . . . . . . 29
3.3 Resource Management . . . . . . . . . . . . . . . . . . . 30
3.4 Floodplain Regulations. . . . . . . . . . . . . . . . . . . 35
3.5 Civic and Open Space Standards . . . . . . . . . . 43
Table 3.1 Civic Space Types . . . . . . . . . . . . . . . . . 44
3.6 Lot Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . 44
Table 3.2 Facades, Elevations, and Lot Lines Illustrated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Table 3.3 High Voltage Line Setbacks . . . . . . . . . 49
3.7 Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
3.8 Block Standards. . . . . . . . . . . . . . . . . . . . . . . . . 52
Table 3.4 Maximum Block Face Length . . . . . . . . 53
3.9 Thoroughfares . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Table 3.5 Context Per Zoning District . . . . . . . . . 53
Table 3.6 Thoroughfare Classification Context . . 54
Figure 3.1 Effective Turning Radius Illustration . 54
Table 3.7 Transect Zoning District Vehicular Lane Dimensions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
Table 3.8 Transect Zoning District Thoroughfare Cross Sections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Table 3.9 Use Zoning District Functional Classification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
Table 3.10 Design Speed . . . . . . . . . . . . . . . . . . . . 62
Table 3.11 Minimum Right-of-Way Width. . . . . . 62
Table 3.12 Maximum Percentage Grade. . . . . . . . 62
Table 3.13 Minimum Percentage Grade. . . . . . . . 62
Table 3.14 Maximum SuperelevatioN. . . . . . . . . . 62
Table 3.15 Minimum Radius of Return at Intersections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
Table 3.16 Maximum Grade at Intersections. . . . 62
Table 3.17 Minimum Intersection Sight Distance (Y) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
Table 3.18 Deceleration Lane Length . . . . . . . . . . 64
Figure 3.2 T4, T4O, T5 Clear Sight Triangle . . . . 64
Table 3.19 Typical Public Frontages . . . . . . . . . . . 66
Table 3.20 Sidewalk Widths . . . . . . . . . . . . . . . . . 67
3.10 Drainage and Storm Sewers . . . . . . . . . . . . . 67
3.11 Sewage Facilities. . . . . . . . . . . . . . . . . . . . . . . . 69
3.12 Utilities and Telecommunication. . . . . . . . . . 70
3.13 Water Facilities . . . . . . . . . . . . . . . . . . . . . . . . . 71

**Article 4 Zoning. . . . . . . . . . . . . . . . . . . . . . 72**
4.1 General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
4.2 Nonconformities . . . . . . . . . . . . . . . . . . . . . . . . 72
4.3 Special Requirements . . . . . . . . . . . . . . . . . . . . 73
4.4 Lot Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . 73
4.5 Lot Use Restrictions . . . . . . . . . . . . . . . . . . . . . 74
Table 4.1 G3 Sector Transect Zone Residential Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Table 4.2 O2, G1, G2 Sectors Transect Zone Residential Uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Table 4.3 Transect Zone Non-Residential Uses . 75
Table 4.4 O2, G1, G2 Use Zones Land Uses . . . . 77
Table 4.5 O2, G1, G2 Building Intensity . . . . . . . 80
4.6 Building Placement Standards. . . . . . . . . . . . . 80
4.7 Height Restrictions . . . . . . . . . . . . . . . . . . . . . . 81
Table 4.6 T2 Lot Standards. . . . . . . . . . . . . . . . . . 82
Table 4.7 T3 Lot Standards. . . . . . . . . . . . . . . . . . 83
Table 4.8 T4 Lot Standards. . . . . . . . . . . . . . . . . . 84
Table 4.9 T5 Lot Standards. . . . . . . . . . . . . . . . . . 85
Table 4.10 D1 Lot Standards. . . . . . . . . . . . . . . . . 86
Table 4.11 D2 Lot Standards. . . . . . . . . . . . . . . . . 87
Table 4.12 D3 Lot Standards. . . . . . . . . . . . . . . . . 88
Table 4.13 NC Lot Standards. . . . . . . . . . . . . . . . . 89
Table 4.14 CC Lot Standards. . . . . . . . . . . . . . . . . 90
Table 4.15 IL Lot Standards . . . . . . . . . . . . . . . . . 91
Table 4.16 IM Lot Standards . . . . . . . . . . . . . . . . 92
4.8 Transect Zoning District Frontage Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
Table 4.17 Private Frontages. . . . . . . . . . . . . . . . . 94
4.9 Specific Zoning District Standards . . . . . . . . . 97
4.10 Use Residential Property Standards . . . . . . . 98
4.11 Non-Residential Use Property Development Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
4.12 Parking Standards . . . . . . . . . . . . . . . . . . . . . 107
Table 4.18 Parking Occupancy Rates. . . . . . . . . . 107
Table 4.19 Use District Parking Requirements. . 108
Table 4.20 Required Parking Lot Dimensions . . 110
Table 4.21 Required Bicycle Parking —Transect Zoning Districts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111
Table 4.22 Required Bicycle Parking — Use Zoning Districts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112
Table 4.23 Off-Street Loading Requirements. . . 112
4.13 Lighting Standards . . . . . . . . . . . . . . . . . . . . . 112
4.14 Landscaping Standards. . . . . . . . . . . . . . . . . . 113
4.15 Fencing Standards . . . . . . . . . . . . . . . . . . . . . 115
4.16 Buffering Standards . . . . . . . . . . . . . . . . . . . . 115
Table 4.24 Buffering Required . . . . . . . . . . . . . . . 116
Figure 4.1 Buffer type 1: Broken Screen Illustration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
Figure 4.2 Buffer 2 and 3: Semi-Opaque Screen Illustration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
Figure 4.3 Buffer Type 4 and 5: Opaque Screen Illustration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118
4.17 Sign Standards . . . . . . . . . . . . . . . . . . . . . . . . 118

iii

Table 4.25   General Sign Restrictions . . . . . . . . . 120
Table 4.26   Specific Transect Zoning District Sign
Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126
**Article 5   Administration and Process . . 129**
5.1   General . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
5.2   Subdivision Process. . . . . . . . . . . . . . . . . . . 129
5.3   Zoning Process. . . . . . . . . . . . . . . . . . . . . . 139
5.4   Plans and Applications . . . . . . . . . . . . . . . . 140
Table 5.1   Accuracy of Surveys . . . . . . . . . . . . . 147
5.5   Approval Authority . . . . . . . . . . . . . . . . . . . 150
Table 5.2   Approval Authority . . . . . . . . . . . . . . 151
5.6   Interpretation. . . . . . . . . . . . . . . . . . . . . . . 158

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 3 of 163 PageID #: 12

## ARTICLE 1   GENERAL PROVISIONS

### 1.1   Authority and Applicability

1.1.1   Authority. The action of the Town of Thompson's Station, Tennessee in the adoption of this Land Development Ordinance (LDO) is authorized under the State of Tennessee, Title 13, §§13-7-201. et seq.

1.1.2   Zoning Enactment. For the purposes cited above and for the general purposes of promoting the health, safety, and general welfare of the citizens of the Town of Thompson's Station, the Board of Mayor and Aldermen hereby ordains, adopts and enacts this ordinance in its entirety, including text, map, and all regulations, all of which shall be known as the Town of Thompson's Station Land Development Ordinance (LDO). This ordinance shall apply to land within the corporate limits, as shown on the official zoning map.

1.1.3   Subdivision Enactment. Having adopted a major thoroughfare plan for the jurisdictional area, and filed a certified copy of the plan with the Williamson County Register of Deeds (hereinafter, referred to as "county register"), as required by Tenn. Code Ann. § 13-4-302, and having held a public hearing as indicated in Subsection 1-108.1, of these regulations, the Planning Commission has fulfilled the requirements set forth in state law as prerequisites to adoption of these regulations.

1.1.4   Jurisdiction. These zoning and subdivision regulations shall apply to all properties located within Thompson's Station, Tennessee. No land shall be subdivided within the jurisdictional area until the subdivider submits necessary plans and plats as required by these regulations, obtains Planning Commission approval of such documents, the documents comply with all requirements of these regulations, and the approved final plat is filed with the county register.

1.1.5   Severability. Should any provision of this be declared invalid or unconstitutional by a court of competent jurisdiction, such declaration shall not affect this ordinance as a whole or any part hereof except that specific provision which was the subject of the declaration.

1.1.6   Construction. The following general rules of construction shall apply to regulations governing the LDO:

    a.   Numerical metrics shall take precedence over graphic metrics.

    b.   The diagrams and illustrations within this ordinance, unless specifically noted as advisory, are considered regulatory in nature and are legally binding.

    c.   The definition of a term in this section shall take precedence over the definition of the same term elsewhere in the Town of Thompson's Station Code of Ordinances.

1.1.7   Terms used throughout this ordinance may be defined in §1.3 Definitions. §1.3 contains regulatory language that is integral to this ordinance. Those terms not defined in §1.3 shall be accorded their commonly accepted meanings.

1.1.8   Urban Service Boundary Sectors are allocated in the General Plan, Land Use Element, and are comprised of open space, growth, and existing suburban or urban areas. Growth areas are intended for the expansion, evolution, and retrofitting of community units, defined in Article 3, which in turn are comprised of Transect zoning districts and use zoning districts, defined by the elements appropriate to them in Article 4.

### 1.2   Intent

1.2.1   The intent and purpose of this ordinance is to enable, encourage and qualify the implementation of the region, the community, the block and the building, and the Transect.

#### 1.2.2   The Town

    a.   The Town should retain its natural infrastructure and visual character derived from topography, woodlands, farmlands, and riparian corridors.

    b.   Development contiguous to urban areas should be structured in the pattern of villages or hamlets

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 4 of 163 PageID #: 13

and be integrated with the existing community pattern.

c.  Development non-contiguous to urban areas should be organized in the pattern of hamlet, village, workplace or commercial center, depending upon adjacency to thoroughfares and sewer capacity.

d.  Transportation corridors should be planned and reserved in coordination with land use.

e.  Trails and green corridors should be used to define and connect the urbanized areas.

f.  The region should include a framework of pedestrian, and bicycle systems that provide alternatives to the automobile.

## 1.2.3   The community

a.  Neighborhoods should be compact, pedestrian-oriented and mixed use.

b.  Neighborhoods should be the preferred pattern of development and that districts specializing in a single use should be the exception.

c.  Ordinary activities of daily living should occur within walking distance of most dwellings, allowing independence to those who do not drive.

d.  Interconnected networks of thoroughfares should be designed to disperse traffic and reduce the length of automobile trips.

e.  Within neighborhoods, a range of housing types should be provided to accommodate diverse ages and incomes.

f.  Civic, institutional, and commercial activity should be embedded in neighborhoods, not isolated in remote single-use complexes.

g.  A range of open space including parks, squares, and playgrounds should be distributed within neighborhoods.

## 1.2.4   The block and the building

a.  Buildings and landscaping should contribute to the physical definition of thoroughfares as civic places.

b.  Development should adequately accommodate automobiles while respecting the pedestrian, the cyclist, and the spatial form of public areas.

c.  Buildings should provide their inhabitants with a clear sense of geography and climate through energy efficient methods.

d.  The preservation and renewal of historic buildings should be facilitated, to affirm the continuity and evolution of society.

## 1.2.5   Sectors

a.  Each sector, as defined by the Town of Thompson's Station General Plan, be used as a regulatory framework for the following purposes.

b.  The O1 Preserved Open Space Sector (O1) should consist of lands protected from development.

c.  The O2 Rural Open Space Sector (O2) should consist of lands of rural character, including hamlets, in which development should be limited to that which will not overburden resources or natural systems.

d.  The G1 Controlled Growth Sector (G1) should consist of lands of primarily rural character, including hamlets and villages.

e.  The G2 Intended Growth Sector (G2) should consist of lands that can support substantial growth by virtue of proximity to existing infrastructure, in which the Town intends to be developed as villages,

workplaces, and commercial centers.

f. The G3 Targeted Growth Sector (G3) should consist of land adjacent to the historic center of Thompson's Station and the intersection of Highway 31 and Thompson's Station Road, in which the Town intends to protect the character of the historic buildings and intensify the intersection to create a downtown.

## 1.2.6 The Transect

a. That communities should provide meaningful choices in living arrangements as manifested by distinct physical environments.

b. That each zoning district should have a distinct character as described below:

i. T5 Neighborhood High Intensity (T5): This zoning district consists of higher density mixed-use buildings that accommodate retail, offices, townhouses and apartments. It has a tight network of thoroughfares, with wide sidewalks, regularly spaced street tree planting and buildings set close to the sidewalks.

ii. T4 Neighborhood Medium Intensity (T4): This zoning district includes a mix of neighborhood commercial and service uses, but is primarily mixed density residential. It may have a wide range of building types: houses, townhouses, duplexes, small apartment buildings, and live-work units. Setbacks and landscaping are variable. Streets and sidewalks define medium-sized blocks.

iii. T3 Neighborhood Low Intensity (T3): This zoning district consists of low density residential areas, with some mix of use, home occupations and accessory buildings. Street and yard planting are naturalistic and building setbacks are relatively deep. Blocks may be large and thoroughfare networks irregular.

iv. T2 Rural (T2): This zoning district consists of sparsely settled lands in open or cultivated states. These include woodland, agricultural land, and pasture. Typical buildings are farmhouses and agricultural buildings. Roads are rural in character had have no pedestrian facilities. Landscaping is naturally occurring. This district will permit for the establishment and maintenance of single family residential associated with agricultural uses. The standards of this district ensure the development of these areas in a fashion that either permanently protects these areas or permits an interim use that will easily permit further development at the appropriate time.

v. T1 Natural (T1): This zoning district consists of lands approximating or reverting to a wilderness condition, including lands unsuitable for settlement due to topography, hydrology or vegetation. Public parks may occur, but general development is prohibited.

c. All or a portion of the property within a designated Transect zoning district may be further subject to the following sub-zoning district:

i. T-4 Open (T4O): a transition zoning district modifying T4 by permitting open commercial uses.

## 1.2.7 Use districts

a. To provide for continuity with existing regulations by further differentiating Transect zoning districts by use, so that the existing character of land developed under previous regulations can be maintained and provision is made for workplaces, commercial centers, and subdivisions that are not structured by neighborhoods.

b. That each use zoning district should have the distinct character as described below:

i. The D1 Low Intensity Residential (D1) zoning district is intended for low density residential development. This district will consist of single-family detached dwellings and their accessory structures.

ii. The D2 Medium Intensity (D2) zoning district is intended for low density residential development where urban services and facilities, including public sewer, are provided or where the

extension of such services and facilities will be physically and economically facilitated.

   iii. The D3 High Intensity Residential (D3) zoning district is intended for higher, density residential development where urban services and facilities, including public sewer, are provided or where the extension of such services and facilities will be available prior to development. This district may permit for the development of multi-family units.

   iv. The Neighborhood Commercial (NC) zoning district should include neighborhood commercial activities, small-scale businesses, and high intensity residential.

   v. The Community Commercial (CC) zoning district should include a range of commercial activities that serve a community or several neighborhoods, and allow larger commercial businesses. This district should be located in areas that are in proximity to major thoroughfares and determined to have commercial potential and to not have existing defined neighborhood characteristics.

   vi. The Light Industrial (IL) zoning district should include light-intensity industrial activities that serve a community or several communities.

   vii. The Medium Industrial (IM) zoning district should include medium-intensity industrial activities that serve a community or several communities.

## 1.2.8 Subdivision regulations

   a. That future growth and development in the Town should be performed in an orderly, incremental and predictable manner, in accordance with the General Plan, as adopted and amended.

   b. That the size and configuration of lots provide for adequate light, air, and privacy; and are secure from fire, flood, and other dangers.

   c. That neighboring subdivision developments will support each other with a continuous network of thoroughfares and blocks forming continuous urban fabric within their communities.

   d. That Town services may be provided efficiently and adequately.

   e. That subdivisions provide for and protect the public health, safety, and general welfare of the Town.

   f. That no easements shall restrict access to private property.

## 1.2.9 Landscaping

   a. That the landscaping in each Transect zoning district reflect its character, from regular and compact in the highest-intensity zoning districts to natural in the lowest intensity and rural zoning districts.

   b. That trees, shrubs, and ground cover consist of native species appropriate to expected climactic conditions.

   c. That the need for irrigation be minimized.

   d. That landscaping provides adequate shade and buffering.

   e. That parking lot landscaping break up large expanses of pavement, create shade, buffer views of parking lots from adjacent thoroughfares and developments and enhance the overall appearance of each project.

## 1.2.10 Signs

   a. That signs provide property owners and occupants an opportunity for effective identification and identification of goods sold or produced or services rendered.

   b. That signs reflect the character of their zoning districts.

   c. That signs maintain or improve the aesthetic character of their context, and that they not distract motorists or demand excessive attention.

   d. That signs protect pedestrians and motorists from injury and property damage wholly or partially

caused by cluttered, distracting, poorly constructed, or poorly maintained signs.

### 1.2.11  Health and safety

a.  Adequate provisions for light and air, access, open spaces, drainage and private property utilized by the public;

b.  Economy in governmental expenditure and adequate reimbursement of the Town for services performed;

c.  Safe, convenient transportation of people, goods and vehicles;

d.  Coordination of land development in accordance with orderly physical patterns as stated in adopted plans and policies;

e.  The transportation system should provide vehicular mobility without compromising livability and pedestrian safety;

f.  The transportation system should enable and prioritize mobility by transit, cars, bicycles and pedestrian modes as appropriate to each zoning district. These modes shall have priority over vehicle dominant strategies when considering design, operations or maintenance of the public Thoroughfares; and

g.  Ensure that proposed grading shall result in the minimum possible disturbance of the terrain and natural features necessary for development.

## 1.3  Definitions

This Section provides definitions for terms in this ordinance that are technical in nature or that otherwise may not reflect a common usage of the term. Interpretations of the definitions and terminology that are either within this section or not included will be made by the Town Planner.

**A-grid**: cumulatively, those thoroughfares that by virtue of their pre-existing pedestrian-supportive qualities, or their future importance to pedestrian connectivity, are held to the highest standards prescribed by this Code. See B-grid.

**Access**: the place, means or way by which pedestrians and vehicles shall have adequate ingress and egress to a property.

**Accessory business**: An incidental business located within a primary business.

**Accessory Dwelling Unit (ADU)**: a rental dwelling unit not greater than 900 square feet, sharing ownership and utility connections with a principal building; it may be within an accessory building or within the principal building. (Syn: ancillary unit)

**Accessory structure**: a detached, subordinate building or structure, the use of which is clearly incidental and related to a principal building or use of the land, and which is located on the same lot as that of the principal building or use. Accessory structure shall be designed to have low flood damage potential and shall offer minimum resistance to the flow of floodwaters. Accessory structures shall be firmly anchored to prevent flotation, collapse, and lateral movement, which otherwise may result in damage to other structures. Utilities and service facilities such as electrical and heating equipment shall be elevated or otherwise protected from intrusion of floodwaters.

**Accessory use**: a use of a building or land that is incidental to the primary use of the building or land on the same project site.

**Act**: the statutes authorizing the National Flood Insurance Program that are incorporated in 42 U.S.C 4001-4128.

**Addition**: any walled and roofed expansion to the perimeter or height of a building.

**Administrative decision**: any decision at the discretion of the Town Administrator or his/her designee.

**Adult oriented establishment**: shall have the same meaning as the term "adult-oriented establishment" as used in T.C.A. § 7-51-1102, and, in construing the term, the definitions contained in T.C.A. § 7-51-1102, subsections (1) through (6) and (9) through (26), are likewise incorporated by reference into and made a part of this

ordinance; provided that the definition in subsection (1) defining "adult bookstore" shall be amended by deleting "principal and predominate" and replacing it with "significant or substantial"; subsection (2) defining "adult cabaret" shall be amended by deleting "principal use" with "substantial use"; subsection (3) defining "adult entertainment" shall be amended by deleting "principal or predominant theme" and replacing it with "significant or substantial theme"; and subsection (23) defining "sexual encounter center" shall be amended by deleting "primary" and replacing it with "substantial."

**Agricultural Use**: the use of land for the primary purpose of profiting from the raising, harvesting, and selling crops or livestock, including but not limited to, livestock and poultry.

**Alley**: a thoroughfare, or access easement, designated to be a secondary means of vehicular access to the rear or side of properties; an Alley may connect to a vehicular driveway located to the rear of lots providing access to accessory buildings, service areas and parking, and containing utility easements.

**Amphitheater**: an unroofed or partially enclosed area for public or private use.

**Amenity**: a physical characteristic of a development that provides a direct benefit to the community.

**Amusement Center**: a facility that offers entertainment or games to the general public for a fee, such as a billiard hall or bowling alley.

**Animal Hospital**: an establishment which provides care and treatment of animals. Treatment may include medical and surgical procedures and short term boarding for convalescence.

**Antique store**: a store which sells or consigns to sell goods that are generally considered to be the quality of another age and deemed to be a collectible item.

**Appeal**: a request for a review of the town planner's interpretation of any provision of this Ordinance or a request for a variance.

**Applicant**: duly authorized representative of the subject property or project.

**Arcade**: a frontage encroachment wherein the facade is a colonnade supporting habitable space that overlaps the sidewalk, while the facade at sidewalk level remains at the frontage line.

**Architect**: An architect certified and registered by the State Board of Architectural and Engineer Examiners pursuant to Tenn. Code Ann. Title 62, Chapter 2 to practice in Tennessee.

**Area of shallow flooding**: areas designated AO or AH Zone on a community's Flood Insurance Rate Map (FIRM) with one percent or greater annual chance of flooding to an average depth of one to three feet where a clearly defined channel does not exist, where the path of flooding is unpredictable and indeterminate; and where velocity flow may be evident. Such flooding is characterized by ponding or sheet flow.

**Area of special flood-related erosion hazard**: land which is most likely to be subject to severe flood-related erosion losses. The area may be designated as Zone E on the Flood Hazard Boundary Map (FHBM). After the detailed evaluation of the special flood-related erosion hazard area in preparation for publication of the FIRM, Zone E may be further refined.

**Area of Special Flood Hazard**: see Special Flood Hazard Area.

**Assisted Living Facility**: an establishment, complex or distinct part thereof that accepts primarily aged persons for services including room and board, assistance with non-medical activities of daily living, administration of typically self-administered medications, and medical services subject to the limitations of these rules.

**Attic**: the interior part of a building contained within a pitched roof structure.

**Auction**: any sale of tangible goods/products by an auctioneer.

**Avenue (AV):** A limited distance, free-movement thoroughfare connecting civic locations within an urbanized area. Unlike a boulevard, its length is finite and its axis is terminated. An avenue may be conceived as an elongated square.

**Awning**: a fixed or movable shading structure, cantilevered or otherwise entirely supported from a building, used to protect outdoor spaces from sun, rain, and other natural conditions. Awnings are typically used to cover outdoor seating for restaurants and cafes.

**B-Grid**: cumulatively, those thoroughfares that by virtue of their use, location, or absence of pre-existing pe-

06

destrian-supportive qualities, may meet a standard lower than that of the *A-Grid*. See *A-Grid*.

**Base flood**: the flood having a one percent chance of being equaled or exceeded in any given year. This term is also referred to as the 100-year flood or the one (1)-percent annual chance flood.

**Basement**: the part of the building that is partially or wholly beneath the grade of the primary structure. The basement may be completed as a livable space.

**Bed and breakfast**: a residence in which overnight accommodations and meals are provided to guests for compensation.

**Bicycle lane (BL)**: a dedicated lane for cycling within a thoroughfare, demarcated by striping.

**Bicycle route (BR):** a thoroughfare suitable for the shared use of bicycles and automobiles moving at low speeds.

**Bicycle trail (BT):** a bicycle way independent of a vehicular thoroughfare.

**Block**: the aggregate of private lots, civic zoning districts, passages, alleys and rear lanes, circumscribed by thoroughfares, railroad rights-of-way, or waterways, or a combination of such.

**Block face**: the aggregate of all the principal frontages on one side of a block.

**Board**: the Board of Mayor and Aldermen of the Town of Thompson's Station.

**Boarding house**: an establishment other than a motel or hotel that provides lodging and meals for a definite time frame for compensation.

**Bond**: An instrument with a sum of money fixed as a penalty, binding the party(s) to pay the same: conditioned, however, that the payment of the penalty may be avoided by the performance and maintenance by one or more of the parties of certain acts. As used in these regulations, the term bond may include a variety of financial instruments including performance bonds, letters-of-credit, escrow accounts and similar sureties. Such surety instruments shall comply with all statutory requirements and shall be satisfactory to legal counsel as to form, sufficiency, and manner of execution, as set forth in these regulations.

**Boulevard (BV):** A long-distance, free-movement thoroughfare traversing an urbanized area. A boulevard often includes a wide median and a wide public frontage and therefor a wide right-of-way. Slip lanes are often provided to separate public frontages from the higher speed lanes.

**Breakaway wall**: a wall that is not part of the structural support of the building and is intended through its design and construction to collapse under specific lateral loading forces, without causing damage to the elevated portion of the building or supporting foundation system.

**Buffer**: any natural or undeveloped area of land which provides a separation between uses.

**Buffer yard**: a combination of setback and a visual buffer or barrier. It includes a yard or area together with; berm construction, planting, fencing or acceptable combination thereof.

**Building**: any permanent structure having a roof and walls used or built for the enclosure or shelter of persons, animals, vehicles, goods, merchandise, equipment, materials or property of any kind.

**Building height**: the vertical extent of a building measured in stories.

**Building permit**: an official document or certificate issued by the Town authorizing the construction of a building.

**Building Site**: A portion of the building envelope where a house or building may be constructed, including five (5) feet beyond the outer extremities of the building foot-print. This area is sometimes referred to as the building pad.

**Bulb-out**: a curb extension typically occurring at intersections, extending the line of curb into a vehicular lane.

**Cash Escrow**: As used in these regulations the term "cash escrow" can refer to two types of performance guarantees. A true cash escrow is cash that is beyond the reach of the persons who are guaranteeing performance of specific work subject to an escrow agreement. A second form is an irrevocable standby letter of credit as defined herein below.

**Canopy**: a small roof or awning structure that is attached to the wall and extends over an area designed to

provide a shaded area.

**Carport**: A roofed structure with at least two open sides to provide shelter for a vehicle located on a residential lot.

**Caretaker**: a person residing on a property whose responsibility is to supervise and maintain the property in which he/she resides.

**Civic**: the term defining not-for-profit organizations dedicated to arts, religion, culture, education, recreation, government, and transit.

**Civic building**: a building operated by one or more civic organizations.

**Civic space**: an outdoor area permanently dedicated for public use.

**Clinic**: a place where medical services are rendered as an outpatient service.

**Commercial**: the term collectively defining workplace, office, retail, and lodging functions.

**Commercial street (CS):** a local, slow-movement thoroughfare suitable for high-intensity urban areas. Commercial streets are urban in character, supporting parallel or angled parking on both sides and narrow lanes appropriate for a commercial environment.

**Common destination**: an area of focused community activity, usually defining the approximate center of a pedestrian shed. It may include without limitation one or more of the following: a civic space, a civic building, a commercial center, and may act as the social center of a neighborhood.

**Common yard**: a planted private frontage, visually continuous with adjacent yards, wherein the facade is set back from the frontage line.

**Condominium Subdivision**: The subdivision of property through the establishment of a condominium or horizontal property regime.

**Consignment sale**: a sale of items in which a third party plans and holds a sale for goods owned by other people in order to split the profits of the sales.

**Construction Plans**: The maps or drawings accompanying a subdivision plat and showing the specific location and design of improvements to be installed in the subdivision in accordance with requirements of the Planning Commission.

**Convalescent care**: a facility that provides lodging which includes nursing and custodial care on a 24-hour basis for unrelated individuals due to illness, physical infirmities or advanced age.

**Commission**: the Planning Commission of the Town of Thompson's Station.

**Common area**: an outdoor area designated and intended for the enjoyment of use by residents or other members of a controlling association.

**Concept plan**: a generalized concept plan indicating areas for future development with possible land uses.

**Corner lot**: a lot or parcel of land abutting two (2) or more thoroughfares at their intersection, or two (2) parts of the same thoroughfare forming an interior angle of less than one hundred thirty-five (135) degrees.

**Critical lot**: any lot that has constraints to typical development including, but not limited to, soil conditions, slope, presence of sinkholes or any other features that would affect site design.

**Crop production**: Commercial agricultural land uses including the production of field crops, flowers, fruits, grains, ornamental crops, vegetable and other similar products along with crop production activities, such as preparation and harvesting.

**Cul-de-sac**: a street or road designed to remain permanently closed at one end by use of a bulb design for turn around.

**Curb**: the edge of the vehicular pavement that may be raised, usually incorporates the drainage system.

**Curb return radius**: the curved edge of a thoroughfare at an intersection, measured at the inside edge of the vehicular tracking along the curb.

**Daycare, adult**: a facility operated to provide services to ten (10) or more adult recipients, for more than three

Case 3:16-cv-02845   Document 1-1   Filed 11/07/16   Page 11 of 163 PageID #: 20

(3) hours per day but less than twenty-four (24) hours per day, by a provider of such services who is not related to such adult, pursuant to an individualized plan of care designed to maintain or restore each adult's optimal capacity for self-care through medical or social services.

**Daycare, child**: Any facility operated by a person, social agency, corporation or institution, or any other group which receives a minimum of eight and a maximum of 12 children (and up to three additional school-age children who will only be present before and after school, on school holidays, on school snowdays, and during school summer vacation) for less than 24-hours per day for care outside their own homes, without transfer of legal custody.

**Daycare, home**: a daycare facility that is operated by the provider from their residential dwelling.

**Density**: the total number of residential units permitted on a gross acre of land.

**Design Speed**: the velocity at which a thoroughfare tends to be driven without the constraints of signage or enforcement.

**Detention pond**: a pond constructed for the temporary storage and gradual release of water runoff.

**Developer**: The owner of land proposed to be subdivided or his authorized representative.

**Development**: any man-made change to improved or unimproved real estate, including, but not limited to, buildings or other structures, mining, dredging, filling, grading, paving, excavating, drilling operations, or storage of equipment or materials.

**Deviation**: A proposed variation from the standards, specifications or other provisions of this ordinance.

**Dripline**: the outermost edge of the tree's canopy.

**Drive (DR)**: a thoroughfare along the boundary between an urbanized and a natural condition or civic zoning district, usually along a stream, park, or topographical change. One side has the urban character of a street or boulevard, while the other has the qualities of a road, with naturalistic planting and rural details.

**Driveway**: a paved or unpaved path of travel for a vehicle connecting the public right-of-way or private street to a private residence.

**Easement**: the right to use private property for specific and limited purposes, including but not limited to, utilities, telecommunications, drainage, landscaping and roadways.

**Ecosystem**: The interacting system between biological resources and the physical environment.

**Effective Turning Radius**: the measurement of the inside curb return radius taking parking lanes into account.

**Electrical and Communication Service Lines**: Electrical and communication systems serving limited geographic areas of residential neighborhoods and providing service directly to a residence or group of residences and not designed to provide service more than one-half mile or transmit service for street lighting.

**Elevated building**: a non-basement building built to have the lowest floor of the lowest enclosed area elevated above the ground level by means of solid foundation perimeter walls with openings sufficient to facilitate the unimpeded movement of floodwater, pilings, columns, piers, or shear walls adequately anchored so as not to impair the structural integrity of the building during a base flood event.

**Elevation**: an exterior wall of a building not along a frontage line. See facade.

**Emergency flood insurance program or emergency program**: the program as implemented on an emergency basis in accordance with Section 1336 of the Act.  It is intended as a program to provide a first layer amount of insurance on all insurable structures before the effective date of the initial FIRM.

**Encroach**: to break the plane of a vertical or horizontal regulatory limit with a structural element, so that it extends into a setback, into the public frontage, or above a height limit.

**Encroachment**: any intrusion into a required setback, a public right-of-way, or an easement.

**Engineer**: An engineer certified and registered by the State Board of Architectural and Engineer Examiners pursuant to Tenn. Code Ann. Title 62, Chapter 2 to practice in Tennessee.

**Equal Degree of Encroachment**: The delineation of floodway limits so that floodplain lands on both sides

of a stream are capable of conveying a proportionate share of flood flows. This is determined by considering the hydraulic conveyance of the floodplain along both sides of a stream for a significant reach.

**Erosion**: the process by which the surface of the ground is worn away by the movement of wind, water or ice.

**Escrow**: A fiduciary agreement with the local government in lieu of actual performance and intended to assure performance. An escrow account may be provided as a bond subject to agreement of the governing body.

**Equestrian facilities**: commercial facilities for horse ranches, riding schools and academies, horse expedition, and similar uses.

**Erodible slope**: Any area of incline, whether natural or man made, which lacks sufficient vegetation to prevent instability and erosion and are therefore subject to erosion.

**Excavation**: the removal or relocation of soil, sand, gravel or rock.

**Exception**: a waiver from the provisions of this Ordinance which relieves the applicant from the requirements of a rule, regulation, order or other determination made or issued pursuant to this ordinance.

**Exhibition center**: a large building designed for holding exhibitions.

**Existing construction**: any structure for which the "start of construction" commenced before the effective date of the initial floodplain management code or ordinance adopted by the community as a basis for that community's participation in the NFIP.

**Existing manufactured home park or subdivision**: a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including, at a minimum, the installation of utilities, the construction of streets, final site grading or the pouring of concrete pads) is completed before the effective date of the first floodplain management code or ordinance adopted by the community as a basis for that community's participation in the NFIP.

**Existing structures**: see existing construction

**Expansion to an existing manufactured home park or subdivision**: the preparation of additional sites by the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads).

**Facade**: the exterior wall of a building that is set along a frontage line.

**Fence**: a permeable metal or wooden wall, independent of a building.

**Fill**: materials, such as soil, gravel, rock or clay deposited with the intent of increasing the surface elevation.

**Final Subdivision Plat**: The final map or drawing and accompanying materials, described in these regulations, on which the subdivider's plan of the subdivision is presented to the Planning Commission for approval and which, if approved by the commission, is recorded with the county register of deeds.

**Financial services**: An establishment for the custody, loan, exchange or issue of money, for the extension of credit, and for facilitating the transmission of funds. Excludes check cashers or short term loans as defined by non-banking financial services.

**Financial services, non-banking**: Pawn shops (brokers), Title Pledge Lenders, Check Cashing and Deferred Presentment services.

**Flood or flooding**: a general and temporary condition of partial or complete inundation of normally dry land areas from: the overflow of inland waters and / or the unusual and rapid accumulation or runoff of surface waters from any source.

**Flood elevation determination**: a determination by the Federal Emergency Management Agency (FEMA) of the water surface elevations of the base flood, that is, the flood level that has a one percent or greater chance of occurrence in any given year.

**Flood elevation study**: an examination, evaluation and determination of flood hazards and, if appropriate, corresponding water surface elevations, or an examination, evaluation and determination of mudslide (i.e., mudflow) or flood-related erosion hazards.

**Flood Hazard Boundary Map (FHBM)**: an official map of a community, issued by FEMA, where the

10

boundaries of areas of special flood hazard have been designated as Zone A.

**Flood Insurance Rate Map (FIRM)**: an official map of a community, issued by FEMA, delineating the areas of special flood hazard or the risk premium zones applicable to the community.

**Flood insurance study**: is the official report provided by FEMA, evaluating flood hazards and containing flood profiles and water surface elevation of the base flood.

**Floodplain or Flood prone area**: any land area susceptible to being inundated by water from any source (see definition of "flooding").

**Floodplain management**: the operation of an overall program of corrective and preventive measures for reducing flood damage, including but not limited to emergency preparedness plans, flood control works and floodplain management regulations.

**Flood protection system**: those physical structural works for which funds have been authorized, appropriated, and expended and which have been constructed specifically to modify flooding in order to reduce the extent of the area within a community subject to a "special flood hazard" and the extent of the depths of associated flooding. Such a system typically includes hurricane tidal barriers, dams, reservoirs, levees or dikes. These specialized flood modifying works are those constructed in conformance with sound engineering standards.

**Floodproofing**: any combination of structural and nonstructural additions, changes, or adjustments to structures which reduce or eliminate flood damage to real estate or improved real property, water and sanitary facilities and structures and their contents.

**Flood-related erosion**: the collapse or subsidence of land along the shore of a lake or other body of water as a result of undermining caused by waves or currents of water exceeding anticipated cyclical levels or suddenly caused by an unusually high water level in a natural body of water, accompanied by a severe storm, or by an unanticipated force of nature, such as a flash flood, or by some similarly unusual and unforeseeable event which results in flooding.

**Flood-related erosion area or Flood-related erosion prone area**: a land area adjoining the shore of a lake or other body of water, which due to the composition of the shoreline or bank and high water levels or wind-driven currents, is likely to suffer flood-related erosion damage.

**Flood-related erosion area management**: the operation of an overall program of corrective and preventive measures for reducing flood-related erosion damage, including but not limited to emergency preparedness plans, flood-related erosion control works and floodplain management regulations.

**Floodway**: the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height.

**Floodway Fringe**: The area adjoining a watercourse which, although not lying within a floodway, has been or may hereafter be covered by a 100-year flood.

**Floor**: the top surface of an enclosed area in a building (including basement), i.e. top of slab in concrete slab construction or top of wood flooring in wood frame construction. The term does not include the floor of a garage used solely for parking vehicles.

**Food truck**: licensed, motorized vehicle or mobile food unit which is temporarily stored on a privately-owned lot, or in an on street parking space, where food items are sold to the general public.

**Forecourt**: a private frontage wherein a portion of the facade is close to the frontage line and the central portion is set back.

**Freeboard**: a factor of safety usually expressed in feet above a flood level for purposes of floodplain management. "Freeboard" tends to compensate for the many unknown factors that could contribute to flood heights greater than the height calculated for a selected size flood and floodway conditions, such as wave action, blockage of bridge or culvert openings, and the hydrological effect of urbanization of the watershed.

**Frontage**: the area between a building facade and the vehicular lanes, inclusive of its built and planted components. Frontage is divided into private frontage and public frontage.

**Frontage, building**: the linear distance of an exterior building wall of a ground floor.

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 14 of 163 PageID #: 23

**Frontage, street**: the portion of a lot or parcel which borders a public street.

**Frontage, buildout**: the percentage of the lot width that is occupied by the building facade within the first lot layer.

**Frontage, line**: a lot line bordering a public frontage.

**Functionally dependent use**: a use which cannot perform its intended purpose unless it is located or carried out in close proximity to water. The term includes only docking facilities but does not include long-term storage or related manufacturing facilities.

**Gallery**: a private frontage wherein the facade is aligned close to the frontage line with an attached cantilevered shed or lightweight colonnade overlapping the sidewalk.

**Garage**: a building either detached or attached to a primary residential building designated for the use of parking vehicles.

**Garage/estate sale**: the sale of personal property, such as household items, clothing, etc. conducted on the premises of a personal residence. All goods should be the personal property of the resident/occupant.

**General Plan**: the General Plan of the Town of Thompson's Station that refers to the goals and policies for the development and maintenance of the Town outlined by the Board of Mayor and Aldermen. The official statement of the Planning Commission which sets forth major policies concerning future development of the jurisdictional area and meeting the provisions set forth in Tenn. Code Ann. §§ 13-4-201 through 13-4-203.

**Grade**: The slope of a public way or a site specified in percentage terms.

**Grading**: the process of excavation or fill or a combination thereof.

**Green**: a civic space type for unstructured recreation, spatially defined by landscaping rather than building frontages.

**Group home**: any home in which eight (8) or fewer unrelated persons with disabilities reside, and may include three (3) additional persons acting as support staff or guardians, who need not be related to each other or to any of the persons with disabilities residing in the home and that are classified as "single family residence" under Tenn. Code Ann. 13-24-102 et seq. Does not include residences operated on a commercial basis or for persons that do not qualify as "individuals with a disability" as defined by the above statute.

**Guesthouse**: a detached accessory building that may have bathroom facilities but may not have any kitchen facilities located on the same site as a primary residence which will provide a temporary residence for the occupants of the house or their guests.

**Hamlet (HAM):** a community type structured by a short or standard pedestrian shed oriented toward a common destination such as a general store, meeting hall, schoolhouse, and/or church. A hamlet takes the form of a small settlement standing free in the countryside. (Syn: cluster)

**Height**: See building height.

**Highest adjacent grade**: the highest natural elevation of the ground surface, prior to construction, adjacent to the proposed walls of a structure.

**Highway (HW)**: a rural and suburban thoroughfare of long distance and high vehicular speed and capacity. A highway should be relatively free of intersections, driveways, and adjacent buildings. This type is allocated to the more rural transect zoning districts (T1, T2, and T3).

**Highway, Limited Access**: A freeway or expressway providing a trafficway for through traffic, in respect to which owners or occupants of abutting property(s) or lands and other persons have no legal right of access to or from the trafficway, except at such points and in such manner as may be determined by the public authority having jurisdiction over such trafficway.

**Historic structure**: any structure that is:

    a.   Listed individually in the National Register of Historic Places (a listing maintained by the U.S. Department of Interior) or preliminarily determined by the Secretary of the Interior as meeting the requirements for individual listing on the National Register;

    b.   Certified or preliminarily determined by the Secretary of the Interior as contributing to the histori-

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 15 of 163 PageID #: 24

cal significance of a registered historic district or a district preliminarily determined by the Secretary to qualify as a registered historic district;

    c. Individually listed on the Tennessee inventory of historic places and determined as eligible by states with historic preservation programs which have been approved by the Secretary of the Interior; or

    d. Individually listed on the Town of Thompson's Station, Tennessee inventory of historic places and determined as eligible by communities with historic preservation programs that have been certified either:

        i. By the approved Tennessee program as determined by the Secretary of the Interior or

        ii. Directly by the Secretary of the Interior.

**Home occupation**: the use of a residential dwelling and/or accessory structure by permanent residents for business activities that does not affect the primary use or residential character of the property.

**Hotel**: a facility in which lodging accommodations are provided for compensation with access primarily from interior hallways.

**Horizontal Property Act**: "The Tennessee Horizontal Property Act", as codified in Tenn. Code Ann. Title 66, Chapter 2 which permits the development of attached dwellings, such as condominiums.

**Industrial**: the function associated with a business or activity involving manufacturing, fabrication, assembly, distribution, disposal, warehousing or bulk storage, trucking and equipment facilities, and other business serving primarily industrial needs.

**Inn**: a type of lodging building function that is owner-occupied, offering 6 to 20 bedrooms, permitted to serve breakfast in the mornings to guests.

**Intersection**: a thoroughfare junction where two or more thoroughfares meet or cross and the preferred location for pedestrian crossings. Intersections are characterized by a high level of activity and shared use, and should be multimodal and deserving of special design treatments.

**Interpretive center**: facility for the education of the public related to conservation, history, agriculture, or other similar resources.

**Irrevocable Standby Letter of Credit**: An irrevocable standby letter of credit is a commitment from a financial institution to pay an agreed sum of money to a third party in compliance with the terms of the letter.

**Junk yard**: business involving the collection and storage of scrap materials.

**Kennel**: an establishment where animals are temporarily boarded for compensation.

**Kitchen**: a room used for cooking and the preparation of meals, which includes a range/stove or oven or utility connections for such appliances, a dishwasher, refrigerator, microwave, and sink. A single kitchen is permitted in single family dwelling units.

**Land Surveyor**: A land surveyor certified and registered by the State Board of Land Survey Examiners pursuant to Tenn. Code Ann. Title 62, Chapter 18 to practice in Tennessee.

**Landscape Architect**: A landscape architect certified and registered by the State Board of Architectural and Engineer Examiners pursuant to Tenn. Code Ann. Title 62, Chapter 2 to practice in Tennessee.

**Large Format Retail**: Retail sales uses located in one structure in excess of fifty thousand (50,000) square feet gross floor area, whether on a single lot or contiguous lots owned or operated as associated, integrated or cooperative business enterprises.

**Legal, non-conforming lot**: a parcel which was lawfully established, formed or subdivided and is not inconsistent with the zoning standards in which it is now located.

**Legal, non-conforming use**: a use or activity which was lawfully permitted prior to the adoption of an ordinance modification which prohibited the use.

**Levee**: a man-made structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control or divert the flow of water so as to provide protection from temporary flooding.

13

**Levee system**: a flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices.

**Light trespass**: Light that falls beyond the property it is intended to illuminate.

**Liner Building**: a building specifically designed to mask a parking lot or a parking structure from a frontage.

**Livery stables**: property used for the boarding of livestock, including horses, mules, etc.

**Lodging**: a building function available for daily and weekly renting of bedrooms.

**Lot**: A tract, plot, or portion of a subdivision or parcel of land intended as a unit for the purpose, whether immediate or future, of transfer of ownership, or for building development.

**Lot, Corner**: A lot situated at the intersection of two (2) thoroughfares.

**Lot Coverage**: the percentage of a lot that is covered by buildings and other roofed structures.

**Lot Improvement**: Any building, structure, place, work of art, or other object or improvement of the land on which such items are situated constituting a physical betterment of real property, or any part of such betterment.

**Lot Line**: the boundary that legally and geometrically demarcates a lot.

**Lot Width**: the length of the principal frontage line of a lot.

**Lowest floor**: the lowest floor of the lowest enclosed area, including a basement. An unfinished or flood resistant enclosure used solely for parking of vehicles, building access or storage in an area other than a basement area is not considered a building's lowest floor; provided, that such enclosure is not built so as to render the structure in violation of the applicable non-elevation design requirements of this Ordinance.

**Main Civic Space**: the primary outdoor gathering place for a community. The main civic space is often, but not always, associated with an important civic building.

**Major thoroughfare**: roads designated in the General Plan which have the primary purpose of carrying traffic through the transportation system.

**Major Thoroughfare Plan**: The plan adopted by the Planning Commission, pursuant to Tenn. Code Ann. § 13-4-302, showing, among other things, "the general location, character, and extent of public ways.... (and) the removal, relocation, extension, widening, narrowing, vacating, abandonment or change of use of existing public ways...."

**Manufactured home park or subdivision**: a parcel (or contiguous parcels) of land divided into two or more manufactured home lots for rent or sale.

**Manufacturing**: premises available for the creation, assemblage and/or repair of artifacts, using table-mounted electrical machinery or artisanal equipment, and including their retail sale.

**Master Sign Plan**: A comprehensive sign plan intended to guide the development, installation and maintenance of signs for a commercial center of one or more lots with a minimum of five tenants or for sites greater than five acres with multiple road frontages.

**Maximum Density**: the maximum number of housing units permitted per acre of gross lot area on a single lot including adjustments for other functions. See density and base density.

**May**: permissive

**Mean Sea Level (MSL)**: the average height of the sea for all stages of the tide. It is used as a reference for establishing various elevations within the floodplain. For the purposes of this Ordinance, the term is synonymous with the National Geodetic Vertical Datum (NGVD) of 1929, the North American Vertical Datum (NAVD) of 1988, or other datum, to which Base Flood Elevations shown on a community's Flood Insurance Rate Map are referenced.

**Meeting Hall**: a building available for gatherings, including conferences, that accommodates at least one room equivalent to a minimum of 10 square feet per projected dwelling unit within the pedestrian shed in which it is located.

14

**Microbrewery**: is an establishment where beer and ale are brewed in small quantities, typically in conjunction with a restaurant, bar or tavern use.

**Microdistillery**: is an establishment where the production of grade spirit alcohol in small quantities, typically in conjunction with a restaurant, bar or tavern use.

**Mixed Use**: multiple functions within the same building through superimposition or adjacency, or in multiple buildings by adjacency, or at a proximity determined by warrant.

**Modular housing**: a dwelling unit that is factory built and designed to be placed on a permanent perimeter foundation.

**Mounted**: attached, affixed to a structure or supported by a structure.

**Model home**: a residential dwelling unit that is temporarily displayed for purposes of example for available house plans within a particular subdivision.

**Motel**: a facility in which lodging accommodations are provided for compensation with direct access from parking area.

**National Geodetic Vertical Datum (NGVD)**: as corrected in 1929, a vertical control used as a reference for establishing varying elevations within the floodplain.

**Natural vegetation**: native plants, grasses, shrubs or trees found within the region.

**Neighborhood Multipurpose Field**: a civic space type for structured recreation and stormwater management. It may be spatially defined by landscaping rather than building frontages.

**Net Lot Area**: the area of a lot within the frontage lines, excluding any portions of street rights-of-way or other required dedications.

**New construction**: any structure for which the "start of construction" commenced on or after the effective date of the initial floodplain management Ordinance and includes any subsequent improvements to such structure.

**New manufactured home park or subdivision**: a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed on or after the effective date of this ordinance or the effective date of the initial floodplain management ordinance and includes any subsequent improvements to such structure.

**Nonconformity**: an existing function, structure, lot or site improvement that is in compliance with the zoning regulations that were applicable to it when it was established, and for which all required permits were issued, but which does not conform in whole or in part to the regulations of this Section. Such nonconformity is legal and may continue except as regulated by this Section.

**North American Vertical Datum (NAVD)**: as corrected in 1988, a vertical control used as a reference for establishing varying elevations within the floodplain.

**Nursing Home**: a facility which provides nursing care and related medical services on a 24 hour basis.

**Office**: premises available for the transaction of general business but excluding retail, artisanal and manufacturing uses.

**Offsite**: Any premise not located within the area of the property to be subdivided, whether or not in the same ownership of the applicant for subdivision approval.

**One Hundred-Year Flood**: See base flood.

**Open market building**: a covered space where buyers and sellers convene for the sale of goods; a marketplace.

**Open space**: any property designated or intended for the preservation of land and passive recreational land uses.

**Outdoor entertainment**: temporary events located within an outdoor amphitheater area or park for the purpose of entertaining the general public, such as concerts, festivals and other similar uses.

**Outdoor storage**: the keeping of materials, goods or vehicles on site for a time frame exceeding 24 hours.

**Park**: a civic space type that is a natural preserve available for passive recreation.

**Parking lane**: A vehicular lane designated and used for parking motor vehicles.

**Parking, shared**: off street parking facilities that are shared by multiple uses in proximity to one another.

**Parking structure**: a building containing one or more stories of vehicular parking above or below grade.

**Parkway (PW)**: A highway designed in conjunction with naturalistic landscaping, including a variable-width median. A parkway should include a wide right-of-way landscaped on both sides of vehicular lanes.

**Passage (PS)**: a pedestrian connector, open or roofed, that passes between buildings to provide shortcuts through long blocks and connect rear parking areas to frontages.

**Path (PT)**: a pedestrian, equine, or bicycle way traversing a park or rural area, with landscape matching the contiguous open space, ideally connecting directly with the urban sidewalk network.

**Pedestrian crossing**: an area designated for pedestrians when traversing a thoroughfare. Pedestrian crossings shall be striped and indicated by signage.

**Pedestrian shed**: An area that is centered on a common destination. Its size is related to average walking distances for the applicable community unit type. Pedestrian sheds are applied to structure communities. The pedestrian shed that is an average 1/4 mile radius or 1320 feet, about the distance of a five-minute walk at a leisurely pace.

**Person**: includes any individual or group of individuals, corporation, partnership, association, or any other entity, including State and local governments and agencies.

**Planning Commission**: A public planning body established pursuant to Tenn. Code Ann. Title 13, Chapter 4, to execute a partial or full planning program within authorized area limits. See Commission.

**Plateline**: The point at which any part of the roof structure touches or bears upon any external wall.

**Planter**: the element of the public frontage which accommodates street trees, whether continuous or individual.

**Playground**: an open space designed and equipped for the recreation of children.

**Plaza**: a civic space type designed for civic purposes and commercial activities in the more urban transect zoning districts, generally paved and spatially defined by building frontages.

**Porch**: An open air room appended to a building, with floor and roof but no walls on the sides facing frontages.

**Preliminary Plat**: The preliminary written and graphic documents described in these regulations, that indicate in a conceptual form the proposed pattern of open spaces, streets and building lots within a subdivision .

**Premise(s)**: A tract of land together with any buildings or structures which may be located thereon.

**Principal building**: the main building on a lot, usually located toward the frontage.

**Principal entrance**: the main point of access for pedestrians into a building.

**Principal frontage**: the private frontage designated to bear the address and principal entrance to the building, and the measure of minimum lot width. See frontage.

**Private frontage**: the privately held layer between the frontage line and the principal building facade.

**Private Street**: Streets not dedicated to and maintained by a government entity.

**Public frontage**: the area between the curb of the vehicular lanes and the frontage line.

**Public Improvement**: Any drainage ditch, roadway, parkway, sidewalk, pedestrian way, tree, lawn, off-street parking area, lot improvement, or other facility for which the local government may ultimately assume the responsibility for maintenance and operation or which may affect an improvement for which government responsibility is established.

**Public Way**: Any publicly owned street, alley, sidewalk, or right-of-way which provides for movement of pedestrians or vehicles.

**Public use land**: any land that is determined by the Board of Mayor and Aldermen to provide community benefit to the Town.

**Push cart**: any rubber-wheeled vehicle or portable cart used for displaying, keeping or storing any article by a vendor or peddler (other than a motor vehicle, bicycle or trailer) which may be moved without the assistance of a motor and which does not require registration by the state department of motor vehicles, and from which prepared food, fruit, merchandise, drink, and flowers may be sold.

**Queue**: a temporary waiting area for vehicles obtaining a service, food, or similar activity.

**Ramble**: an open space located in the middle of a block. While public, the space is an amenity largely utilized by the properties surrounding the space.

**Reach**: A hydraulic engineering term to describe longitudinal segments of a stream or river. A reach generally includes the segment of the flood hazard area where flood heights are influenced by a man-made area or natural obstruction.

**Reasonably safe from flooding**: base flood waters will not inundate the land or damage structures to be removed from the Special Flood Hazard Area and that any subsurface waters related to the base flood will not damage existing or proposed structures.

**Recreation, active**: leisure activities that require the development of a site, such as sports fields, swimming pools, etc.

**Recreational facility**: a land use which includes, but is not limited to parks, swimming pools, etc.

Recreational vehicle: a vehicle which is built on a single chassis; 400 square feet or less when measured at the largest horizontal projection; designed to be self-propelled or permanently towable by a light duty truck; designed primarily not for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.

**Recreation, passive**: leisure activities that require little to no alteration or formal development of a site for public or private enjoyment.

**Regulating Plan**: a zoning map or set of maps that show the transect zoning districts, civic zoning districts, special districts, special requirements, and thoroughfare assignments of areas subject to, or potentially subject to, regulation by this Section.

**Regulatory floodway**: the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height.

**Regulatory Flood Protection Elevation**: The elevation not less than one (1) foot above the water surface profile associated with the Regulatory Flood.

**Renovation**: means physical improvements that increase the value of the real property.

**Residential Use**: characterizing premises available for long-term human dwelling. Residential uses have definitions applicable to ownership and definitions applicable to building type as follows:

**Residential Ownership:**

**Apartment:** Any residential building containing four or more residential units for occupancy of four separate families living independent of one another with the individual units leased to occupants.

**Condominium:** A form of ownership of less than the whole of a building or system of buildings under the provisions of Title 66, Chapter 27, Tennessee Code, which provides the mechanics and facilities for formal filing and recordation of divided interests in real property, whether the division is vertical or horizontal.

**Fee Simple:** A form of absolute ownership that is free of any other claims against the title such as a single family detached property.

**Residential Building Types:**

**Apartment Building:** This residential building type is urban in character and frequently is a multi-story building. It is a single use residential building.

**Duplex:** Two (2) dwelling units sharing a detached building, each dwelling unit provides a residence for a

17

single family.

**Garden Apartment:** A cluster of low-rise buildings, usually no more than two or three stories high, on a single piece of property. Open lawns, landscaping, and pathways are considered common areas for garden apartment rentals, and some garden apartment complexes have amenities such as pools, clubhouses, playgrounds, and gyms on the property as well.

**Live Work:** A unit consisting of a commercial and residential function. The commercial function may be anywhere in the unit. It is intended to be occupied by a business operator who lives in the same structure that contains the commercial activity or industry.

**Mixed Use Building:** Residential use combined with commercial use within the same building through superimposition or adjacency. This building type is urban in character and frequently is a multi-story building with residential uses above commercial uses.

**Single-family:** A building used as a residence for a single family. This is a general term and may apply to a house or a townhouse with fee simple ownership.

**Townhouse:** A single-family dwelling that shares a party wall with another of the same type and occupies the full frontage line.

**Triplex:** Three (3) dwelling units sharing a detached building, each dwelling unit provides a residence for a single family.

**Resubdivision**: A change in a map of any approved or recorded subdivision plat altering the lots incorporated within the confines of the original plat.

**Retail**: characterizing premises available for the sale of merchandise and food service.

**Retail Frontage**: a frontage designated on a regulating plan that requires or recommends the provision of a shopfront, encouraging the ground level to be available for retail use. See special requirements.

**Retirement home**: age restricted housing units designed to meet the needs of persons 55 years and older.

**Ridgeline**: the crest or line of the hill that connects the two highest points.

**Right-of-Way**: A strip of land occupied or intended to be occupied by a public way crosswalk, railroad, electric transmission line, oil or gas pipeline, water main, sanitary or storm sewer line, or for another similar use. The usage of the term "right-of-way", for land platting purposes, shall mean that every right-of-way hereafter established and shown on a final plat is to be separate and distinct from the lots or parcels adjoining such right-of-way and shall not be included within the dimensions or areas of such lots or parcels.

**Riverine**: relating to, formed by, or resembling a river (including tributaries), stream, brook, etc.

**Road (RD)**: a local, rural and suburban thoroughfare of low-to-moderate vehicular speed and capacity. Roads tend to be rural in character without curbs or striping.

**Rooming house**: a residential structure with rooms available for renting for a definite time frame however no dining facilities are available to tenant.

**Same Ownership**: Ownership by the same person, corporation, firm entity, partnership, or unincorporated association or ownership by different corporations, firms, partnerships, entities, or unincorporated associations, in which a stockholder, partner, associate, or a member of his family owns an interest in each corporation, firm, partnership, entity, or unincorporated association.

**Secondary Frontage**: on corner lots, the private frontage that is not the principal frontage. As it affects the public realm, its first layer is regulated.

**Sediment**: solid material, both inorganic (mineral) and organic, that is in suspension, is being transported, or has been moved from the site of origin by wind, water, gravity, or ice as a product of erosion.

**Sedimentation**: the process of forming or settling out of transported soil particles. Sedimentation occurs when the velocity of water or wind in which soil particles are suspended is slowed to a degree and for a period of time sufficient to allow the particles to settle out of suspension, or when the degree of slope is lessened to achieve the same result.

**Senior housing**: dwellings, either single-family or multi-family, specifically designed for and occupied by

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 21 of 163 PageID #: 30

Town of Thompson's Station

persons 55 or older in at least 80 percent of the occupied units, and adheres to a policy that demonstrates intent to house persons who are 55 or older.

**Setback**: The distance between the face of a building and the nearest property line. Transect zones have both minimum and maximum setbacks, while use zones have only minimum setback requirements.

**Shall**: mandatory.

**Shopfront**: a private frontage conventional for retail use with substantial glazing wherein the facade is aligned close to the frontage line with the building entrance at sidewalk grade.

**Sidewalk**: the paved section of the public frontage dedicated exclusively to pedestrian activity. (Syn. walkway)

**Sign**: any identification, description, illustration, or device, illuminated or non-illuminated, that is visible from a public right-of-way or is located on private property and visible to the public and which directs attention to a product, place, activity, person, institution, business, message or solicitation, including any permanently installed or situated merchandise, with the exception of window displays, and any letter, numeral, character, figure, emblem, painting, banner, pennant, placard, or temporary sign designed to advertise, identify or convey information.

    **Auxiliary Sign**: A sign that provides special information such as direction, sales information, hours of operation, or warning. No names, name brands, or information regarding product lines or services are included.

    **Awning Sign**: A sign that is attached to an awning.

    **Bandit Sign**: an illegal sign placed within a public right-of-way, public property or on private property that is visible from a public right of way or public property intended to advertise, notify or otherwise communicate any commercial message. Bandit signs shall include lawn signs, snipe signs or any other similar signs.

    **Banners or Pennants**: A sign that is made of fabric or flexible material that is mounted to a pole and moves with the wind.

    **Billboard**: A permanent sign that provides off-site advertisement or display.

    **Blade Sign:** a sign made from rigid material mounted perpendicular to a building wall with one side attached or supported by a device extending from a building wall.

    **Canopy Sign**: A sign that is attached to a canopy or other covered walkway to commercial uses.

    **Campaign Signs**: A sign that is designed to influence the passage or defeat of any measure on a ballot or to influence voters with respect to the nomination, election, defeat, or removal of a candidate from public office at any national, state or local election.

    **Changeable Copy Sign**: A sign that is characterized by changeable copy, letters, symbols or numbers.

    **Directional Sign**: An off-site sign located near or at major intersections to provide general directional guidance to major destinations of broad public interest.

    **Display Case or Display Case Sign**: A glazed enclosure for the display of directories or printed materials.

    **Electronic Sign:** A sign which uses an electronic or computer or functionally similar means to display messages, symbols or graphics.

    **Fuel Pricing Sign**: A sign indicating and limited to the brand or trade name, method of sale, grade identification, and price per gallon of gasoline or any other type of vehicle fuel offered for sale.

    **Future Development Sign**: A sign which announces a proposed development.

    **Hand Held Sign**: A sign that is held by or otherwise mounted on a person.

    **Illegal Sign**: A sign which is not approved, prohibited, is not exempt, does not comply with the requirements set forth by the Sign Ordinance.

    **Marquee Sign**: A canopy or roof-like projection over the entrance to a theater, hotel, or other building, usually bearing a sign on its face or sides.

    **Monument Sign**: A self-supporting sign located on a base installed at grade and has no air space, columns, or supports visible between the ground and bottom of the sign.

**Painted Sign**: A sign or information that is painted directly on the wall face of a building.

**Portable Sign**: A sign mounted on a frame and/or chassis which is designed for easy and repeated relocation.

**Projecting Sign**: A sign which is attached to and projects perpendicular from a structure or building face.

**Pylon Sign**:  An on-site sign that is separated from the ground and supported by one or more poles, pole covers or columns.

**Real Estate Sign**: A temporary sign used for the sole purpose of displaying information regarding the sale, rental or lease of a property or buildings on a site.

**Roof Sign**: A sign mounted and supported by the roof of any building or structure.

**Special Event Banner/Sign**: A temporary sign or banner publicizing a special purpose, event or occasion.

**Snipe Sign**: An off-premises sign which is tacked, nailed, posted, pasted,  glued, or otherwise attached to trees, poles, stakes, fences, or to other objects.

**Suspended Sign**: A small, pedestrian-oriented sign that projects perpendicular from a structure such as a canopy.

**Temporary Sign**: A sign intended to be displayed for a limited period of time.

**Wall Sign**: a wall area of a non-residential building built along the entire width of a principal or secondary frontage allocated for the placement of a sign above a shopfront or at the cornice.

**Window Sign**: A sign, graphic, or design which is painted or mounted or otherwise displayed within a window area.

**Yard Sign**: A small freestanding sign that is not a monument sign. A yard sign is typically supported by one or two pole-like supports, and rises to head-height or below.

**Slip Lane**: an outer vehicular lane or lanes of a thoroughfare, designed for slow speeds and separated from inner lanes that carry higher speed traffic. (Syn: access lane, slip road.)

**Solar collection system**: a panel or solar energy device which is utilized for the collection, storage and distribution of solar energy resources.

**Solar farm**: energy generation facilities utilizing a solar collection system for the primary purpose of converting solar energy to electricity.

**Special Exception**: a ruling that would permit a practice that is not consistent with a specific provision of this ordinance but is justified by its Intent.

**Special flood hazard area**: the land in the floodplain within a community subject to a one percent or greater chance of flooding in any given year. The area may be designated as Zone A on the FHBM. After detailed rate-making has been completed in preparation for publication of the FIRM, Zone A usually is refined into Zones A, AO, AH, A1-30, AE or A99.

**Special hazard area**: an area having special flood, mudslide (i.e., mudflow) and/or flood-related erosion hazards, and shown on an FHBM or FIRM as Zone A, AO, A1-30, AE, A99, or AH.

**Special requirements**: provisions for a-grid, b-grid, required retail frontage, build-to lines, terminated vistas, or cross block passages on a concept plan.

**Square**: a civic space type designed for unstructured recreation and civic purposes, spatially defined by building frontages and consisting of paths, lawns and trees, formally disposed.

**Start of construction**: includes substantial improvement, and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, rehabilitation, addition, placement, or other improvement was within 180 days of the permit date. The actual start means either the first placement of permanent construction of a structure (including a manufactured home) on a site, such as the pouring of slabs or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; and includes the placement of a manufactured home on a foundation. Permanent construction does not include initial land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways; nor does it include excavation for a basement, footings, piers, or foundations or the erection of

20

temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds, not occupied as dwelling units or not part of the main structure. For a substantial improvement, the actual start of construction means the first alteration of any wall, ceiling, floor, or other structural part of a building, whether or not that alteration affects the external dimensions of the building.

**State coordinating agency**: the Tennessee Department of Economic and Community Development, as designated by the Governor of the State of Tennessee at the request of FEMA to assist in the implementation of the NFIP for the State.

**Stoop**: a private frontage wherein the facade is aligned close to the frontage line with the first story elevated from the sidewalk for privacy, with an exterior stair and landing at the entrance.

**Story**: a habitable level within a building by which height is measured, excluding an attic or raised basement.

**Stream**: an area where surface water has produced a water course or channel for the passage of water over time either year round or intermittent.

**Street (ST)**: a local urban thoroughfare of low speed and capacity, and flexible in the types of public frontages they support.

**Streetscreen**: a freestanding wall built along the frontage line, or coplanar with a facade. (Syn: streetwall)

**Structure**: Anything constructed above or below ground, including a gas or liquid storage tank, as well as a manufactured home.

**Subdivider**: Any person who (1) having an interest in land, causes it, directly or indirectly, to be divided into a subdivision or who (2) directly or indirectly, sells, leases, or develops, or offers to sell, lease, or develop, or advertises for sale, lease, or development, any interest, lot, parcel site, unit, or plot in a subdivision or who (3) engages, directly or indirectly, or through an agent in the business of selling, leasing, developing, or offering for sale, lease, or development a subdivision or any interest, lot, parcel, site, unit, or plot in a subdivision or who (4) is directly or indirectly controlled by or under direct or indirect common control with any of the foregoing.

**Subdivision**: the division of a tract or parcel of land into two (2) or more lots, sites, or other divisions requiring new street or utility construction, or any division of less than five (5) acres for the purpose, whether immediate or future, of sale or building development, and includes resubdivision and when appropriate to the context, relates to the process of resubdividing or to the land or area subdivided. (See Section 13-4-301, Tennessee Code.)

**Subdivision, Major**: a subdivision of a lot, tract, or parcel into five (5) or more lots.

**Subdivision, Minor**: a subdivision of a lot, tract, or parcel into no more than four (4) lots.

**Substantial damage**: damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed fifty percent (50%) of the market value of the structure before the damage occurred.

**Substantial improvement**: any reconstruction, rehabilitation, addition, alteration or other improvement of a structure in which the cost equals or exceeds fifty percent (50%) of the market value of the structure before the "start of construction" of the initial improvement. This term includes structures which have incurred "substantial damage", regardless of the actual repair work performed. The market value of the structure should be (1) the appraised value of the structure prior to the start of the initial improvement, or (2) in the case of substantial damage, the value of the structure prior to the damage occurring. The term does not, however, include either: (1) Any project for improvement of a structure to correct existing violations of State or local health, sanitary, or safety code specifications which have been pre-identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions and not solely triggered by an improvement or repair project or; (2) Any alteration of a "historic structure", provided that the alteration will not preclude the structure's continued designation as a "historic structure".

**Substantial Modification**: alteration to a building that is valued at more than 50% of the replacement cost of the entire building, if new.

**Substantially improved existing manufactured home parks or subdivisions**: the repair, reconstruction, rehabilitation or improvement of the streets, utilities and pads equals or exceeds fifty percent (50%) of the value of the streets, utilities and pads before the repair, reconstruction or improvement commenced.

**Swale**: a low or slightly depressed natural area for drainage.

**Terrace**: A frontage wherein the facade is set back from the frontage line by an elevated terrace or a sunken lightwell. This type buffers residential use from urban sidewalks and removes the private yard from public encroachment.

**Third Place**: a term used in the concept of community building to refer to social surroundings separate from the two usual social environments of home and work-place. Criteria for a third place include the following: highly accessible, proximate for many within walking distance, involve regulars, and inexpensive food and drink. Coffee shops and cafes are often used as a neighborhood's third place.

**Thoroughfare**: a way for use by vehicular and pedestrian traffic and to provide access to lots and open spaces, consisting of vehicular lanes and the public frontage.

**Thoroughfare Assembly**: the result of the public frontage elements assembled with the elements within a right-of-way.

**Thoroughfare Network**: an interconnected network of vehicular, pedestrian and bicycle mobility.

**Tow yard**: an outdoor storage yard for vehicles on a temporary basis.

**Town**: the Town of Thompson's Station, Tennessee, or a community unit type (TWN) structured by more than one standard pedestrian shed oriented toward a mixed use center or corridor, and in the form of a higher intensity settlement near a transportation route.

**Town Planner**: Such person designated by the town administrator to be responsible for enforcing the provisions of these regulations.

**Transect**: a cross-section of the environment showing a range of different habitats. The rural-urban transect of the human environment used in this ordinance is divided into five transect zoning districts. These zoning districts describe the physical form and character of a place, according to the intensity of its land use.

**Turning Radius**: the curved edge of a thoroughfare at an intersection, measured at the inside edge of the vehicular tracking. The smaller the turning radius, the smaller the pedestrian crossing distance and the more slowly the vehicle is forced to make the turn.

**Utility Equipment**: Includes poles, support towers, wires, conductors, circuits, guys, stubs, platforms, cross arms, braces, transformers, insulators, cut-outs, switches, communication circuits, appliances, attachments and appurtenances used or useful in supplying electrical, natural gas, water, communication or similar associated services to residential areas within the planning region of the Town.

**Variance**: is a grant of relief from the requirements of this ordinance.

**Vehicular Lane**: the portion of a thouroughfare which is occupied by vehicles, usually the moving lanes and parking lanes. The vehicular lane together with the walkway fill the right-of-way.

**Village (VIL)**: a community unit type structured by a standard pedestrian shed oriented toward a common destination consisting of a mixed use center or corridor, and in the form of a medium-sized settlement near a transportation route. (Syn: neighborhood.)

**Violation**: the failure of a structure or other development to be fully compliant with the community's floodplain management regulations. A structure or other development without the elevation certificate, other certification, or other evidence of compliance required in this ordinance is presumed to be in violation until such time as that documentation is provided.

**Water surface elevation**: the height, in relation to the National Geodetic Vertical Datum (NGVD) of 1929, the North American Vertical Datum (NAVD) of 1988, or other datum, where specified, of floods of various magnitudes and frequencies in the floodplains of riverine areas.

**Wireless communications facilities**: a tower, pole or similar structure that supports any telecommunications antenna operated for commercial purposes.

**Woodlands**: an area characterized by dense and extensive tree cover.

**Worship facility**: a building or a portion thereof which is used by a religious institution for worship services and customarily incidental functions

Town of Thompson's Station

**Walkway**: the portion of the thoroughfare dedicated exclusively to pedestrian activity. The walkway includes sidewalks and the planting areas of the streetscape.(Syn. Sidewalk)

**Zoning Map**: the official map or maps that are part of the zoning ordinance and delineate the boundaries of individual zoning districts. See regulating plan.

## ARTICLE 2   SECTOR PLAN

The sector plan and the community types allocated within support §1.2 Intent by allocating each community type to one or more suitable sectors, in locations suitable with respect to transportation and adjacent development, and by ensuring that each community type is of a size and internal design suitable to its location and surroundings.

### 2.1   Sector Plan Adopted.

The Board has adopted the Sector Plan in support of the General Plan. The Sector Plan prescribes the community types that are permitted in each growth sector. See Table 2.1 Community Types Permitted in Sectors.

#### TABLE 2.1   COMMUNITY TYPES PERMITTED IN SECTORS

| COMMUNITY TYPE → <br> SECTOR ↓ | FARM | HAMLET | VILLAGE | TOWN | RESIDENTIAL SUBDIVISION | WORKPLACE | COMMERCIAL CENTER |
|---|---|---|---|---|---|---|---|
| O1 | | | | | | | |
| O2 | P | P | | | P | | |
| G1 | P | P | P | | P | P | P |
| G2 | P | | P | | P | P | P |
| G3 | P | | | P | | | |

Key: "P" is permitted by zoning.

### 2.2   Community Types.

The community types support §1.2 Intent, by regulating community types as uses permitted within certain locations. These community types are regulated by size, use, and intensity suitable for allocation to sectors and site conditions within the Town.

2.2.1   General.

    a.   The characteristics of each community type are listed below, and shall be allocated to the sectors indicated in Table 2.1 Community Types Permitted in Sectors.

    b.   Each community type shall have services and be located per Table 2.2 Community Types, Criteria

    c.   Each community type shall have the characteristics required by Table 2.3 Community Types, Areas and Civic Space, and in this section. The Planning Commission's recommendation to approve or deny the application shall include a determination as to whether the proposed development, if developed according to the plans and information provided, will have the corresponding characteristics.

### TABLE 2.2   COMMUNITY TYPES, CRITERIA

| CRITERIA →<br>COMMUNITY TYPES ↓ | WASTEWATER SERVICE | TRANSPORTATION ADJACENCY | COMMUNITY ADJACENCY |
|---|---|---|---|
| FARM | Optional | Not Applicable | Not Applicable |
| HAMLET | Optional | Not Applicable | Not Applicable |
| VILLAGE | Required | Should be within 1/2 mile of junctions between principal arterials | Should be within 1/4 mile of existing residential or commercial development |
| TOWN | Required | Adjacent to or on both sides of at least one junction between principal arterials | Should be within 1/8 mile of existing or proposed residential and commercial development |
| RESIDENTIAL SUBDIVISION | Required | Should be within 1/2 mile of junctions between principal arterials | Should be within 1/4 mile of existing residential or commercial development |
| WORKPLACE | Required | Adjacent to or on both sides of a principal arterials | Not Applicable |
| COMMERCIAL CENTER | Required | Adjacent to or on both sides of a principal arterials within 1/4 mile of a highway interchange | Not Applicable |

### TABLE 2.3   COMMUNITY TYPES, AREAS AND CIVIC SPACE

| STANDARDS<br>COMMUNITY TYPES | SIZE (ACRES) | TYPE OF MAIN CIVIC SPACE | CIVIC SPACE % OF AREA | ZONING DISTRICTS (PERCENT OF COMMUNITY AREA) | | | |
|---|---|---|---|---|---|---|---|
| | | | | T1 OR T2 | T3 | T4 | T5 |
| FARM | Unlimited | N/A | N/A | | | | |
| HAMLET | 10 – 60 | Green or Square | 0 - 5% | 60% min. | 10 - 20% | 10 - 20% | 0 - 10% |
| VILLAGE | 40 – 200 | Green, Square or Plaza | 10-20% | 40% min. | 0-30% | 30-60% | 0-15% |
| TOWN | 40 - 200 | Square or Plaza | 5-15% | N/A | 0-20% | 40-70% | 10-25% |
| RESIDENTIAL SUBDIVISION | Varies | Green, Square or Plaza | 5 - 10% | 45% min. | N/A | N/A | N/A |
| WORKPLACE | Varies | Optional | 5 - 10% | N/A | N/A | N/A | N/A |
| COMMERCIAL CENTER | Varies | Square or Plaza | 5 - 10% | N/A | N/A | N/A | N/A |

(1) At least 60% of the area of a hamlet shall consist of land in either or both the T1 or T2 zoning districts.

(2) The land to be dedicated as a main civic space shall be assigned to an appropriate zoning district per Table 3.1 Civic Space Types and Table 4.1 Land Use and Building Type.

(3) Minor subdivisions may be exempt from the requirement for designated open space upon approval of the Planning Commission.

2.2.2   Farmland.

    a.   The purpose for identifying farmland as a community type is to support §1.2 Intent. For this purpose, farmland is allocated within the sector plan.

    b.   Farmland is unstructured by pedestrian sheds, and is to be located on suitably zoned land. (See Table 4.1 Land Use and Building Type)

2.2.3   Residential Subdivision, Workplace, Commercial Center.

    a.   The purpose for identifying residential subdivisions, workplaces, and commercial centers as com-

munity types is to support §1.2 Intent, primarily by ensuring that single use districts are regulated as units within the sector plan.

b. The designation of residential subdivisions, workplaces, and commercial centers shall be reserved only for land uses that by their intrinsic function, layout, or location cannot conform to one of the mixed-use community types. (See §2.2.4 Mixed-use Community Types, Design.)

c. A residential subdivision, workplace, or commercial center may be a subdivision unstructured by pedestrian sheds, and shall be permitted only on land within the G2 sector of the General Plan. If a one of these types is to be designated on land that is in another sector, it shall require a General Plan amendment.

2.2.4    Mixed-use Community Types, Design.

Hamlets, villages, and towns are termed "mixed-use community types." They shall be designed according to the following procedure:

a. Structure of a mixed-use community type. The land area of each mixed-use community type shall be allocated according to the percentages of land area in Table 2.3 Community Types, Areas and Civic Space, except that a town shall be aggregated from 2-3 community types per §2.2.7 Town.

b. Structure and placement of a pedestrian shed. A pedestrian shed is a notional circle with a radius of 1/4th mile. Each pedestrian shed is placed on the site of a community type. The pedestrian shed should be located according to existing conditions, such as traffic intersections, adjacent developments, transit stations, and natural features.

c. Adjustment. Each pedestrian shed shall then be adjusted to include the land falling outside it or between itself and other pedestrian sheds under the same application, but shall not exceed the size limitations in Table 2.3 Community Types, Areas and Civic Space The adjusted pedestrian shed(s) or sheds shall then become(s) the boundary of its community type.

d. Transect zoning districts. The Transect zoning district standards shall be allocated to the community type in the percentages specified in Table 2.3 Community Types, Areas and Civic Space

e. Civic space. (1) A main civic space shall be assigned to each mixed-use community type per Table 2.3 Community Types, Areas and Civic Space (2) The land on which the civic space is to be located shall be assigned to a zoning district that permits the civic space, per Table 3.1 Civic Space Types and Table 4.1 Land Use and Building Type (3) The remaining acreage of the community type required to be assigned as civic space shall be computed per the percentage indicated in Table 2.3 Community Types, Areas and Civic Space (4) This remaining acreage shall then be assigned to one or more of the civic spaces of Table 3.1 Civic Space Types. (5) The land on which that/those civic space(s) is/are to be located shall then be assigned to corresponding zoning district(s) within the mixed-use community type per Table 3.1 Civic Space Types and Table 4.1 Land Use and Building Type (6) Where a civic space is permitted in more than one zoning district, the zoning district may be assigned from any of the zoning districts in which the civic space is permitted.

f. Subdivision Design Standards for Community Types. Each community type shall conform to Article 3 Subdivision Regulations.

g. A mixed-use community shall have the wastewater services, types of civic spaces, and the percentages of land allocated to civic space and Transect zoning districts specified in Table 2.2 Community Types, Criteria

2.2.5    Hamlet

a. A hamlet is a mixed-use community type.

b. A hamlet shall be structured by one pedestrian shed.

c. A hamlet shall have a common destination such as a general store, meeting hall, schoolhouse, and/or place of worship.

26

    d.    A minimum of 60% of the area of the hamlet shall be permanently set aside as the hamlet's "undeveloped portion," and the balance shall be its "developed portion." The undeveloped portion shall be exclusively for agricultural uses or any uses permitted in the T1 or T2 zoning districts. This area may also be used for wastewater drip fields.

    e.    The undeveloped portion shall separate the developed portion from adjacent developed land. The undeveloped portion shall be configured as contiguous area.

2.2.6    Village.

    a.    A village is a mixed-use community type.

    b.    A village shall be structured by one or two pedestrian shed(s).

    c.    A village shall have a common destination such as a general store, café, coffee shop, meeting hall, schoolhouse, and / or place of worship.

    d.    A minimum of 40% of the area of the village shall be permanently set aside as the village's "undeveloped portion," and the balance shall be its "developed portion." The undeveloped portion shall be exclusively for agricultural use or any uses permitted in the T1 or T2 zoning districts. This area may also be used for wastewater drip fields.

    e.    The undeveloped portion shall separate the developed portion from adjacent developed land. The undeveloped portion shall be configured as contiguous area.

2.2.7    Town.

    a.    A town is a mixed-use community type.

    b.    A town shall be aggregated of a total of 2-3 villages that will, at completion, match the criteria for the individual community types in Table  2.2 Community Types, Criteria

    c.    A town shall have a common destination for each pedestrian shed such as a main street, café, coffee shop, meeting hall, schoolhouse, and / or place of worship.

## ARTICLE 3   SUBDIVISION REGULATIONS

These subdivision regulations are intended to support §1.2 Intent, by ensuring that the development of land is in a form supporting the intents of §1.2.4 The block and the building, and §1.2.11 Health and safety. These regulations are intended to accomplish this primarily by ensuring that the lots, blocks and thoroughfares engender compact and interconnected development where appropriate, and that adequate civic spaces and buildings are convenient to their communities.

### 3.1   General Provisions

#### 3.1.1   Policy

It is hereby declared to be the policy of the Planning Commission to consider subdivision of land and development of a subdivision as subject to control of the jurisdictional area for orderly, planned, and efficient physical and economical development. Land to be subdivided shall be of such character that it can be used for building purposes without danger of fire, flood, or other menace.

Land shall not be subdivided until proper provisions have been made for drainage, water, sewerage, telecommunications, other public utilities, and for other required public services.

This Article shall supplement and facilitate enforcement of the provisions and standards contained in Article 4 Zoning.

#### 3.1.2   Previously Approved Subdivisions

a.   Unexpired Approval

The approval granted on any preliminary or final plat granted by the Thompson's Station Planning Commission prior to the effective date of these regulations shall remain in force and effect for the time period stipulated by the regulations under which such approval was first granted and as amended prior to adoption of this revision.

#### 3.1.3   Expired Approval

a.   For all plans or plats approved prior to January 1, 2015, in any instance where the period of concept plan or preliminary approval shall have passed, development and construction of the subdivision shall proceed only under one of the three (3) options listed as follows:

i.   The Planning Commission may grant up to three (3) one (1) year extensions to allow the subdivision to be developed under the terms of the Subdivision Regulations in effect at the time of the preliminary approval, or

ii.   The Planning Commission may grant up to three (3) one (1) year extensions under the condition the subdivision be developed and constructed according to any new regulations or standards enacted since preliminary approval, or

iii.   The Planning Commission may declare the preliminary approval null and void and require that a new plat be presented subject to all laws and provisions of the regulations that are in effect at the time such action is considered.

b.   Plans or plats approved after December 31, 2014 shall be regulated per T. C. A. §13-4-310.

#### 3.1.4   Filing of Previously Approved Plats

All previously approved final plats shall be filed with the county register's office within six (6) months following adoption of these subdivision regulations. In the event the owner fails to file a plat within the time period stipulated herein the approval shall become void and no building permit shall be issued for any lot located therein until action is taken to reinstate the plat. All final plats approved under these regulations shall be filed with the county register's office within six (6) months following final approval.

#### 3.1.5   Amendments

a.   Enactment

For the purpose of providing for the public health, safety, and general welfare the Planning Commission may from time to time amend these regulations. Before adoption of any amendment to these regulations, a public hearing thereon shall be held by the Planning Commission, as required by Chapters 3 and 4, Title 13, Tennessee Code.

### 3.1.6   Vacation of Plats

Any plat, or any part of any plat, may be vacated by the owner of the premises at any time before sale of any lot described on the plat by a written instrument to which a copy of such plat shall be attached declaring the plat, or part of the plat, to be vacated. In approving the vacation of plats, the Planning Commission shall follow the same procedure for approval of plats. The governing body may reject any such instrument that abridges or destroys any public rights in any of its public uses, improvements, or public ways. Such an instrument shall be executed, acknowledged, or approved, and duly recorded or filed; the instrument shall operate to void the recorded plat and divest all public rights in the public ways and public grounds and all dedications described in such plat. When any lot or lots have been sold, the plat may be vacated in the same manner only if all of the owners of all lots in such platted area join in the execution of such writing.

### 3.1.7   Civil Enforcement

Appropriate actions and proceedings may be taken in equity

- to prevent any violation of these regulations,
- to prevent unlawful construction,
- to recover damages;
- to restrain, correct, or abate a violation, or
- to prevent illegal occupancy of a building, structure, or premise.

### 3.1.8   Repeal of Previous Regulations

Upon the adoption and effective date of these regulations, the Subdivision Regulations of Thompson's Station, Tennessee, previously adopted, as amended, are repealed.

### 3.1.9   Fees for Plat Review

Any individual who is seeking to subdivide property within the jurisdictional area where these regulations are applicable shall pay such filing and review fees as required by the town. These fees shall be paid at the time of submittal of the application for plat review and approval.

## 3.2   Character of the Land

### 3.2.1   Land Unsuitable for Development

Land which the Planning Commission finds to be unsuitable for subdivision or development due to flooding, improper drainage, steep slopes, rock formations, adverse earth formations or topography, utility easements, or other features which would be harmful to the safety, health, and general welfare of inhabitants of the land and surrounding areas shall be designated as "conservation lands" and may be utilized as provided in §3.2.2 Use of Conservation Lands. Land included within this category shall be as specified below or by the Tennessee Department of Environment and Conservation, the United States Environmental Protection Agency, or the Town Engineer:

- a. wetlands and land that is generally inundated (land under ponds, lakes, creeks, etc.),
- b. all of the floodway and floodway fringe as shown on official Federal Emergency Management Agency maps,
- c. land with slopes exceeding twenty-five (25) percent, or soils subject to slumping,
- d. land situated within sink holes and other karst areas,
- e. land under permanent easement prohibiting future development (including easements for drainage, access, and utilities, including telecommunications).

29

3.2.2    Use of Conservation Lands

It is intended that, within residential subdivisions, the areas indicated in §3.2.1 Land Unsuitable for Development shall be designated as open space, to facilitate easement monitoring and enforcement, and to promote appropriate management by a single entity according to approved land management standards.

All undivided open space shall be restricted from further subdivision through a permanent conservation easement, in a form acceptable to the Town and duly recorded in the office of the County Register of Deeds. Any lot capable of further subdivision that contains "Land Unsuitable for Development" may be restricted so as to prohibit such action.

Stormwater management ponds or basins may be located within these areas. If a homeowners association is to be established, stormwater management ponds may be included within the areas preserved as "conservation lands."

## 3.3    Resource Management

The section provide standards for the protection of natural resources (before, during, and after the development process) to ensure the efficient integration of new development into the community while ensuring to protect the rich resources of the community.

3.3.1    Resource Protection and Site Performance Standards

Resource protection and site performance standards shall apply to all subdivisions and development in all districts, thereby ensuring that the desired character of Thompson's Station is preserved. The standards in this Article both protect all natural resources and require the provision of buffer-yards and landscaping in order to further protect and enhance the natural environment in Thompson's Station.

   a.   Excepting single-family residential building requests, a resource inventory map must be prepared and submitted with any development proposal located in Thompson's Station. This resource inventory map shall identify the following natural resources: floodplains, wetlands, woodlands, drainage-ways, slopes, slippage soils, sinkholes, hilltops, ridgelines, mined or otherwise disturbed areas, and historical and cultural features.

   b.   Development that is impacted by the above natural resources shall utilize design strategies that respect and protect the sites natural resources. Individual lots impacted by these natural resources are subject to critical lot designations. Critical lots require additional information to ensure any construction on the site meets strict criteria for health, safety and welfare, and therefore; lots so designated, shall be required to prepare a plan prepared by a professional licensed in the area of expertise of the site specific issues that address specific natural resource issues. Approval of critical lots will be dependent on the design features that are utilized to minimize the grading and protect natural and cultural resources.

3.3.2    Wetlands

The resource inventory map must identify all potential wetland areas. The Tennessee Department of Environment and Conservation and/or the U. S. Army Corp of Engineers must make a determination on any possible wetland areas prior to the approval of any proposed concept plan. All wetland areas as protected or regulated by the Corp shall be designated as permanent common open area and must be incorporated into the overall storm water drainage plan. Any modification or mitigation of identified wetlands shall meet all applicable state and federal regulations in addition to approval of a special use exception by the Thompson's Station Board of Zoning Appeals. Generally the modification or mitigation of wetlands and subsequent use of said areas is discouraged.

3.3.3    Woodlands

See 3.3.14 Tree Protection.

3.3.4    Streams/Drainage-ways

For every development proposal, there must be a delineation of all streams as classified under the Tennessee Department of Environment and Conservation (TDEC). These streams must have buffers as required by

Town of Thompson's Station

TDEC in their "General NPDES Permit for Discharges of Stormwater Associated with Construction Activities" manual, latest edition. A streams shall have a minimum of 30 feet from top of bank buffer zone unless the stream is an impaired stream as defined by TDEC, then the buffer zone shall be increased to 60 feet from top of bank. The resource inventory map must identify and classify all on site streams/drainage-ways. Streams may not be altered except as permitted by TDEC through the Aquatic Resources Alteration (ARAP) permit process. Modification of drainage-ways shall be discouraged except for necessary utility and roadway crossings. Those drainage-ways not regulated by TDEC may be altered via the special use exception process as identified for modifications to floodplains and wetlands. All drainage-ways shall be incorporated into the overall storm-water management plan.

3.3.5    Slippage Soils

The resource inventory map must include the soils classification as identified by a licensed soil scientist or as identified by the U. S. Geological Survey maps. Any soils with identified slippage characteristics must be identified and overlaid on the slope analysis map. Construction on areas impacted by a combination of slippage soils and slopes in excess of 7% must have foundation and grading plans approved by the Town's Engineer or Engineering Consultant prior to issuance of building permits.

3.3.6    Sinkholes

The resource inventory map must include all site areas characterized by closed depressions (with or without a drainage throat). The disturbance, alteration or mitigation of such features shall be discouraged. All closed depressions shall be included in required or common open space along with a 50 foot buffer circling the highest contour of the closed depression. All sinkholes shall be incorporated into the overall storm-water management plan.

3.3.7    Hillside and Ridgeline Development

The resource inventory map must include a slope analysis that identifies all natural slopes in excess of 15% on the project site and all ridgelines. Disturbance, grading and development of natural slopes exceeding 15% including hilltop areas shall be discouraged. Any lot exceeding 15% slope shall be designated as a critical lot. Any development that will result in more than 5% critical lots shall require additional preconstruction evaluation including a mass grading plan to be submitted during the preliminary plat phase. Design features such as larger lots may be required to reduce disruption and encourage lots to utilize existing contours reducing overall impacts. All proposed construction on slopes in excess of 15% shall submit engineered foundation and grading plans and an engineering report to address all site specific issues for review and approval by the Town's Engineer or Engineering consultant prior to issuance of a building permit. Disturbance, grading and development of ridgeline areas shall be discouraged. Any proposal for ridgeline development must be granted a special use exception by the BZA. Any structures allowed via the special exception process shall be limited to one story and may not exceed 25 feet at the highest point. Disturbance, grading and development of natural slopes exceeding 25% shall be prohibited. Slopes exceeding 25% may be counted toward meeting open space requirements.

3.3.8    Mined or Disturbed Areas

Because of the history of phosphate and other mining activities, it is incumbent on the developer to assess any previously mined or disturbed areas and to include those areas on the natural resource assessment map. Any mined or disturbed areas may be modified and developed given review and approval of the grading and drainage plan by the Town's Engineer or Engineering Consultant. All lots with building envelopes encroaching into previously disturbed areas may also require engineered site plans and engineered foundations.

3.3.9    Historical/Cultural Components

The resource inventory map must include all areas impacted by historical and cultural resources. These include historical and/or architecturally significant structures, existing roadway features (tree canopies, cross section & alignment), cemeteries, historic and prehistoric archeological sites.

3.3.10   Threatened or Endangered Flora/Fauna

For every development proposal, there must be an effort made to determine whether a given site contains

threatened or endangered flora and fauna or features, area and habitat that provides for the maintenance and propagation said species.

### 3.3.11   Resource Management

The management of storm water run-off and erosion control are governed by the provisions of the following Sections.

### 3.3.12   Storm Water Runoff

a. Each development shall provide for the on site or off site detention of excess storm water runoff resulting from that development. For the purpose of this Ordinance, "excess storm water runoff" shall include all increases in storm water resulting from:

    i. An increase in the impervious surface of the site, including all additions of buildings, roads, and parking lots;

    ii. Changes in soil absorption caused by compaction during development;

    iii. Modifications in contours, including the filling or draining of small depressions, alterations of drainage-ways, or re-grading of slopes;

    iv. Destruction of woodland areas;

    v. Alteration of drainage-ways or installation of collection systems to intercept street flows or to replace swales or other drainage-ways;

    vi. Alteration of subsurface flows, including groundwater, dewatering or diversion practices such as curtain drains.

b. Limitation on Storm Water Runoff. No development shall cause downstream property owners, water courses, channels, or conduits to receive storm water runoff from proposed developments at a higher peak flow rate, at higher volumes, or at higher velocities than would have resulted from the same storm event occurring over the site of the proposed development with the land in its natural, undeveloped condition. Flood events to be used in this determination will include the one through 100-year flood.

    i. Undeveloped Condition: shall mean that all the natural retention areas and drainage-ways plus existing farm drainage tiles and highway drainage structures shall be included in the flow calculations.

    ii. Ground Cover: shall be considered to be meadow or grassland, with the exception that forested areas shall be treated as woodlands.

    iii. Channel or Drainage-way Channel: shall mean the channels used to convey the one hundred (100) year drainage flows between successive retention facilities, to retention facilities, and from the property.

c. Storage Capacity. All storm water storage facilities shall be designed to accommodate all runoff caused by the development in excess of the runoff that would have resulted from the site if left in its natural, undeveloped condition for the range of floods from the one through 100-year events. In the event that proposed and/or projected development is likely to increase the frequency and/or duration of existing flooding or create new flooding, the developer will provide solutions to such problems. Solutions may include but are not limited to regionalized detention/retention via either on or off-site facilities that reduce total basin runoff at the damage centers or acceptable channel improvements.

d. Design Regulations. All detention facilities and improvements required by this section shall comply with the following regulations.

    i. Storage: Wet or dry basins, reservoirs, parking areas, or rooftop storage facilities may be utilized for storm water runoff.

    ii.   Outlet Control Structures. Outlet control structures shall be designed as simply as possible and shall operate automatically. They shall be designed to limit discharges into existing or planned downstream channels or conduits so as not to extend existing flow off the site in its natural condition.

    iii.   Spillway. Emergency overflow facilities shall be provided unless inflow is controlled to divert flows when the basin is at capacity.

    iv.   Dry Bottom Basin. For basins designed without permanent pools:

       a)   Interior Drainage. Provisions must be made to facilitate interior drainage. These must include the provision of natural grades to outlet structures, longitudinal and transverse grades to perimeter drainage facilities, or the installation of subsurface drains.

       b)   Multipurpose Features. These may be designed to serve secondary purposes for recreation, open space, or other types of use that will not be adversely affected by occasional or intermittent flooding.

       c)   Cleaning. The basins shall be designed for periodic cleaning and removal of sediments in an appropriate manner.

    v.   Wet Basins. For basins designed with permanent pools:

       a)   Depth for Fish. If fish are used to help keep the basin clean, at least one quarter (.25) of the area of the permanent pool must have a minimum depth of ten (10) feet.

       b)   Emptying Provisions. For emergency purposes, cleaning, or shoreline maintenance, facilities shall be provided or plans prepared for the use of auxiliary equipment to permit emptying and drainage.

       c)   Pollution Abatement. Aeration facilities may be required if the quality of the influent and detention time result in a lowering of dissolved oxygen content in the basin.

       d)   Slopes. Approach slopes shall be at least six to one (6:1) but not more than three to one (3:1) and shall be at least four (4) feet to six (6) feet wide and slope gently toward the basin. The side slopes shall be of non-erosive material with a slope of 1:1 or flatter. The ledge shall be four (4) feet to six (6) feet wide and slope gently toward the shore to prevent people or objects from sliding into deep water. There shall be a freeboard of twelve (12) to eighteen (18) inches above the high-water elevation on all retention basins. Alternate designs for side slopes may be considered under special circumstances where good engineering practice is demonstrated.

       e)   Cleaning. Basins shall be designed to include sediment traps in all inlets. Sediment traps shall be designed to permit cleaning and maintenance. A basin maintenance plan shall be developed to ensure that basin design depths will be maintained.

    vi.   Building Regulations

       a)   Rooftop Storage. Detention storage requirements may be met by detention on flat roofs. Design specifications of such detention shall be a part of the application. These specifications shall include the depth and volume of storage, design of outlet devices and down drains, elevations of overflow scuppers, design loadings for the roof structure, and emergency overflow provisions. Rooftop storage shall not be permitted to drain directly into sanitary sewers or streets.

       b)   Parking Lot Storage. Paved parking lots may be designed to provide detention. Outlets shall be designed to empty the stored waters slowly, and depths of storage must be limited so as to prevent damage to parked vehicles. Storage areas shall be posted with warning signs and shall be designed to fill to maximum depth in not less than two (2) hours.

  e.   Operation and Maintenance of Facilities

33

    i. The developer, owner or the homeowner's association shall be responsible for maintenance of all on-site detention/retention facilities.

    ii. All types of developments shall form a management entity such as a homeowner's association, trust indenture, or other management entity to be responsible for the long-term operation and maintenance of storm water infrastructure located within the development.

    iii. An engineer shall provide a long term operation and maintenance plan subject to approval by the Town Engineer and recorded with the final plat.

f. Inspection of Facilities. The developer's engineer shall be required to inspect all drainage facilities under construction and certify their compliance with approved plans. The Town's Engineer or Engineering consultant may inspect all drainage facilities while under construction. When facilities are not constructed according to approved plans, the Town has the explicit authority to compel compliance and require correction of construction or require or as-built construction drawings if modifications are acceptable.

g. If the Town's Engineer or Engineering Consultant determines that off-site storm-water detention is preferable to on-site detention, funds in lieu of detention may be required in an amount equivalent to the estimated cost of on-site detention plus land costs.

## 3.3.13 Soil Erosion and Sedimentation Control

a. In order to prevent both soil erosion and sedimentation, a soil erosion and sedimentation control plan shall be required whenever an area greater than 10,000 square feet is disturbed for purposes other than agricultural, and when land located in a stream, channel, or body of water is disturbed.

b. Soil erosion and sedimentation control measures shall be provided to achieve maximum protection of all disturbed land. Measures include minimizing water runoff, amounts and velocities, and retaining sedimentation within the development site as early as possible following disturbances.

## 3.3.14 Tree Protection

a. The resource inventory map must identify all non-invasive trees of 24 inches in caliper and greater measured at 4½ feet above the natural grade of the tree. All clusters of trees and tree rows must also be identified on the inventory map. Removal of mature, indigenous trees in healthy condition is discouraged. During the preliminary plat process, trees that are proposed for removal shall require tree removal approval from the Planning Commission for all trees 24 inches in caliper and greater and replacement trees shall be required at a 1.5:1 ratio for each inch removed. Replacement or relocated trees must be planted on site or Planning Commission approval is required for an off-site location.

b. Approval of removal of trees shall be considered through the preliminary plat process. A licensed arborist or other licensed professional shall prepare a protection plan and mitigation and/or replacement of removed trees. The protection plan shall include a tree inventory which shall document all trees that are 24 inches or greater in diameter that are indigenous to the region.

c. Trees that are designated to remain shall be subject to the following requirements to minimize disturbance to the tree:

    i. All trees that will remain on site shall have protective fencing installed be installed around the dripline of the tree to protect the root system for the tree.

    ii. If earthwork is necessary within the dripline of the protected tree, hand digging shall be required.

    iii. No equipment, supplies or any other material shall be stored within the dripline of any protected trees.

    iv. No dirt or other fill material shall be stockpiled within the dripline.

    v. No signage shall be permitted on any protected tree.

d.  Any protected trees that are damaged by any construction, demolition, grading or other development work shall be evaluated by a licensed arborist or other licensed professional for treatment of the impacted trees. In the event that the tree cannot be saved the tree shall be replaced. All replacement trees shall be similar in size and species approved by the Planning Commission.

## 3.4    Floodplain Regulations

3.4.1    General Provisions

a.  Application

This Ordinance shall apply to all areas within the incorporated area of the Town of Thompson's Station, Tennessee.

b.  Basis for Establishing the Areas of Special Flood Hazard

The Areas of Special Flood Hazard identified in the Town of Thompson's Station, Tennessee, as identified by FEMA, and in its Flood Insurance Study (FIS) and Flood Insurance Rate Map (FIRM), Community Panel Numbers Beginning with map panel number 47187CO330F & including panels: 335F, 340F, 345F, 355F & 365F dated September 29, 2006 along with all supporting technical data, are adopted by reference and declared to be a part of this Ordinance.

c.  Requirement for Development Permit

A development permit shall be required in conformity with this Ordinance prior to the commencement of any development activities.

d.  Compliance

No land, structure or use shall hereafter be located, extended, converted or structurally altered without full compliance with the terms of this Ordinance and other applicable regulations.

e.  Abrogation and Greater Restrictions

This Ordinance is not intended to repeal, abrogate, or impair any existing easements, covenants or deed restrictions. However, where this Ordinance conflicts or overlaps with another regulatory instrument, whichever imposes the more stringent restrictions shall prevail.

f.  Interpretation

In the interpretation and application of this Ordinance, all provisions shall be: (1) considered as minimum requirements; (2) liberally construed in favor of the governing body and; (3) deemed neither to limit nor repeal any other powers granted under Tennessee statutes.

g.  Warning and Disclaimer of Liability

The degree of flood protection required by this Ordinance is considered reasonable for regulatory purposes and is based on scientific and engineering considerations. Larger floods can and will occur on rare occasions. Flood heights may be increased by man-made or natural causes. This Ordinance does not imply that land outside the Areas of Special Flood Hazard or uses permitted within such areas will be free from flooding or flood damages. This Ordinance shall not create liability on the part of the Town of Thompson's Station, Tennessee or by any officer or employee thereof for any flood damages that result from reliance on this Ordinance or any administrative decision lawfully made hereunder.

h.  Penalties for Violation

Violation of the provisions of this Ordinance or failure to comply with any of its requirements, including violation of conditions and safeguards established in connection with grants of variance shall constitute a misdemeanor punishable as other misdemeanors as provided by law. Any person who violates this ordinance or fails to comply with any of its requirements shall, upon adjudication therefore, be fined as prescribed by Tennessee statutes, and in addition, shall pay all costs and expenses involved in the case. Each day such violation continues shall be considered a separate offense. Nothing herein contained shall prevent the Town of Thompson's Station, Tennessee from taking such other

35

lawful actions to prevent or remedy any violation.

3.4.2   Administration

a.   Designation of Ordinance Administrator

The Town Planner is hereby appointed as the Administrator to implement the provisions of this Ordinance.

b.   Permit Procedures

Application for a development permit shall be made to the Administrator on forms furnished by the community prior to any development activities. The development permit may include, but is not limited to the following: plans in duplicate drawn to scale and showing the nature, location, dimensions, and elevations of the area in question; existing or proposed structures, earthen fill placement, storage of materials or equipment, and drainage facilities. Specifically, the following information is required:

i.   Application stage

a)   Elevation in relation to mean sea level of the proposed lowest floor, including basement, of all buildings where Base Flood Elevations are available, or to certain height above the highest adjacent grade when applicable under this Ordinance.

b)   Elevation in relation to mean sea level to which any non-residential building will be floodproofed where Base Flood Elevations are available, or to certain height above the highest adjacent grade when applicable under this Ordinance.

c)   A FEMA Floodproofing Certificate from a Tennessee registered professional engineer or architect that the proposed non-residential floodproofed building will meet the floodproofing criteria in §3.4.3 Provisions for Flood Hazard Reduction.

d)   Description of the extent to which any watercourse will be altered or relocated as a result of proposed development.

ii.   Construction Stage

Within AE Zones, where Base Flood Elevation data is available, any lowest floor certification made relative to mean sea level shall be prepared by or under the direct supervision of, a Tennessee registered land surveyor and certified by same. The Administrator shall record the elevation of the lowest floor on the development permit. When floodproofing is utilized for a non-residential building, said certification shall be prepared by, or under the direct supervision of, a Tennessee registered professional engineer or architect and certified by same.

Within approximate A Zones, where Base Flood Elevation data is not available, the elevation of the lowest floor shall be determined as the measurement of the lowest floor of the building relative to the highest adjacent grade. The Administrator shall record the elevation of the lowest floor on the development permit. When floodproofing is utilized for a non-residential building, said certification shall be prepared by, or under the direct supervision of, a Tennessee registered professional engineer or architect and certified by same.

For all new construction and substantial improvements, the permit holder shall provide to the Administrator an as-built certification of the lowest floor elevation or floodproofing level upon the completion of the lowest floor or floodproofing.

Any work undertaken prior to submission of the certification shall be at the permit holder's risk. The Administrator shall review the above-referenced certification data. Deficiencies detected by such review shall be corrected by the permit holder immediately and prior to further work being allowed to proceed. Failure to submit the certification or failure to make said corrections required hereby, shall be cause to issue a stop-work order for the project.

c.   Duties and Responsibilities of the Administrator

Duties of the Administrator shall include, but not be limited to, the following:

i. Review all development permits to assure that the permit requirements of this Ordinance have been satisfied, and that proposed building sites will be reasonably safe from flooding.

ii. Review proposed development to assure that all necessary permits have been received from those governmental agencies from which approval is required by Federal or State law, including Section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334.

iii. Notify adjacent communities and the Tennessee Department of Economic and Community Development prior to any alteration or relocation of a watercourse and submit evidence of such notification to FEMA.

iv. For any altered or relocated watercourse, submit engineering data/analysis within six (6) months to FEMA to ensure accuracy of community FIRM's through the Letter of Map Revision process.

v. Assure that the flood carrying capacity within an altered or relocated portion of any watercourse is maintained.

vi. Record the elevation, in relation to mean sea level or the highest adjacent grade, where applicable, of the lowest floor (including basement) of all new and substantially improved buildings, in accordance with §3.4.2.b.

vii. Record the actual elevation, in relation to mean sea level or the highest adjacent grade, where applicable to which the new and substantially improved buildings have been floodproofed, in accordance with §3.4.2.b.

viii. When floodproofing is utilized for a nonresidential structure, obtain certification of design criteria from a Tennessee registered professional engineer or architect, in accordance with §3.4.2.b.

ix. Where interpretation is needed as to the exact location of boundaries of the Areas of Special Flood Hazard (for example, where there appears to be a conflict between a mapped boundary and actual field conditions), make the necessary interpretation. Any person contesting the location of the boundary shall be given a reasonable opportunity to appeal the interpretation as provided in this Ordinance.

x. When Base Flood Elevation data and floodway data have not been provided by FEMA, obtain, review, and reasonably utilize any Base Flood Elevation and floodway data available from a Federal, State, or other sources, including data developed as a result of these regulations, as criteria for requiring that new construction, substantial improvements, or other development in Zone A on the Town of Thompson's Station, Tennessee FIRM meet the requirements of this Ordinance.

xi. Maintain all records pertaining to the provisions of this Ordinance in the office of the Administrator and shall be open for public inspection. Permits issued under the provisions of this Ordinance shall be maintained in a separate file or marked for expedited retrieval within combined files.

3.4.3   Provisions for Flood Hazard Reduction

a.   General Standards

In all areas of special flood hazard, the following provisions are required:

i. New construction and substantial improvements shall be anchored to prevent flotation, collapse and lateral movement of the structure;

ii. Manufactured homes shall be installed using methods and practices that minimize flood damage. They must be elevated and anchored to prevent flotation, collapse and lateral movement. Methods of anchoring may include, but are not limited to, use of over-the-top or frame ties to ground anchors. This requirement is in addition to applicable State of Tennessee and local

37

anchoring requirements for resisting wind forces.

iii. New construction and substantial improvements shall be constructed with materials and utility equipment resistant to flood damage;

iv. New construction and substantial improvements shall be constructed by methods and practices that minimize flood damage;

v. All electrical, heating, ventilation, plumbing, air conditioning equipment, and other service facilities shall be designed and/or located so as to prevent water from entering or accumulating within the components during conditions of flooding;

vi. New and replacement water supply systems shall be designed to minimize or eliminate infiltration of flood waters into the system;

vii. New and replacement sanitary sewage systems shall be designed to minimize or eliminate infiltration of flood waters into the systems and discharges from the systems into flood waters;

viii. On-site waste disposal systems shall be located and constructed to avoid impairment to them or contamination from them during flooding;

ix. Any alteration, repair, reconstruction or improvements to a building that is in compliance with the provisions of this Ordinance, shall meet the requirements of "new construction" as contained in this Ordinance;

x. Any alteration, repair, reconstruction or improvements to a building that is not in compliance with the provision of this Ordinance, shall be undertaken only if said non-conformity is not further extended or replaced;

xi. All new construction and substantial improvement proposals shall provide copies of all necessary Federal and State permits, including Section 404 of the Federal Water Pollution Control Act amendments of 1972, 33 U.S.C. 1334;

xii. All subdivision proposals and other proposed new development proposals shall meet the standards of §3.4.3.b;

xiii. When proposed new construction and substantial improvements are partially located in an area of special flood hazard, the entire structure shall meet the standards for new construction;

xiv. When proposed new construction and substantial improvements are located in multiple flood hazard risk zones or in a flood hazard risk zone with multiple Base Flood Elevations, the entire structure shall meet the standards for the most hazardous flood hazard risk zone and the highest Base Flood Elevation.

b. Specific Standards

In all Areas of Special Flood Hazard, the following provisions, in addition to those set forth in §3.4.3.a, are required:

i. Residential Structures

In AE Zones where Base Flood Elevation data is available, new construction and substantial improvement of any residential building (or manufactured home) shall have the lowest floor, including basement, elevated to no lower than one (1) foot above the Base Flood Elevation. Should solid foundation perimeter walls be used to elevate a structure, openings sufficient to facilitate equalization of flood hydrostatic forces on both sides of exterior walls shall be provided in accordance with the standards of this section: "Enclosures".

Within approximate A Zones where Base Flood Elevations have not been established and where alternative data is not available, the administrator shall require the lowest floor of a building to be elevated to a level of at least three (3) feet above the highest adjacent grade (as defined in §1.3 Definitions). Should solid foundation perimeter walls be used to elevate a structure, openings sufficient to facilitate equalization of flood hydrostatic forces on both sides of exterior walls shall be

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 41 of 163 PageID #: 50

provided in accordance with the standards of this section: "Enclosures"

ii.   Non-Residential Structures

In AE Zones, where Base Flood Elevation data is available, new construction and substantial improvement of any commercial, industrial, or non-residential building, shall have the lowest floor, including basement, elevated or floodproofed to no lower than one (1) foot above the level of the Base Flood Elevation. Should solid foundation perimeter walls be used to elevate a structure, openings sufficient to facilitate equalization of flood hydrostatic forces on both sides of exterior walls shall be provided in accordance with the standards of this section: "Enclosures"

In approximate A Zones, where Base Flood Elevations have not been established and where alternative data is not available, new construction and substantial improvement of any commercial, industrial, or non-residential building, shall have the lowest floor, including basement, elevated or floodproofed to no lower than three (3) feet above the highest adjacent grade (as defined in §1.3 Definitions). Should solid foundation perimeter walls be used to elevate a structure, openings sufficient to facilitate equalization of flood hydrostatic forces on both sides of exterior walls shall be provided in accordance with the standards of this section: "Enclosures"

Non-Residential buildings located in all A Zones may be floodproofed, in lieu of being elevated, provided that all areas of the building below the required elevation are watertight, with walls substantially impermeable to the passage of water, and are built with structural components having the capability of resisting hydrostatic and hydrodynamic loads and the effects of buoyancy. A Tennessee registered professional engineer or architect shall certify that the design and methods of construction are in accordance with accepted standards of practice for meeting the provisions above, and shall provide such certification to the Administrator as set forth in §3.4.2.b.

iii.   Enclosures

All new construction and substantial improvements that include fully enclosed areas formed by foundation and other exterior walls below the lowest floor that are subject to flooding, shall be designed to preclude finished living space and designed to allow for the entry and exit of flood waters to automatically equalize hydrostatic flood forces on exterior walls.

a)   Designs for complying with this requirement must either be certified by a Tennessee professional engineer or architect or meet or exceed the following minimum criteria.

1)   Provide a minimum of two openings having a total net area of not less than one (1) square inch for every square foot of enclosed area subject to flooding;

2)   The bottom of all openings shall be no higher than one (1) foot above the finished grade;

3)   Openings may be equipped with screens, louvers, valves or other coverings or devices provided they permit the automatic flow of floodwaters in both directions.

b)   The enclosed area shall be the minimum necessary to allow for parking of vehicles, storage or building access.

c)   The interior portion of such enclosed area shall not be finished or partitioned into separate rooms in such a way as to impede the movement of floodwaters and all such partitions shall comply with the provisions of §3.4.3.b.

iv.   Standards for Manufactured Homes and Recreational Vehicles

a)   All manufactured homes placed, or substantially improved, on: (1) individual lots or parcels, (2) in expansions to existing manufactured home parks or subdivisions, or (3) in new or substantially improved manufactured home parks or subdivisions, must meet all the requirements of new construction.

b)   All manufactured homes placed or substantially improved in an existing manufactured home park or subdivision must be elevated so that either:

1)     In AE Zones, with Base Flood Elevations, the lowest floor of the manufactured home is elevated on a permanent foundation to no lower than one (1) foot above the level of the Base Flood Elevation or

2)     In approximate A Zones, without Base Flood Elevations, the manufactured home chassis is elevated and supported by reinforced piers (or other foundation elements of at least equivalent strength) that are at least three (3) feet in height above the highest adjacent grade (as defined in §1.3 Definitions).

c)     Any manufactured home, which has incurred "substantial damage" as the result of a flood, must meet the standards of §3.4.3.a and §3.4.3.b.

d)     All manufactured homes must be securely anchored to an adequately anchored foundation system to resist flotation, collapse and lateral movement.

e)     All recreational vehicles placed in an identified Special Flood Hazard Area must either:

1)     Be on the site for fewer than 180 consecutive days;

2)     Be fully licensed and ready for highway use (a recreational vehicle is ready for highway use if it is licensed, on its wheels or jacking system, attached to the site only by quick disconnect type utilities and security devices, and has no permanently attached structures or additions), or;

3)     The recreational vehicle must meet all the requirements for new construction.

v.     Standards for Subdivisions and Other Proposed New Development Proposals

Subdivisions and other proposed new developments, including manufactured home parks, shall be reviewed to determine whether such proposals will be reasonably safe from flooding.

a)     All subdivision and other proposed new development proposals shall be consistent with the need to minimize flood damage.

b)     All subdivision and other proposed new development proposals shall have public utilities and facilities such as sewer, gas, electrical, telecommunications, and water systems located and constructed to minimize or eliminate flood damage.

c)     All subdivision and other proposed new development proposals shall have adequate drainage provided to reduce exposure to flood hazards.

d)     In all approximate A Zones require that all new subdivision proposals and other proposed developments (including proposals for manufactured home parks and subdivisions) greater than 50 lots or 5 acres, whichever is the lesser, include within such proposals Base Flood Elevation data (§3.4.3.e).

c.     Standards for Special Flood Hazard Areas with Established Base Flood Elevations and With Floodways Designated

Located within the Special Flood Hazard Areas established in §3.4.1.b, are areas designated as floodways. A floodway may be an extremely hazardous area due to the velocity of floodwaters, debris or erosion potential. In addition, the area must remain free of encroachment in order to allow for the discharge of the base flood without increased flood heights and velocities. Therefore, the following provisions shall apply:

i.     Encroachments are prohibited, including earthen fill material, new construction, substantial improvements or other development within the regulatory floodway. Development may be permitted however, provided it is demonstrated through hydrologic and hydraulic analyses performed in accordance with standard engineering practices that the cumulative effect of the proposed encroachments or new development shall not result in any increase in the water surface elevation of the Base Flood Elevation, velocities, or floodway widths during the occurrence of a base flood discharge at any point within the community. A Tennessee registered professional

engineer must provide supporting technical data, using the same methodologies as in the effective Flood Insurance Study for the Town of Thompson's Station, Tennessee and certification, thereof.

ii. New construction and substantial improvements of buildings, where permitted, shall comply with all applicable flood hazard reduction provisions of §3.4.3.a and §3.4.3.b.

d. Standards for Areas of Special Flood Hazard Zones AE with Established Base Flood Elevations but Without Floodways Designated

Located within the Special Flood Hazard Areas established in Article III, Section B, where streams exist with base flood data provided but where no floodways have been designated (Zones AE), the following provisions apply:

i. No encroachments, including fill material, new construction and substantial improvements shall be located within areas of special flood hazard, unless certification by a Tennessee registered professional engineer is provided demonstrating that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one (1) foot at any point within the community. The engineering certification should be supported by technical data that conforms to standard hydraulic engineering principles.

ii. New construction and substantial improvements of buildings, where permitted, shall comply with all applicable flood hazard reduction provisions of Article V, Sections A and B.

e. Standards for Streams without Established Base Flood Elevations and Floodways (A Zones)

Located within the Special Flood Hazard Areas established in §3.4.1.b, where streams exist, but no base flood data has been provided and where a Floodway has not been delineated, the following provisions shall apply:

i. The Administrator shall obtain, review, and reasonably utilize any Base Flood Elevation and floodway data available from any Federal, State, or other sources, including data developed as a result of these regulations (see 2 below), as criteria for requiring that new construction, substantial improvements, or other development in approximate A Zones meet the requirements of §3.4.3.a and §3.4.3.b.

ii. Require that all new subdivision proposals and other proposed developments (including proposals for manufactured home parks and subdivisions) greater than 50 lots or 5 acres, whichever is the lesser, include within such proposals Base Flood Elevation data.

iii. Within approximate A Zones, where Base Flood Elevations have not been established and where such data is not available from other sources, require the lowest floor of a building to be elevated or floodproofed to a level of at least three (3) feet above the highest adjacent grade (as defined in §1.3 Definitions). All applicable data including elevations or floodproofing certifications shall be recorded as set forth in §3.4.2.b. Openings sufficient to facilitate automatic equalization of hydrostatic flood forces on exterior walls shall be provided in accordance with the standards of §3.4.3.b.

iv. Within approximate A Zones, where Base Flood Elevations have not been established and where such data is not available from other sources, no encroachments, including structures or fill material, shall be located within an area equal to the width of the stream or twenty(20) feet, whichever is greater, measured from the top of the stream bank, unless certification by a Tennessee registered professional engineer is provided demonstrating that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one (1) foot at any point within the Town of Thompson's Station, Tennessee. The engineering certification should be supported by technical data that conforms to standard hydraulic engineering principles.

41

    v.   New construction and substantial improvements of buildings, where permitted, shall comply with all applicable flood hazard reduction provisions of §3.4.3.a and §3.4.3.b. Within approximate A Zones, require that those subsections of §3.4.3.a and §3.4.3.b dealing with the alteration or relocation of a watercourse, assuring watercourse carrying capacities are maintained and manufactured homes provisions are complied with as required.

f.   Standards For Areas of Shallow Flooding (AO and AH Zones)

Located within the Special Flood Hazard Areas established in §3.4.1.b, are areas designated as shallow flooding areas. These areas have special flood hazards associated with base flood depths of one (1) to three (3) feet where a clearly defined channel does not exist and where the path of flooding is unpredictable and indeterminate; therefore, the following provisions, in addition to those set forth in §3.4.3.a and §3.4.3.b, apply:

    i.   All new construction and substantial improvements of residential and non-residential buildings shall have the lowest floor, including basement, elevated to at least one (1) foot above as many feet as the depth number specified on the FIRM's, in feet, above the highest adjacent grade. If no flood depth number is specified on the FIRM, the lowest floor, including basement, shall be elevated to at least three (3) feet above the highest adjacent grade. Openings sufficient to facilitate automatic equalization of hydrostatic flood forces on exterior walls shall be provided in accordance with standards of §3.4.3.b.

    ii.   All new construction and substantial improvements of non-residential buildings may be floodproofed in lieu of elevation. The structure together with attendant utility and sanitary facilities must be floodproofed and designed watertight to be completely floodproofed to at least one (1) foot above the flood depth number specified on the FIRM, with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydrodynamic loads and the effects of buoyancy. If no depth number is specified on the FIRM, the structure shall be floodproofed to at least three (3) feet above the highest adjacent grade. A Tennessee registered professional engineer or architect shall certify that the design and methods of construction are in accordance with accepted standards of practice for meeting the provisions of this Ordinance and shall provide such certification to the Administrator as set forth above and as required in accordance with §3.4.2.b.

    iii.   Adequate drainage paths shall be provided around slopes to guide floodwaters around and away from proposed structures.

g.   Standards For Areas Protected by Flood Protection System (A-99 Zones)

Located within the Areas of Special Flood Hazard established in §3.4.1.b, are areas of the 100-year floodplain protected by a flood protection system but where Base Flood Elevations have not been determined. Within these areas (A-99 Zones) all provisions of §3.4.2 and §3.4.3 shall apply.

h.   Standards for Unmapped Streams

Located within the Town of Thompson's Station, Tennessee, are unmapped streams where areas of special flood hazard are neither indicated nor identified. Adjacent to such streams, the following provisions shall apply:

    i.   No encroachments including fill material or other development including structures shall be located within an area of at least equal to twice the width of the stream, measured from the top of each stream bank, unless certification by a Tennessee registered professional engineer is provided demonstrating that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one (1) foot at any point within the locality.

    ii.   When a new flood hazard risk zone, and Base Flood Elevation and floodway data is available, new construction and substantial improvements shall meet the standards established in accordance with §3.4.2 and §3.4.3.

3.4.4    Legal Status Provisions

    a.    Conflict with Other Ordinances

In case of conflict between this Ordinance or any part thereof, and the whole or part of any existing or future Ordinance of the Town of Thompson's Station, Tennessee, the most restrictive shall in all cases apply.

## 3.5    Civic and Open Space Standards

3.5.1    Civic spaces shall be assigned to each pedestrian shed. The minimum and maximum percentage of land to be dedicated and deeded as land in civic space is shown in Table 2.3 Community Types, Areas and Civic Space Civic spaces shall be assigned per Table 4.1 Land Use and Building Type, and shall be designed per Table 3.1 Civic Space Types to conform to their zoning district, and to the following:

    a.    Those portions of the T1 zoning district, if any, within the community type shall be part of the civic space allocation, and shall be a nature conservancy or a park, per Table 3.1 Civic Space Types.

    b.    Each pedestrian shed shall contain at least one main civic space that is a green, square or plaza per Table 3.1 Civic Space Types. An entrance to the main civic space shall be within 800 feet of the center point of the pedestrian shed, unless topographic conditions, pre-existing thoroughfare alignments, or other circumstances prevent such location.

    c.    Playgrounds conforming to Table 3.1 Civic Space Types shall be located so that every residential lot is within 1000 feet of an entry to a playground, as measured along sidewalks that do not cross major thoroughfares.

    d.    At least 50% of the perimeter of each square or plaza per Table 3.1 Civic Space Types shall abut a thoroughfare.

    e.    Small spaces that do not conform to the specific standards of Table 3.1 Civic Space Types are permitted and encouraged, although they shall not contribute to the minimum percentage of land required to be dedicated as civic space.

    f.    The Board of Mayor and Aldermen (BOMA) may elect to accept ownership of land in civic space, but nothing in this ordinance shall obligate BOMA to accept such land.

    g.    Planting, lighting, and landscaping in civic spaces shall conform to Article 4 Zoning.

    h.    The design of a civic space shall be approved by the Commission. Where a civic space extends between two or more zoning districts, the Commission shall determine the applicable zoning district.

**TABLE 3.1  CIVIC SPACE TYPES**

| NATURE CONSERVANCY | |
|---|---|
| AREA | 5 acres, min. |

STANDARD: A natural preserve with the primary purpose of conservation of habitat. A Conservancy may be independent of surrounding building frontages. Its landscape shall be natural and may consist of fields, water bodies, forests, and wetlands, all naturalistically disposed. Pervious paths may be included at the edges, however, the priority is the preservation of habitat. Drainage buffers may be included.



| PARK | |
|---|---|
| AREA | 3 acres, min. |

STANDARD: A park may be independent of surrounding building frontages. Its landscape shall consist of paths and trails, fields, water bodies, forests, and open shelters, all naturalistically disposed. Parks may be lineal, following the trajectories of rivers or streams.



| GREEN | |
|---|---|
| AREA | 1 – 8 acres |

STANDARD: A green may be spatially defined by landscaping rather than building frontages. Its landscape shall consist of landscaping and trees, naturalistically disposed.



| SQUARE | |
|---|---|
| AREA | 1/2 – 5 acres |

STANDARD: A square is spatially defined by building frontages. Its landscape shall consist of paths, landscaping and trees, formally disposed. Squares shall be located at the intersection of important thoroughfares.



44

Town of Thompson's Station

## TABLE 3.1   CIVIC SPACE TYPES

| PLAZA | |
|---|---|
| | AREA  1/4 – 4 acres |
| STANDARD: A plaza shall be spatially defined by building frontages. Its landscape shall primarily be pavement. Trees are recommended but not required. Plazas should be located at the intersection of important streets and should include a civic building if possible. |  |

| NEIGHBORHOOD MULTIPURPOSE FIELD | |
|---|---|
| | AREA  1-1/2 – 3 acres |
| STANDARD: A neighborhood multipurpose field may be spatially defined by landscaping or by building frontages. There shall be a 20 ft. clear zoning district at the perimeter for viewing and the perimeter shall be landscaped with canopy trees. If this area is adjacent to a thoroughfare, the street trees may provide the required shade. This field may serve a secondary purpose of stormwater management. |  |

| RAMBLE | |
|---|---|
| | AREA  1/4 – 5 acres |
| STANDARD: A ramble is spatially defined by rear lanes or alleys and the rear yard of the perimeter buildings. Rambles shall consist of landscaping and trees and may contain a playground or community garden. |  |

| RECREATION AND SPORTS FACILITY | |
|---|---|
| | AREA  Varies |
| STANDARD: An area composed of more than one physically defined sports field (natural or synthetic). Fields may be multipurpose or specific to individual sports. Because of regional draw, a facility requires significant parking facilities, and as such is not included within a neighborhood plan, nor is it spatially defined by buildings or thoroughfares. |  |

45

**TABLE 3.1   CIVIC SPACE TYPES**



| PLAYGROUND | |
|---|---|
| | AREA   Varies |
| STANDARD: A playground shall be fenced and may include an open shelter or shade structure. Playgrounds shall be interspersed within residential areas and may be placed within a block or another civic space. | |
| **COMMUNITY GARDEN** | |
| | AREA   Varies |
| STANDARD: A community garden may be fenced and may include a tool shed. Running water is required. Community gardens may be located within a block or included within a park or green or temporarily located on vacant parcels. | |

3.5.2    Civic Buildings

     a.   The applicant shall covenant to construct a meeting hall or a third-place in proximity to the main civic space of each pedestrian shed. Its corresponding parkway shall be equipped with a shelter and a bench for a transit stop, if on an existing or planned transit route.

## 3.6   Lot Standards

3.6.1    Each lot shall contain a sufficient building site such that there will be no foreseeable difficulties, for reasons of topography, slope/foundation stability, flood hazards, or other conditions in locating the structures and driveway access to the structures upon such lot. All lots shall have dimensions and area sufficient to ensure that the building setbacks and yards are in compliance with any zoning ordinance. No building site shall include any land defined as unsuitable for development by the provisions of §3.2.1 Land Unsuitable for Development.

3.6.2    In evaluating the layout of lots and open space the following criteria will be considered by the Planning Commission as indicating design appropriate to the site's natural, historic, and cultural features, and meeting the purposes of these regulations. Diversity and originality in lot layout shall be encouraged to achieve the best possible relationship between development and conservation areas. Accordingly, the Planning Commission shall evaluate proposals to determine whether the proposed plan:

     a.   Protects and preserves all floodplains, wetlands, and steep or unstable slopes from clearing, grading, filling, or construction (except as may be approved by the Town for essential infrastructure or active or passive recreation amenities).

     b.   Designs around existing hedgerows and tree lines between fields or meadows, and minimizes impacts on large woodlands, (greater than five (5) acres), especially those containing many mature trees or significant wildlife habitat. Also, woodlands of any size on highly erodible soils with slopes greater than twenty-five (25) percent should be avoided. When any woodland is developed, great care shall be taken to the fullest extent that is practicable to design all disturbed areas (for building, roads, yards, septic disposal fields, etc.) in locations where there are no large trees or obvious wildlife areas.

     c.   Protects wildlife habitat areas of species listed as endangered or threatened by the U.S. Environ-

mental Protection Agency or the Tennessee Department of Environment and Conservation.

d.   Designs around and preserves sites of historic, archaeological, or cultural value, and their environs, insofar as needed to safeguard the character of the feature, including stone walls, spring houses, barn foundations, cellar holes, earthworks, and burial grounds.

e.   Protects rural roadside character and improves public safety and vehicular carrying capacity by avoiding development fronting directly onto existing arterials. Establishes buffer zoning districts along the scenic corridor of rural roads with historic buildings, stone walls, hedgerows, etc.

f.   Landscapes common areas (such as community greens) and both sides of new streets with native species shade trees and flowering shrubs. These trees shall generally be located between the sidewalk or footpath and the edge of the street, within a planting strip not less than five (5) feet in width.

g.   Provides active recreational areas in suitable locations that offer convenient access by residents and adequate screening from nearby house lots.

h.   Includes a pedestrian circulation system designed to assure that pedestrians can walk safely and easily on the site, between properties and activities or special features within the neighborhood open space system. All roadside footpaths should connect with off-road trails, which in turn should link with potential open space on adjoining undeveloped parcels.

i.   Provides open space that is reasonably contiguous. Long thin strips of conservation land shall be avoided, unless the conservation feature is linear or unless such configuration is necessary to connect with other streams or trails. The open space shall generally abut existing or potential open space land on adjacent parcels (such as in other subdivisions, public parks, or properties owned by or leased to private land conservation organizations). Such subdivision open space shall be designed as part of large contiguous and integrated pedestrian, bikeway and green way systems.

### 3.6.3   Lots Subject to Flood

The creation of buildable lots in areas subject to flooding requires special use approval by the Board of Zoning Appeals.

### 3.6.4   Water Bodies and Watercourses

If a tract being subdivided contains a water body, or portion thereof, such area shall generally be placed within jointly held open space. The Planning Commission may approve an alternative plan whereby the ownership of and responsibility for safe maintenance of the water body is so placed that it will not become a governmental responsibility.

Where a watercourse separates a buildable area of a lot from the public way to which such lot has access, provisions shall be made for installation of a culvert of adequate overflow size or other structure approved by the Planning Commission. No certificate of occupancy shall be issued for a structure on such a lot until the installation is completed and approved.

### 3.6.5   Lots with Building Sites on Steep Slopes

Due to the potential threat to health and safety posed by development located on lands with steep slopes, the following regulations shall apply:

a.   Building Sites on Slopes over 25%

Pursuant to §3.2.1 Land Unsuitable for Development, land with slopes in excess of 25% shall be considered land unsuitable for development and shall not be subdivided into lots except as pursuant to §3.2.2 Use of Conservation Lands.

b.   Building Sites with Slopes of 15 to 25%

The preliminary and final plats shall identify each lot with a slope of 15 to 25% by placing a star on the lot. The legend of the plat shall specify that no building permit will be issued on said lots until and unless the Town Engineer has received and approved a site plan conforming to the following requirements.

47

i.   The exact size, shape, and location of the lot,

ii.   The proposed location of all buildings, driveways, drainage ways, and utilities,

iii.   Proposed contours at vertical intervals of no more than two (2) feet,

iv.   The extent of natural tree cover and vegetation,

v.   The location of any on-site sewage disposal systems,

vi.   A building foundation plan,

vii.   The type and location of erosion control facilities.

viii. The stamp of the Tennessee registered engineer who prepared the plan, or, if approved by the Town Engineer, a Tennessee registered land surveyor.

c.   Site Development Standards

The following standards shall be used as a guide in determining the suitability of the construction proposed for the particular site in question. The engineer's certification required in §3.6.5.b.viii, above, shall address these standards:

i.   Natural vegetation shall be preserved to the maximum extent possible,

ii.   Natural drainage ways and systems shall be maintained, except that surface water shall be diverted around a house or slope area to a natural drain using acceptable construction techniques,

iii.   Operations that increase loads, reduce slope support, and cause instability of the slope shall be prohibited to the maximum extent possible. These methods include filling, irrigation systems, and on-site soil absorption sewage disposal systems,

iv.   Where sanitary sewers are not available all on-site sewage disposal systems (including both primary and secondary drainage fields) shall be shown on the site plan and located to avoid slide-prone areas.

v.   Erosion control measures specified in the Tennessee Erosion and Sediment Control Handbook shall be employed and maintained to prevent soil from leaving the site. Additionally, soil from excavation on the site shall not be deposited as fill on a potential slide area.

vi.   No construction that would cut the toe of the slope beyond the soil's natural angle of repose shall be permitted unless approved by the Town Engineer. This shall apply as well to subdivision roads constructed in compliance with these regulations.

3.6.6   Lot Structure

a.   Lots shall have minimum and maximum widths pursuant to Table 4.3 – Table 4.13.

b.   Each lot shall have a primary frontage along the vehicular thoroughfare, except up to 20% of the parcels in the pedestrian shed may front a civic space or pedestrian passage.

c.   Where lots have multiple frontages as illustrated in Table 3.2 Facades, Elevations, and Lot Lines Illustrated, one frontage line shall be designated as primary and any other frontage lines shall be designated as secondary.

d.   Double frontage lots shall be avoided, except where necessary to provide separation of residential development from traffic arteries, or to overcome specific disadvantages of topography and orientation.

e.   Reversed frontage lots are prohibited.

48

**TABLE  3.2   FACADES, ELEVATIONS, AND LOT LINES ILLUSTRATED**



| TERMS | |
|---|---|
| 1-4 | Lot Line |
| 1 | Primary Frontage Line |
| 2 | Secondary Frontage Line |
| 3 | Side Lot Line |
| 4 | Rear Lot Line |
| 5-6 | Facade |
| 5 | Primary Facade |
| 6 | Secondary Facade |
| 7-8 | Elevations |
| 7 | Side Elevation |
| 8 | Rear Elevation |

### 3.6.7    Building Setbacks from High Voltage Electric Lines

In the case of electric transmission lines where easement widths are not definitely established, a minimum building setback line from the center of the transmission line shall be established as follows:

**TABLE  3.3   HIGH VOLTAGE LINE SETBACKS**

| VOLTAGE OF LINE | BUILDING SETBACK |
|---|---|
| 7.2 KV | 15 feet |
| 13 KV | 25 feet |
| 46 KV | 37.5 feet |
| 69 KV | 50 feet |
| 161 KV | 75 feet |

3.6.8    Permanent reference monuments of non-degradable material shall be placed in all subdivisions where new streets are to be constructed. All monumentation shall be placed on property corners or referenced to property lines or road alignments. Certification by a licensed surveyor of placement of monuments shall be required. Monuments shall be located and set as follows:

a.   Control Monuments. At the discretion of the Town Engineer, a minimum of three (3) permanent control monuments, containing both vertical and horizontal data, shall be located within each sub-division where new roads are to be constructed. Such monuments shall be constructed of concrete not less than thirty (30) inches in length; or less than four (4) inches square or five (5) inches in diameter; and marked on top with a cross, brass plug, iron rod, or other durable material securely embedded. Iron Bar Monuments may be used and shall be no less than five-eighths (5/8) inch in diameter and not less than twenty-four (24) inches in length. Both shall have a permanent metal cap with a minimum diameter of two and one-half (2½) inches with the Land Surveyor's name and license number. Monuments shall have horizontal coordinates and vertical elevations shown on the final plat. Reference notes (field ties) defining magnetic bearings and distances to the nearest established street line or official benchmark shall be accurately described on the plat. All control monuments shall be located within dedicated right-of-way along curve points or lot lines and within line of sight of one another. All horizontal and vertical data shall be referenced to TN NAVD83 4100 State Plan Coordinates and North American Vertical Datum 1988 (NAVD88) or current acceptable equivalent. These monuments are to be placed near the entrance to the subdivision and, if possible within a non-fill area or be affixed to natural rock outcrops. The location of all control monuments shall be described on the final plat with words and symbols that facilitate locating them at the site.

b.   Internal Monuments and Lot Pins. One internal (1) monument, for each four (4) lots located within the subdivision, shall be placed within line of sight of one another. Such monuments shall be placed within dedicated right-of -way, when possible, and shall be located within non-fill areas or affixed to rock natural outcrops. An internal monument shall be constructed to the same standards as a

49

control monument minus the elevation data. In all subdivisions, lot corners and all lot line breaks shall be staked by iron rods, pipe, or pins at least eighteen (18) inches long and five-eighths (5/8) inch in diameter. Placement of iron pins under sidewalks should be avoided.

c.  Along Rivers and Streams. The lines of lots that extend to rivers or streams shall be monumented in the field by iron pins at least eighteen (18) inches long and five-eighths (5/8) inch in diameter or by round or square iron bars at least eighteen (18) inches long. Such pins shall be placed at the point of intersection of the river or stream and lot line, with a meander line established not more than forty (40) feet back from the bank of the river or stream. At the discretion of the Planning Commission, a control monument meeting the specifications of Subpart 1, above, may be required upon any lot affected by the 100-year floodplain of any stream.

## 3.6.9   Lot Drainage

a.  Lots shall be laid out so as to provide positive drainage away from all buildings but not across public sidewalks or other pedestrian ways. Drainage of individual lots shall be coordinated with the existing or proposed general storm drainage pattern for the area.

b.  Drainage shall be designed so as to avoid concentration of stormwater from each lot to adjacent lots, except within drainage easements or street rights-of-way. Surface water drainage patterns for each and every lot shall be shown on the road and drainage plans. Drainage flow and conveyance arrows shall be indicated on the topographic grading and drainage plan. Driveways shall be either paved or graded in such manner as to avoid any collection of soil or gravel within any public right-of-way.

c.  It shall be the responsibility of the builder of any building or other structure to design and construct a suitable drainage scheme that will convey surface water, without ponding on the lot or under the building, to the drainage system constructed within the subdivision.

d.  The Town Engineer reserves the right to require that the developer set minimum elevations on all floors, patios, building equipment, or other amenities that serve the overall development. This prerogative to establish elevation exists in addition to any ordinances or provision of these regulations that refer to floodplain elevation requirements. This provision is intended to give the Planning Commission summary review powers over any calculated or historical evidence of stormwater presence in overland or channel conditions.

e.  The subdivision developer will ensure that all artesian ground waters of a permanent or temporary nature encountered within the right-of-way will be intercepted and carried away to primary drainage conduits along swaled ditches or in underground pipes located on property line easements. Regardless of the location of property lines, intercept will be allowed at the point of artesian surfacing.

## 3.6.10   Erosion and Sediment Control

There shall be a minimization of changes in the rate of natural erosion and sedimentation that result from the development process. An erosion and sediment control plan shall be presented with the construction plans submitted in conformance with these regulations.

## 3.6.11   Debris and Waste

No cut trees, timber, construction debris, junk, rubbish, or other waste materials of any kind shall be buried in any land, left on any lot, or deposited, in any natural drainageway (such as sinkholes, underground streams or channels, wet weather stream beds or floodways) or public way at the time of the issuance of a certificate of occupancy for the lot. Waste shall not be left or deposited in any area of the subdivision at any time. Debris dumpsters with lids shall be required for construction debris disposal. A dumpster shall be required for every two adjacent lots at the time any construction activity begins. The dumpsters shall be of adequate size, maintained in a clean manner, the location shall be placed with clear site distance.  The dumpsters shall be removed in a timely manner upon the completion of construction activities.  All natural, vegetated material shall be shredded, chipped, or other means to use on-site. Burning of materials on-site shall be prohibited unless otherwise approved by the Planning Commission.

50

3.6.12   Lot Resubdivision Compatibility

a.   Review of Approved Plat(s)

The land area and building setbacks of lots located upon any proposed plat involving resubdivision shall be generally governed by that noted on the original plat of subdivision or previously approved plans of development of which such subdivision is part. In any instance where such information was not incorporated in such instruments or is otherwise unavailable, the Town Planner shall review lots as provided in §3.6.12.b.

b.   Determining Compatibility

Within areas previously subdivided and predominantly developed, lot sizes (area and width) and building setbacks resulting from a proposed resubdivision shall be generally in keeping with the frontage and area of the surrounding lots. The term "surrounding lots" shall mean all lots located within the same section of the original subdivision plat which meets the following criteria:

i.   Are located on the same and opposing block face that are within three hundred (300) feet of the boundary of the property proposed for resubdivision;

ii.   Abut each quadrant of a street intersection, when the proposal involves a corner lot; and

iii.   Abut or are directly across a public way from the proposed resubdivision.

## 3.7   Access

3.7.1   Access to Lots

The Planning Commission may require that lots shall not derive access from major thoroughfares pursuant to the General Plan. Where driveway access from such public ways may be necessary for several adjoining lots, the commission may require that the lots be served by a combined access drive, alley, or rear lane in order to limit possible traffic hazards. Driveways shall be designed and arranged so as to avoid requiring vehicles to back onto arterial or collector streets.

3.7.2   Access to Lots by Public Way or Private Easement

Pursuant to Tenn. Code Ann. § 13-4-308, no building permit shall be issued and no building or structure shall be erected on any lot within the jurisdictional area unless the public way giving access to the lot upon which the building or structure is proposed to be placed shall have been accepted or opened or shall have otherwise received the legal status of a public way prior to that time or unless such way corresponds in its location and lines with a way shown on a subdivision plat approved by the Planning Commission, or on a street plat made and adopted by the commission, or unless such lot fronts upon a permanent easement which conforms to all rules, regulations and specifications set forth herein.

In any instance where a permanent easement is used to provide access to a lot or tract of land having been or being separated by deed or plat from other property, such easement shall be at least fifty (50) feet in width. Where a permanent easement is proposed to provide access to more than five (5) lots or tracts of land, an access way shall be constructed within the easement which will meet or exceed the standards for design and construction of public ways set forth in §5.2.6 and §5.4.5 of this ordinance and the Planning Commission shall act to ensure that the responsibility for future maintenance of any such access way lying within a permanent easement remains solely with the benefited parties and that in no event shall the maintenance of such access way become a public responsibility.

3.7.3   Minimum Corner Clearance

The minimum corner clearance between proposed new non-residential driveways shall be two-hundred (200) feet for streets designated as locals and three-hundred fifty (350) feet for streets designated as collectors. All residential driveways shall be a minimum of fifty (50) feet from the nearest point of curvature.

3.7.4   Design Standards for Nonresidential Driveways

a.   For access to thoroughfares where the posted speed limit is 35 m.p.h. or less, all two-way nonresidential driveways shall be constructed with a minimum horizontal width of twenty-four (24) feet,

51

and all one-way nonresidential driveways shall be constructed with a minimum horizontal width of twelve (12) feet. All drives serving nonresidential property shall be paved with concrete or an asphalt surface. Lanes shall be clearly designated and lane uses shall be clearly and permanently marked. The minimum separation from an intersection and between drives shall be two hundred (200) feet along arterial and three hundred thirty-five along all other streets.

b.  Where the posted speed limit is 45 m.p.h. or greater, nonresidential driveways shall be constructed with a right turn deceleration lane.

c.  The centerline of every nonresidential driveway shall intersect the centerline of the public way at an angle between seventy-five (75) and ninety (90) degrees.

### 3.7.5   Design Standards for Residential Driveways

Where permitted, residential driveways fronting collector and arterial routes shall be designed so as to avoid requiring vehicles to back onto these thoroughfares. Any driveway should be constructed in a manner such that the drive has a maximum slope of eight percent (8%) for the first fifteen (15) feet (measured from the back of the town approved sidewalk). Driveways greater than 8% slope shall be reviewed and approved by the Town Engineer prior to a building permit being issued. In no case shall the driveway slope exceed 10% in the first 15 feet from the street. Where the potential exists for gravel or soil to be washed from a driveway onto the public right-of-way such driveways shall be paved or otherwise stabilized for a distance sufficient to prevent material from migrating onto public property.

### 3.7.6   Relationship to State Standards

Where the driveway design and location standards listed above are not in conformance with the standards of the Tennessee Department of Transportation, the Town Engineer shall require conformance with whichever standard is more restrictive.

## 3.8   Block Standards

### 3.8.1   Networks of Thoroughfares

The following standards shall apply to all thoroughfares, both public and private. The arrangements, character, and location of all thoroughfares shall conform to the General Plan, and should consider their relationship to existing and other planned thoroughfares, topographical conditions, dust and surface drainage both in and through the subdivision, public safety, their appropriateness to the proposed uses of the land to be served by such thoroughfares. The layout and design of thoroughfares shall:

a.  Be laid out so as to distribute traffic throughout the vicinity of the subdivision and connect it to the Town's thoroughfare network.

b.  Be laid out and designed to discourage excessive speeds.

c.  Continue existing thoroughfares where they terminate at the bounds of the proposed subdivision.

d.  Provide stub thoroughfares to the edge of the subdivision where conditions permit the later extension of thoroughfares into adjacent parcels.

e.  Conform to any plan for the vicinity of the subdivision that has been approved by the Town.

f.  Along a railroad right-of-way or limited access highway right-of-way, or where a ford crosses a river or stream, the design shall provide a parallel thoroughfare at a distance suitable for the development of the intervening land according to its zoning district. The design shall also provide sufficient space for the safe operation of signals and queuing of traffic.

g.  Ensure that both ends of every thoroughfare segment terminate at an intersection, and that the thoroughfares form a network bounding blocks and extending in all available directions. The Town Planner may grant deviations to this requirement where the terrain or the width of the parcel to be subdivided is such that it is not practical to serve an area except by a cul-de-sac. No cul-de-sac shall exceed 600' or 1/2 block in length for its zoning district, to the center of its bulb.

3.8.2   Networks of Thoroughfares, Plats. Each plat (preliminary and final) shall include a thoroughfare net-

work plan, which must include the following:

a.  The existing network of major thoroughfares. This shall generally be the thoroughfares leading to commercial and mixed-use areas and connecting between them; railroad lines; highways; and designated County, State, and Federal Routes;

b.  The designation for each thoroughfare mapped (both within and adjacent to the proposed subdivision). When a segment of thoroughfare between two intersections abuts two different zoning districts, the designation shall be appropriate to both.

c.  The proposed network of thoroughfares and their intersections, including the following: (1) the width of the right-of-way, (2) the design of public frontages. (3), curb and turning radii at intersections, (3) the location and type of traffic control devices, (4) and any dimensions dictated by safety standards and engineering requirements.

d.  Any proposed modifications to existing thoroughfares.

3.8.3    Block Standards

a.  The lengths of block faces is measured along the lot lines, for its zoning district shall not exceed the requirements of Table 3.4 Maximum Block Face Length, except that the Town Planner may adjust the length of a block face by up to 10% by administrative deviation to accommodate specific site conditions.

b.  Where two or more zoning districts occur on the same face of a block, the block face length shall not exceed that permitted for either of the zoning districts along the length of the block per Table 3.4.

c.  The Town Planner may exempt blocks adjacent to undeveloped land, areas unsuitable for development, or pre-existing incomplete blocks from a limitation on block length by administrative deviation.

d.  Block faces exceeding 500 feet shall be subdivided with a pedestrian passage that extends through the block and that is a minimum of 16 ft. in width.

e.  Rear lanes or alleys shall be required in T4 zoning districts, and rear alleys shall be required in T5 zoning districts, except that rear lanes and alleys are not mandatory where the lots' rear lot lines are at the edge of the site to be subdivided, and where the block has been previously subdivided.

## TABLE 3.4    MAXIMUM BLOCK FACE LENGTH

| | T1 | T2 | T3 | T4 | T5 | D1 | D2 | D3 | NC | CC | IL | IM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MAX.      BLOCK LENGTH (FEET) | | | 660 | 600 | 500 | 1,200 | 1,000 | 800 | 500 | 600 | | |

Key: "" means "no maximum." Numbers refer to the length in feet.

## 3.9    Thoroughfares

3.9.1    Thoroughfare assemblies shall be designed according to this subsection. Thoroughfares shall be designed per the character of their context to implement §1.2 Intent. The Thompson's Station Comprehensive Plan defines types of communities in the region relative to their community character. Thoroughfares shall be built according to their context classification per Table 3.6 Thoroughfare Classification Context. The context is regulated by the adjacent zoning district pursuant to Table 3.5 Context Per Zoning District.

## TABLE 3.5    CONTEXT PER ZONING DISTRICT

| ZONING DISTRICT | CONTEXT |
|---|---|
| Natural (T1) | Rural |
| Rural (T2) | Rural |
| Neighborhood Low Intensity (T3) | Walkable Urban |
| Neighborhood Medium Intensity (T4) | Walkable Urban |
| Neighborhood High Intensity (T5) | Walkable Urban |

53

**TABLE 3.5   CONTEXT PER ZONING DISTRICT**

| | |
|---|---|
| Low Density Dwelling (D1) | Suburban |
| Medium Density Dwelling (D2) | Suburban |
| High Density Dwelling (D3) | Suburban |
| Neighborhood Commercial (NC) | Walkable Urban |
| Community Commercial (CC) | Suburban |
| Light Industrial (IL) | Suburban |
| Medium Industrial (IM) | Suburban |

**TABLE 3.6   THOROUGHFARE CLASSIFICATION CONTEXT**

| SUBURBAN | WALKABLE URBAN | RURAL |
|---|---|---|
| Arterial | Avenue, Parkway | Highway, Road |
| Collector | Avenue, Drive, Street | Road |
| Local | Drive, Street | Roads |

3.9.2   The subdivider shall provide documentation proving that all thoroughfares to and within a development have unobstructed legal and physical access to a public thoroughfare.

3.9.3   The width for thoroughfares linking a Transect zoning district development to a public thoroughfare shall be regulated by §3.9.9 Transect Zoning District Thoroughfares, Table 3.7 Transect Zoning District Vehicular Lane Dimensions and Table 3.8 Transect Zoning District Thoroughfare Cross Sections.

3.9.4   The width for thoroughfares linking a use zoning district development to a public thoroughfare shall be assigned pursuant to subsection §3.9.10 Use Zoning District Design Criteria

3.9.5   All roads shall be provided with adequate grades and drainage, including the conveyance of collected runoff, and culverts or dip sections for the lateral passage of flows. Easements within a thoroughfare section may be used for the conveyance and storage of storm runoff and utilities.

3.9.6   Curb return radii in Transect zoning districts shall be regulated by Table 3.7 Transect Zoning District Vehicular Lane Dimensions. This table assigns lane widths and turning radii in Transect zoning districts. The design speed is the determinant for each of these sections. Curb return radii in use zoning districts shall be regulated per §Table 3.15 Minimum Radius of Return at Intersections. See Figure 3.1 Effective Turning Radius Illustration below.

**Figure 3.1   Effective Turning Radius Illustration**



1: Radius at the curb
2: Effective turning
   radius (± 8 ft.)

3.9.7   The following documents shall be used to guide the planning, design, and construction of motor vehicle, bicycle, and pedestrian facilities:

a.   ITE Context Sensitive Solutions (CSS)

b.   AASHTO Guide for the Development of Bicycle Facilities, as amended; and

c.   AASHTO Guide for the Planning, Design, and Operation of Pedestrian Facilities, as amended.

3.9.8   The following requirements shall apply to all thoroughfares intersecting public rights-of-way in Thomp-

son's Station:

a.   Roadway build-out is from the outside of the right-of-way.

b.   Internal street systems require access to adjacent subdivisions/phases.

c.   Multi-use paths shall be a minimum of eight feet wide.

3.9.9   Transect Zoning District Thoroughfares

Design for Transect zoning district thoroughfares shall comply with the following standards.

a.   Bicycle lanes shall not be built on roadways with design speeds below 30 mph.

b.   On-street parking standards shall be pursuant to Table 3.7 Transect Zoning District Vehicular Lane Dimensions. This table assigns lane widths and turning radii in Transect zoning districts.

### TABLE  3.7   TRANSECT ZONING DISTRICT VEHICULAR LANE DIMENSIONS

| DESIGN SPEED | TRAVEL LANE WIDTH (FEET) | T2 | T3 | T4 | T5 |
|---|---|---|---|---|---|
| 20 - 25 mph | 9 | P | P | P | NP |
| 25 - 35 mph | 10 | P | P | P | P |
| 25 - 35 mph | 11 | P | NP | NP | P |
| Above 35 mph | 12 | P | NP | NP | P |
| DESIGN SPEED | PARKING LANE WIDTH (FEET) | T2 | T3 | T4 | T5 |
| 20 - 25 mph | (Angle) 18 | NP | NP | P | P |
| 20 - 25 mph | (Parallel) 7 | NP | NP | P | NP |
| 25 - 35 mph | (Parallel) 8 | NP | P | P | P |
| Above 35 mph | (Parallel) 9 | NP | NP | NP | P |
| DESIGN SPEED | EFFECTIVE TURNING RADIUS (FEET) | T2 | T3 | T4 | T5 |
| 20 - 25 mph | 10 – 15 | P | P | P | P |
| 25 - 35 mph | 15 – 20 | P | P | P | P |
| Above 35 mph | 20 – 30 | P | NP | NP | NP |

NOTE: P = permitted, NP = not permitted

c.   All thoroughfares classified as avenue may be designated as transit routes. Transit-related facilities, such as a shelter or bus pull-out, may be required.

d.   The following assemblies are pre-approved for new thoroughfares in Transect zoning districts. Alternative assemblies may be approved by the Town Engineer pursuant to Table 3.7 Transect Zoning District Vehicular Lane Dimensions, Table 3.20 Sidewalk Widths, and Table 3.19 Typical Public Frontages.

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 58 of 163 PageID #: 67

### TABLE 3.8   TRANSECT ZONING DISTRICT THOROUGHFARE CROSS SECTIONS

| Street: ST-50-26 |  |
|---|---|

| | |
|---|---|
| ROW Width | 50 ft. |
| Design Speed | 20 mph |
| Design ADT | 1,000 VPD |
| Curb-to-Curb Width | 26 feet |
| Maximum Grade | 10% |
| Minimum Curve Radius | 100 feet |
| Curb Return Radius | 15 feet |
| Clear Sight Distance | 20' along local street from end of curb radius |
| Zoning Districts | T3, T4 |
| Functional Classification | Local |
| Green Street Provisions | Pervious pavers and/or bioswales and/or inverted crown French drain |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 59 of 163 PageID #: 68

### TABLE  3.8    TRANSECT ZONING DISTRICT THOROUGHFARE CROSS SECTIONS

Street: ST-52-32



| ROW Width | 52 ft. |
|---|---|
| Design Speed | 20 mph |
| Design ADT | 7,500 VPD |
| Curb-to-Curb Width | 32 feet |
| Maximum Grade | 12% |
| Minimum Curve Radius | 100 feet |
| Curb Return Radius | 15 feet |
| Clear Sight Distance | 20' along local street from end of curb radius |
| Zoning Districts | T3, T4 |
| Functional Classification | Local |
| Green Street Provisions | Pervious pavers and/or bioswales and/or inverted crown French drain |

Street: ST-60-34



| ROW Width | 60 ft. |
|---|---|
| Design Speed | 20 mph |
| Design ADT | 10,000 VPD |
| Curb-to-Curb Width | 34 feet |
| Maximum Grade | 10% |
| Minimum Curve Radius | 100 feet |
| Curb Return Radius | 15 feet |
| Clear Sight Distance | 20' along local street from end of curb radius |
| Zoning Districts | T4, T5 |
| Functional Classification | Local, Collector |
| Green Street Provisions | Pervious pavers and/or pervious paver sidewalks and/or inverted crown French drain |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 60 of 163 PageID #: 69

### TABLE 3.8   TRANSECT ZONING DISTRICT THOROUGHFARE CROSS SECTIONS



**Street: ST-60-36**

| | |
|---|---|
| ROW Width | 60 ft. |
| Design Speed | 25 mph |
| Design ADT | 15,000 VPD |
| Curb-to-Curb Width | 36 feet |
| Maximum Grade | 12% |
| Minimum Curve Radius | 100 feet |
| Curb Return Radius | 15 feet |
| Clear Sight Distance | 20' along collector street from end of curb radius |
| Zoning Districts | T4O, T5 |
| Functional Classification | Collector |
| Green Street Provisions | Pervious pavers and/or bioswales and/or inverted crown French drain |

**Street: ST-80-54**

| | |
|---|---|
| ROW Width | 80 ft. |
| Design Speed | 25 mph |
| Design ADT | 15,000 VPD |
| Curb-to-Curb Width | 58 feet |
| Maximum Grade | 8% |
| Minimum Curve Radius | 100 feet |
| Curb Return Radius | 10 feet |
| Clear Sight Distance | 20' along collector street from end of curb radius |
| Zoning Districts | T4O, T5 |
| Functional Classification | Collector |
| Green Street Provisions | Pervious pavers and/or pervious paver sidewalks and/or inverted crown French drain |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 61 of 163 PageID #: 70

## TABLE 3.8   TRANSECT ZONING DISTRICT THOROUGHFARE CROSS SECTIONS

**Avenue: AV-72-46**



| 6' | 7' | 8' | 10' | 10' turn lane / median | 10' | 8' | 7' | 6' |
|---|---|---|---|---|---|---|---|---|
| side walk | planter | park-ing | | | | park-ing | planter | side walk |

46'
curb to curb

| ROW Width | 72 ft. |
|---|---|
| Design Speed | 25 mph |
| Design ADT | 22,000 VPD |
| Curb-to-Curb Width | 46 feet |
| Maximum Grade | 8% |
| Minimum Curve Radius | Varies |
| Curb Return Radius | 15 feet |
| Clear Sight Distance | 30' along collector street from end of curb radius |
| Zoning Districts | T3, T4, T5 |
| Functional Classification | Collector, Arterial |
| Green Street Provisions | Pervious pavers and/or side and center bioswales and/or inverted crown French drain |

**Avenue: AV-90-66**



| 5' | 7' | 8' | 10' | 10' | 10' median / turn lane | 10' | 10' | 8' | 7' | 5' |
|---|---|---|---|---|---|---|---|---|---|---|
| side walk | planter | parking | | | | | | parking | planter | side walk |

66'
curb to curb

| ROW Width | 90 ft. |
|---|---|
| Design Speed | 25 mph |
| Design ADT | 32,000 VPD |
| Curb-to-Curb Width | 66 feet |
| Maximum Grade | 8% |
| Minimum Curve Radius | Varies |
| Curb Return Radius | 15 feet |
| Clear Sight Distance | 30' along collector street from end of curb radius |
| Zoning Districts | T3, T4, T5 |
| Functional Classification | Collector, Arterial |
| Green Street Provisions | Pervious pavers and/or side and center bioswales and/or inverted crown French drain |

59

### TABLE 3.8   TRANSECT ZONING DISTRICT THOROUGHFARE CROSS SECTIONS



**Avenue: AV-V-34**

| ROW Width | Varies with width of central tree canopy |
|---|---|
| Design Speed | 25 mph |
| Design ATD | 15,000 VPD |
| Curb-to-Curb Width | Varies with width of central tree canopy |
| Maximum Grade | 10% |
| Minimum Curve Radius | Varies |
| Curb Return Radius | 15 feet |
| Clear Sight Distance | 30' along collector street from end of curb radius |
| Zoning Districts | T3, T4 |
| Functional Classification | Local, Collector |
| Green Street Provisions | Pervious pavers and/or side and center bioswales and/or inverted crown French drain |

**Old Town Parking Plaza**

**PP-97-77**

| ROW Width | Varies with width of rail R.O.W |
|---|---|
| Design Speed | 25 mph |
| Design ATD | 15,000 VPD |
| Curb-to-Curb Width | 77 feet |
| Maximum Grade | 8% |
| Minimum Curve Radius | N/A |
| Curb Return Radius | 10 feet |
| Clear Sight Distance | 30' along collector street from end of curb radius |
| Zoning Districts | T4O |
| Functional Classification | Local, Collector |
| Green Street Provisions | Pervious pavers with inverted crown and French drain in parking median and pervious pavers and/or side bioswales |

### TABLE 3.8   TRANSECT ZONING DISTRICT THOROUGHFARE CROSS SECTIONS



Columbia Pike
Main Street Retrofit
AV-80-38

| | |
|---|---|
| ROW Width | 80 feet |
| Design Speed | 25 mph |
| Design ATD | 22,000 VPD |
| Curb-to-Curb Width | 50 feet |
| Maximum Grade | 8% |
| Minimum Curve Radius | Varies |
| Curb Return Radius | 15 feet |
| Clear Sight Distance | 20' along collector street from end of curb radius |
| Zoning Districts | T3, T4 |
| Functional Classification | Arterial |
| Green Street Provisions | Pervious pavers and/or side and center bioswales and/or inverted crown French drain |

3.9.10   Use Zoning District Design Criteria

Design for use zoning district thoroughfares shall comply with the following standards.

    a.   New Streets. Each proposed street shall be classified and designed to meet the minimum average daily traffic (ADT) standards for one of the following street types:

### TABLE 3.9   USE ZONING DISTRICT FUNCTIONAL CLASSIFICATION

| THOROUGHFARE CLASSIFICATION | DESIGN CAPACITY (ADT) |
|---|---|
| Local | 300 |
| Collector | 6,000 |
| Arterial | As designated |

    b.   Existing Streets. During the plan review process, each street abutting or affecting the design of a subdivision or land development that is not already classified on the Major Thoroughfare Plan shall be classified according to its function, design and use by the Planning Commission at the request of the applicant. The classification of existing streets shall include the hierarchy of Table 3.9 Use Zoning District Functional Classification, and may also include classifications of higher orders as determined by the adopted Major Thoroughfare Plan.

    c.   Trip Generation Rates. The following chart shall be used to determine the anticipated average daily traffic level of proposed residential development:

       i.   Volume Calculations. Calculation of traffic volumes shall be accomplished by using the following formula:

*(Regeneration Rate per Dwelling) x (# Units Receiving Access from Street) = Design ADT*

    d.   Thoroughfare Design Criteria and Service Restrictions.

       i.   Local

        •   Design Capacity and Service Restriction: Each local shall be designed so that no section of

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 64 of 163 PageID #: 73

the street conveys an average daily traffic (ADT) volume greater than three-hundred (300).

- • Street Access: Local streets may intersect or take access from any street type.

ii. Collector

- • Design Capacity and Service Restriction - The collector shall plan for traffic volumes ranging from three-hundred (300) to six-thousand (6,000) trips per day. Collectors shall be designed to have no residential lots fronting directly on them.

iii. Arterial

- • Design Capacity and Service Restriction - Arterials are intended to serve anticipated traffic volumes greater than three-thousand (3,000).

e. General Design. The general design of all use zoning district public ways shall conform to the American Association of State and Highway Transportation Officials (AASHTO) Geometric Design of Highways and Streets except as provided in the tables below.

## TABLE 3.10   DESIGN SPEED

|  | RESIDENTIAL (MPH) | NON-RESIDENTIAL (MPH) |
|---|---|---|
| LOCAL | 25 | 30 |
| COLLECTOR | 40 | 40 |
| ARTERIAL | * | * |

\* As determined by the Major Road and Street Plan

## TABLE 3.11   MINIMUM RIGHT-OF-WAY WIDTH

|  | RESIDENTIAL (FEET)* | NON-RESIDENTIAL (FEET)* |
|---|---|---|
| LOCAL | 50 | 50 |
| COLLECTOR | 60 | 60 |
| ARTERIAL | 84 | 84 |

\* Except as approved in planned developments.

## TABLE 3.12   MAXIMUM PERCENTAGE GRADE

|  | RESIDENTIAL | NON-RESIDENTIAL |
|---|---|---|
| LOCAL | 10% | 7% |
| COLLECTOR | 7% | 7% |
| ARTERIAL | 6% | 6% |

## TABLE 3.13   MINIMUM PERCENTAGE GRADE

|  | RESIDENTIAL | NON-RESIDENTIAL |
|---|---|---|
| ALL TYPES | 1% | 1% |

## TABLE 3.14   MAXIMUM SUPERELEVATION

|  | RESIDENTIAL (FOOT/FOOT) | NON-RESIDENTIAL (FOOT/FOOT) |
|---|---|---|
| ALL TYPES | 0.08 | 0.08 |

## TABLE 3.15   MINIMUM RADIUS OF RETURN AT INTERSECTIONS

|  | RESIDENTIAL (FEET) | NON-RESIDENTIAL (FEET) |
|---|---|---|
| AT RIGHT-OF-WAY | 25 | 40 |
| AT CURB | 30 | 45 |

## TABLE 3.16   MAXIMUM GRADE AT INTERSECTIONS

|  | RESIDENTIAL | NON-RESIDENTIAL |
|---|---|---|
| LOCAL (WITHIN 50' FROM EDGE OF PAVEMENT) | 4% | 4% |
| COLLECTOR (WITHIN 50' FROM EDGE OF PAVEMENT) | 7% | 7% |
| ARTERIAL (WITHIN 50' FROM EDGE OF PAVEMENT) | 6% | 6% |

3.9.11   Intersections

a. Pavement shall intersect as nearly as possible to a 90 degree angle for a minimum of one hundred (100) feet from the stop bar. A proposed intersection of two (2) new public ways at an angle of less

than seventy-five (75) degrees shall not be permitted. Not more than two (2) public ways shall intersect at any one point, unless specifically approved by the Planning Commission.

b. Centerline off-sets of less than one hundred fifty (150) feet between T-type intersections within public ways shall not be permitted, except where the intersected public ways have separated dual drives without median breaks at either intersection. Where public ways intersect arterial or collector routes, the alignment of such streets shall be continuous. Intersections of collector streets shall be at least two-hundred (200) feet apart. Intersections of arterial streets shall be at least four-hundred (400) feet apart.

c. Minimum curb or edge of pavement radius shall be determined according to the specifications for the street of higher classification in the street system hierarchy, as specified herein.

d. Whenever a proposed street intersects an existing or proposed street of higher order in the street hierarchy, (see Table 3.6 Thoroughfare Classification Context) the street of lower order shall be made a stop street. The street of lower order shall also be designed to provide a minimum corner sight distance as specified in §3.9.12 Clear Sight Triangles.

e. The cross-slope on all public ways, including intersections, shall be two (2) percent or otherwise specified in this document.

3.9.12   Clear Sight Triangles

a. The application of a clear sight triangle is most critical on high-speed thoroughfares and is not as critical on low-speed, walkable urban thoroughfares with controlled intersections and right-of-way constraints per the Institute of Transportation Engineers Context Sensitive Solutions. The Thompson's Station T4, T4O and T5 Transect zoning districts are walkable urban areas and have specific clear sight criteria per §3.9.12.c below and Table 3.8 Transect Zoning District Thoroughfare Cross Sections.

b. §3.9.12 Clear Sight Triangles shall apply to all other thoroughfares, private thoroughfares, intersections, and public, private, and off-thoroughfare multiple parking area entrances, exits, and driveways to and from public and private thoroughfares and all property subject to Thompson Stations's jurisdiction. The standards established by these clear sight triangles regulations shall be met for all future construction or development which requires a building or other permit to be issued by the Town, and shall apply to all existing or future landscaping or other nonstructural obstructions.

c. Design requirements for compliance:

i. An area of unobstructed vision at street intersections, entrances/exits, permitting a vehicle to see approaching vehicles to the right or left shall be required. The entire area of the clear sight triangle, shall be designed to provide an unobstructed view across it from three and one-half (3.5) to all points three and one-half (3.5) feet above the roadway along the centerline. See Table 3.17 Minimum Intersection Sight Distance (Y) and Figure 3.2 T4, T4O, T5 Clear Sight Triangle.

ii. Any existing trees located within the clear sight triangle will be allowed to remain if all branches are trimmed from a height between three feet and eight feet.

iii. No single post or column within the designed triangle shall exceed 12 inches in thickness at its greatest cross-section dimension.

### TABLE 3.17   MINIMUM INTERSECTION SIGHT DISTANCE (Y)

| STREET CLASSIFICATION | DESIGN SPEED | Y (FEET) |
| --- | --- | --- |
| Local (Residential) | 25 mph | 280 |
| Local (Non-residential) | 30 mph | 335 |
| Collector | 40 mph | 445 |

iv. T4, T4O and T5 Transect zoning district clear sight distances shall be determined by the character of the zoning district, the design speed of the thoroughfare, and the frequency of controlled intersections. Measurements shall be from the back of curb rather than the property

63

line. See Figure 3.2 T4, T4O, T5 Clear Sight Triangle and Table 3.8 Transect Zoning District Thoroughfare Cross Sections.

### Figure 3.2   T4, T4O, T5 Clear Sight Triangle



d.  Permits. No building or grading permits shall be issued for the construction or alteration of any structure that would create a violation of s§3.9.12 Clear Sight Triangles. Construction or erection of utilities such as overhead poles, boxes, risers, etc., within the clear sight triangle which would interfere with the area of obstructed sight shall not be permitted except by special permit authorized by the Town Engineer.

3.9.13   Acceleration and Deceleration Lanes

a.  Deceleration or turning lanes may be required by a traffic impact study.

b.  Deceleration Lanes Shall Be Designed to the Following Standards:

  i.  On a State Route, the lane shall be designed in conformance with the requirements of the Tennessee Department of Transportation.

  ii.  The lane width shall be the same as the required width of the roadway moving lanes for its full stacking length.

  iii.  A taper shall begin at the end of the deceleration lane and shall be 8:1 up to thirty (30) mph and 15:1 up to fifty (50) mph.

  iv.  The minimum lane length shall be as follows:

### TABLE 3.18   DECELERATION LANE LENGTH

| Design Speed of Road | Minimum Deceleration Lane Length |
| --- | --- |
| 30 mph | 235 feet |
| 40 mph | 315 feet |
| 50 mph | 435 feet |

c.  Acceleration lanes are also required when indicated as needed by a traffic impact study. The design shall be as per the recommendation of the Town Engineer. As necessary, a paved taper shall be provided for right turns.

3.9.14   Arrangement of Dead-End Streets

a.  Temporary Stub Streets

  i.  Local stub streets may be required, or, such may be permitted but only within subsections of phased development for which the proposed extension, in its entirety, has been approved as part of a conceptual preliminary plat.

  ii.  Collector stub streets may be permitted or required by the Town on collector streets provided that the future extension of the street is deemed desirable by the Town and conforms to the adopted Major Thoroughfare Plan.

      iii. Temporary Turnarounds. All stub streets shall be provided with a turnaround paved to an outside radius of fifty (50) feet. No turnaround is required if the stub street provides access to two (2) or less lots or housing units.

  b. Permanent Dead-End Public Ways

      i. General Design Standards. Where a public way does not extend beyond the boundary of the subdivision and its continuation is not required by the Planning Commission for access to adjoining property, its terminus shall normally not be nearer to such boundary than one hundred fifty (150) feet. However, the Planning Commission may require the reservation of an appropriate easement to accommodate drainage facilities, pedestrian traffic, or utilities. A cul-de-sac shall be provided at the end of a dead-end public way in accordance with the design standards of these regulations.

      ii. Design of Turnarounds. The type of turnaround required shall be determined by the Planning Commission based upon recommendation of the Town Engineer. Turnarounds shall be designed to accommodate emergency and service vehicles as well as passenger cars. The maximum length of a street leading to turnarounds shall be 800 feet, unless otherwise approved by the Town Engineer. The Planning Commission will consider alternative shapes for terminations when the street is located upon steep slopes and excessive cut or fill will be required to meet the design standards of the typical sections.

3.9.15 Bicycle Lanes

  a. Bicycle lanes shall be striped on both sides and include signs, directional arrows, and stencils.

  b. Bicycle lanes shall not be built on roadways classified below collector.

3.9.16 All roadways classified as collector and above may be designated as transit routes. Transit-related facilities, such as a shelter or bus pull-out, may be required.

3.9.17 Culs-de-sac require pedestrian and bike access through head, except where a physical barrier exists.

3.9.18 Multi-Use Paths

  a. May be used if they are incorporated with the overall design and traverse the development on an independent right-of-way allowing for more direct access to a destination.

  b. Shall be a minimum of eight feet wide.

  c. Where use zoning district residential subdivisions are proposed along collector or arterial thoroughfares that prohibit direct access to the thoroughfare, the developer shall provide an approved physical barrier, including but not limited to a solid wall or fence with landscaping along the right-of-way, which shall be built at the time of thoroughfare construction. The barrier shall conform to the clear sight triangle per §3.9.12 Clear Sight Triangles, and shall be properly maintained.

3.9.19 Public Frontage

  a. The public frontage contributes to the character of each zoning district, and includes the types of sidewalk, curb planting strip, bicycle facility and street trees.

  b. Public frontages shall be designed and allocated within zoning districts as specified in Table 3.19 Typical Public Frontages.

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 68 of 163 PageID #: 77

**TABLE  3.19   TYPICAL PUBLIC FRONTAGES**



| PERMITTED TRANSECT ZONING DISTRICTS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| T1 | T2 | | | T3 | T4 | T4O | | T4O | T5 | |

| PERMITTED USE ZONING DISTRICTS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | D1 | D2 | D3 | NC | IL | NC | CC | IM |

| (1) Parkway | (2) Transportation Way |
|---|---|
| (a) Walkway: no less than 5 ft., 6 ft. min. in T4O and T5 | (d) Parking Lane |
| (b) Swale | (e) Travel Lane |
| (c) Planter & Verge | |

Note: Alternative parkway configurations may be considered based on land use.

## 3.9.20   Sidewalks

Sidewalks shall be required along both sides of all streets, except in T1 and T2. Sidewalks shall be required along the proposed subdivision's frontage on existing public streets.

    a.   Sidewalk minimum widths shall be provided as required by Table  3.20 Sidewalk Widths. Width shall be exclusive of encroachments such as utility poles, fire hydrants, parking meters, sign standards, street furniture, etc. See §Table  3.19 Typical Public Frontages for locations.

    b.   Sidewalk width shall be 8 ft. minimum at shopfronts.

    c.   Sidewalks shall be maintained by Property Owner Associations, Home Owner Associations, or adjacent property owners.

66

## TABLE 3.20   SIDEWALK WIDTHS

|  | T1 | T2 | T3 | T4 | T5 | D1 | D2 | D3 | NC | CC | IL | IM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WIDTH (FEET) |  |  | 5 | 5 | 8 | 5 | 5 | 5 | 6 | 6 | 6 | 6 |

Key: "" means "no minimum." Numbers refer to the width in feet.

### 3.9.21   Sidewalk Design Standards

The following criteria shall apply to the design of all sidewalks.

    a.    Sidewalks shall be included within the dedicated public frontage portion of the right-of-way or public access easement. A planting strip of grassed or landscaped area at least five (5) feet wide shall separate all sidewalks from adjacent streets. See Table  3.19 Typical Public Frontages.

    b.    Pedestrian access ways shall be required from a public way to schools, parks, playgrounds, or other nearby public ways. To accomplish this purpose, the Planning Commission may require perpetual unobstructed easements at least sixteen (16) feet in width.

    c.    Sidewalks shall be designed and constructed so as to comply with ADA Standards, as amended.

### 3.9.22   Planting strip assemblies

    a.    Each segment of a thoroughfare must include a planting strip corresponding to its adjacent zoning district(s) as specified in Table  3.19 Typical Public Frontages.

    b.    Public lighting must be located within the verge as specified in Table  3.19 Typical Public Frontages..

    c.    Planting strips in T5 zoning districts and those with galleries or shopfronts may replace public planting with pedestrian pavement.

    d.    The lot owner shall maintain plant material between the roadway and the property line.

### 3.9.23   Road Construction Specifications

The road construction specifications in this Article shall be the minimum standards for construction of public or private improvements located within any subdivision within the jurisdictional area. No asphalt binder shall be installed unless temperature is at least 40°F and rising unless otherwise approved by the Town Engineer.

## 3.10   Drainage and Storm Sewers

### 3.10.1   General Requirements

All plats shall make adequate provisions for stormwater or floodwater runoff basins or channels. The stormwater drainage system shall be separate and independent from any sanitary sewer system. Each lot shall have necessary drainage easements. Easements at least twenty (20) feet in width shall be required for pipes with diameters of sixty (60) inches or less or as required by the Town Engineer.

### 3.10.2   Stormwater Facilities

    a.    Stormwater Design and Construction Specifications

The stormwater design and construction specifications included in these regulations shall be the minimum standards for any subdivision within the jurisdictional area.

    b.    Location

Drainage facilities shall be located in the public right-of-way, wherever feasible, or in perpetual unobstructed easements of appropriate width.

    c.    Accommodation of Upstream Drainage Areas

A culvert or other drainage facility shall be large enough to accommodate potential runoff from its entire upstream drainage area whether inside or outside the subdivision.

    d.    Effect on Downstream Drainage Areas

67

The subdivider shall prepare and submit to the Town Engineer a study of the effect of each subdivision on existing downstream properties and drainage facilities outside the area of the subdivision.

i.    Pre-development and post-development runoff rates, volumes and velocities for the two (2), ten (10), twenty-five (25) and one-hundred (100) year occurrences as determined using the SCS TR-55 method, or approved equal, along with associated calculations and maps shall be submitted with a stormwater drainage report prepared by an engineer licensed in the state of Tennessee. If increased runoff rate or total volume impacts downstream drainage structures then these structures shall be improved with the permission of the appropriate property owners. It shall be the responsibility of the developer to obtain permission from the property owners to make these improvements. If existing drainage easements do not exist, the Planning Commission may require that they be obtained by the developer.

ii.   Where it is anticipated that drainage and/or runoff from a development will overload an existing downstream drainage facility, the Planning Commission shall withhold approval of the subdivision until provision has been made for adequate improvement of such drainage facilities. The subdivider shall be required to construct adequate downstream facilities or contribute his pro-rata share toward the construction of adequate downstream facilities and install on-site stormwater detention to mitigate the downstream impacts.

iii.  On-site stormwater detention proposed to reduce the peak rate of discharge to offsite drainage systems downstream shall not cause increased peak flows or velocities detrimental to downstream properties or facilities. When detention facilities are utilized, the peak rate of discharge after development shall not exceed the pre-development peak rate.

iv.   Controlled releases of discharge from a detention basin shall include "v-notch", rectangular or other weir configurations which prevent increased discharge above pre-development conditions for storm events of two (2), ten (10) and twenty-five (25) year occurrences. The developer shall ensure that the one-hundred (100) year design storm can be managed safely by the detention facility, incorporating spillways as necessary. At the town's discretion, funds in lieu of detention may be offered as an alternative to providing onsite detention. Funds in lieu amount shall be based on the estimated cost of the eliminated on-site detention.

v.    Detention facilities shall be platted in open space as perpetual drainage easements and shall be designed as amenities and maintained by the homeowners' association. Estimated increases in discharge velocity shall be mitigated by energy dissipation devices where required to prevent erosion. The developer shall file copies of the covenants and/or homeowners' association charter and bylaws with the Town.

vi.   The drainage system shall be designed to honor natural drainage divides, where practical. Surface waters shall not be concentrated and discharged onto adjoining property at rates and/or velocities exceeding predevelopment conditions, unless an easement expressly authorizing such discharge has been granted by the owner of the affected land or unless the discharge is into an adequate natural watercourse or drainage system.

e.   Areas of Poor Drainage

In general, areas of poor drainage shall be classified as "land unsuitable for development" (see §3.2.1 Land Unsuitable for Development) and shall not be included in streets and lots. In any instance where it may be necessary to locate a thoroughfare in an area subject to flooding that is not located within the one-hundred year regulatory flood boundary, the Planning Commission may approve such subdivision; provided, the applicant fills the affected flood area of said subdivision to place thoroughfare elevations no lower than one (1) foot above the known flood elevation.

For drainage ways, creeks, streams, etc. not included within any existing flood study area as shown on the most current FEMA Flood Maps for the project area, the boundaries of the 100 hundred year floodway and floodway fringe area, and the regulatory flood elevation, shall be determined by the Town Engineer upon receipt of appropriate flood study data supplied by the applicant. Said flood study shall be conducted using procedures and methodology recognized by and acceptable to FEMA.

Case 3:16-cv-02845   Document 1-1   Filed 11/07/16   Page 71 of 163 PageID #: 80

As general policy, sinkholes shall be classified as "land unsuitable for development" (see §3.2.1 Land Unsuitable for Development) and shall not be included in streets and lots. When sinkholes are encountered, the limits of standing water shall be determined by the developer based upon competent engineering. Any alteration of a sinkhole or the drainage pattern shall receive prior approval by the Board of Zoning Appeals.

f.   Floodway Areas

In all instances, the regulatory floodway shall be preserved from any and all destruction or damage resulting from clearing, grading, or dumping of earth, waste material, or stumps. Any subdivision that contains flood prone land shall be subject to the special provisions set forth in §3.6.3 Lots Subject to Flood; of these regulations.

g.   Stormwater Detention and Discharge Control

The developer shall provide detention for the increased volume of water generated by a development. The major factors in evaluating drainage designs shall be the effect of increased runoff rates on downstream water levels and the proximity of any structures.

3.10.3   Dedication of Drainage Easements

a.   General Requirements

Where a subdivision is traversed by a watercourse, drainageway, channel, or stream, there shall be provided a stormwater easement or drainage right-of-way conforming substantially to the lines of the one-hundred (100) year flood elevation of such watercourse. Where new open drainageways are utilized they shall be designed for the twenty-five (25) year frequency flood.

b.   Drainage Easements

i.   Where topography or other conditions are such as to make impracticable inclusion of drainage facilities within the right-of-way of a thoroughfare, perpetual unobstructed easements at least twenty (20) feet in width for such facilities shall be provided across property outside the public way lines and with satisfactory access to public ways. Easements shall be indicated on the final plats. Drainage easements shall be carried from the public way to a natural watercourse or to other drainage facilities.

ii.   When downstream drainage improvements are proposed that will require additional easements across private land outside the subdivision, appropriate drainage easements must be secured by the developer and indicated on a plat amendment for that property.

iii.   The applicant shall dedicate, when required by the Planning Commission, either in fee, or by drainage or conservation easement, the land on both sides of an existing watercourse for a distance to be determined by the Town Engineer.

c.   Ditching, Culverts and Storm Drains

The design and construction details of drainage facilities shall be in accordance with the provisions of these regulations. The Town Engineer shall approve the design and construction details of all such facilities.

## 3.11   Sewage Facilities

3.11.1   General Requirements

The applicant shall install sanitary sewer facilities in a manner prescribed by the regulations of the Tennessee Department of Environment and Conservation, the Town of Thompson's Station Wastewater and Water Reuse Ordinance, and by any other applicable standards and specifications. All plans shall be designed and approved in accordance with the rules, regulations, specifications, and standards, of any applicable governmental agency or appropriate unit.

a.   Distributed wastewater treatment plants are the preferred system for the Town of Thompson's Station and shall be required to operate on gravity flow sewage collection.

69

b. Sewage treatment plants shall be located only in Growth Sectors pursuant to the General Plan Sector Plan.

c. The minimum treatment plant capacity shall be 30,000 gallons per day.

d. The subdivider shall dedicate to the Town the requisite land to build the entire sewage treatment plant for the development including sewage treatment and spray or drip disposal of effluent in accordance with TDEC regulations.

e. The subdivider shall pay for the construction and commissioning of the entire treatment plant system and transfer ownership and operation to the Town to ensure environmental standards protect the health and safety of the community.

3.11.2   Mandatory Connection to Public Sewer System

a. When public sanitary sewers are accessible to the subdivision, as determined by the Board of Mayor and Aldermen, the subdivider shall provide such facilities to each lot therein and shall connect the facilities to the public system. The subdivider shall provide sewers that meet standards set forth in the regulations of the Tennessee Department of Environment and Conservation.

b. All sanitary sewer facilities located outside a flood hazard area.

c. All public sanitary sewer systems shall be constructed utilizing materials that are American Society for Testing and Materials (ASTM) and/or American Water Works Association (AWWA) approved.

3.11.3   Individual Disposal System Requirements

If public sewer facilities are not available and individual disposal systems are proposed, the individual disposal system, including the size of the septic tank and size of the tile fields, or other secondary treatment device, shall be approved by the Williamson County Department of Sewage Disposal Management. The entire individual disposal system, including all associated drainage fields, shall be located within the area of fee simple ownership with the principal structure such system is to serve.

3.11.4   Design Criteria for Sanitary Sewers

Sanitary sewer systems shall be designed for the ultimate tributary population per the Town wastewater specifications. Sewer capacities shall be adequate to accommodate the anticipated maximum hourly quantity of sewage and industrial wastes together with an adequate allowance for infiltration and other extraneous flow. Sewer connections to dwellings shall not be less than six (6) inches in diameter. Short laterals and all other lines shall be eight (8) inches or larger in diameter, depending on anticipated flow.

## 3.12   Utilities and Telecommunication

3.12.1   Permanent Easements

Easements shall be provided for all proposed utilities and technology (public and private), including but not limited to water, electric, sewer, fiber optic, cable, telecommunications, etc. to the satisfaction of the utility provider and the Town Planning Commission and pursuant to §4.4.2 Utilities and Telecommunication Easements.

a. Properties without rear lanes or alleys.

i. Dry utilities shall be placed under the sidewalk, or within the planting strip and adjacent to the property line where no sidewalk is required; and

ii. Where possible, transformers and utility pedestals shall be set behind the principal building frontage.

b. Properties with rear lanes or alleys.

i. Dry utilities easements shall be in the rear lane or alley right-of-way.

ii. Transformers and utility pedestals shall be located on private property within utility easements at the rear of the lot.

70

3.12.2   Temporary Construction Easements

Temporary construction easements exceeding the width of permanent easements may be required as necessary until completion of any one project.

3.12.3   Electrical and Communication Service Lines

a.   Underground Utilities

Following adoption of this ordinance all electrical and communication service lines located within any subdivision approved under authority of these regulations shall be placed underground.

Any right of way requiring repair after utilities have been placed underground shall be repaired to the level of standard prior to any road work and shall be completed to the satisfaction of the Town Engineer.

b.   Above Ground Utilities

Except as provided in subsection §3.12.2 Temporary Construction Easements, it shall be unlawful to erect or construct permanent above ground utility equipment (see definition) within any subdivision approved under authority of these regulations.

c.   Exceptions

The following exceptions shall apply to the application of this section.

i.   Above ground utility equipment may be installed, maintained and utilized by utility companies for a period not to exceed ninety (90) days in order to provide emergency utility services. This time limit may be extended, if warranted, by the Planning Commission.

ii.   Utility equipment utilized for vehicular or pedestrian traffic control purposes.

iii.   Utility equipment appurtenant to underground facilities, such as service-mounted, pedestal-mounted, or pad-mounted transformers, terminal boxes, meters and meter cabinets. Such equipment shall be set behind the building frontage, and outside the private frontage.

iv.   Temporary utility equipment utilized exclusively in conjunction with construction projects. Upon installation of permanent utility equipment the temporary equipment shall be removed.

v.   Fire hydrants, fire plugs and other utility equipment utilized exclusively for fire-fighting purposes.

vi.   Telephone and television transmission towers.

vii.   Equipment installed by an electric utility which should not be installed underground for engineering or safety reasons.

viii.   Upgrade of existing electric lines.

d.   Lighting

When street lights are proposed in a subdivision, the lighting plan must be reviewed and approved by the Town Engineer relative to design, height, luminaire intensity and cutoff. The developer bears responsibility for maintenance and utility service costs.

## 3.13   Water Facilities

Water facilities shall be installed per the requirements of the HB&TS Utility District. The maximum fire hydrant spacing shall be no more than five-hundred (500) feet. The minimum fire flow shall be one-thousand (1,500) gallons per minute for a four (4) hour run while maintaining a residual pressure of 25 pounds per square inch (psi).

## ARTICLE 4   ZONING

### 4.1   General

4.1.1   Map of Zoning Districts

Zoning districts established by this Ordinance are as shown on the Official Zoning Map of Thompson's Station, which, together with all explanatory materials thereon, is, hereby, made a part of this Ordinance.

4.1.2   Interpretation of District Boundaries

The following rules shall be used to determine the precise location of any zone boundary shown on the Official Zoning Map of Thompson's Station:

a. Boundaries shown as following or approximately following the limits of any municipal corporation or its urban growth boundary shall be construed as following such limits.

b. Boundaries shown as following or approximately following streets or railroad lines shall be construed as following the centerlines of such streets or railroad lines.

c. Boundaries shown as following or approximately following platted lot lines or other property lines as shown on the Thompson's Station Tax Maps shall be construed as following such lines.

d. Boundaries shown as following or approximately following the centerlines of streams, rivers, or other water courses shall be construed as following the channel centerline of such water courses, and, in the event of a natural change in the location of such streams, rivers, or other water courses, the zone boundary shall be construed as moving with the channel centerline.

e. Boundaries shown as following or approximately following ridgelines or watersheds shall be construed as following such lines.

4.1.3   Zoning Districts and Bulk Standards

This Article contains the basic performance standards of the district and the site capacity calculations that must be met by proposed land uses. The following apply to all uses:

a. All front setbacks shall be measured from the property line. When the deed reads to the middle of the thoroughfare the right of way is assumed to be 50 feet and the setback shall be measured from the assumed edge of right of way.

b. All lots on individual septic systems must comply with the Williamson County Department of Sewage Disposal Management's regulations.

c. Lots with frontage on roadways with differing classifications shall take access from the lesser, classified roadway unless otherwise approved by the Planning Commission.

d. Lots accessed by easement must be approved by the Planning Commission.

e. With the exception of minor (two lot) subdivisions, all developments must prepare and submit a resource inventory map.

4.1.4   This Article sets forth the standards applicable to the development and modification of structures and other elements of the built environment within private lots.

4.1.5   Plans required by this section are subject to administrative approval by the Town Planner in accordance with Article 5 Administration and Process.

### 4.2   Nonconformities

4.2.1   Any lawful use of land or structures or any structure, existing at the date of passage of this Zoning ordinance, or subsequent amendment thereto, and located in a zoning district in which it would not be permitted as a new use or structure under the terms of this Zoning Ordinance, is declared to be a legal

nonconforming use.

4.2.2   Any legal nonconforming lot, use, sign, or structure may be continued so long as it remains otherwise lawful, except as otherwise provided in this article. All nonconforming uses shall be encouraged to convert to conformity wherever possible and shall be required to convert to conforming status as required by this Section.

4.2.3   The burden of establishing that any nonconforming use is a legal nonconforming use, as defined by this Section, shall, in all cases, be upon the owner of the nonconforming use and not upon the Town.

4.2.4   A nonconforming structure which is damaged may be restored, provided the restoration is started within six months of the damage and does not exceed the original footprint or volume.

4.2.5   A structure or parcel which has been nonconforming, and which hereafter becomes vacant and remains vacant or is not used for a continuous period of 30 months or more is not to be occupied thereafter except by a conforming use and form as specified in the regulations of the zone in which such structure is located.

## 4.3   Special Requirements

4.3.1   A concept plan may designate any of the following special requirements to be applied according to the standards of this article. These restrictions are applied to the plat by the applicant. and shall be applied as follows:

   a.   A differentiation of the thoroughfares as a-grid and b-grid. Frontages located more than 100′ from the a-grid can be considered for private frontage exceptions by the Town Planner. The frontages assigned to the b-grid shall not exceed 30% of the total length of frontages within a pedestrian shed.

   b.   Mandatory and/or recommended retail frontage, requiring or advising that a building provide a shopfront at sidewalk level along the entire length of its private frontage. The shopfront shall be no less than 50% glazed in clear glass as generally described in Table 4.14 and specified in §4.8 Transect Zoning District Frontage Requirements.

   c.   Build-to line, requiring the placement of the building facade along the line.

   d.   Mandatory and/or recommended terminated vista locations, requiring or advising that the building be provided with architectural articulation of a type and character that responds visually to the location.

   e.   Cross block passages, requiring that a minimum 8-foot-wide pedestrian access be reserved between buildings.

## 4.4   Lot Standards

4.4.1   Lot size is limited for newly platted lots, lot assemblies and lot subdivisions according to Table 4.3 – Table 4.13. Lot width is measured along the primary frontage. See Table 3.2 Facades, Elevations, and Lot Lines Illustrated.

   a.   Lot widths on curves may be reduced to 35 feet minimum in T3, D1, D2, and D3.

4.4.2   New Transect Communities require a mix of lot sizes as follows:

   a.   Applicable to T3.

      i.   Pedestrian sheds shall have no less than three lot sizes varying by a minimum of five feet in width.

      ii.   Blocks shall be composed of a minimum of two different lot sizes varying by a minimum of five feet in width.

      iii.   No single lot width may represent more than 60 percent of the total number of lots within a pedestrian shed.

   b.   Applicable to T4.

    i.   Pedestrian sheds shall have no less than two lot sizes varying by a minimum of five feet in width.

    ii.   Blocks shall be composed of a minimum of two different lot sizes varying by a minimum of five feet in width.

    iii.   No single lot width may represent more than 60 percent of the total number of lots within a pedestrian shed.

4.4.3   Utilities and Telecommunication Easements

    a.   Easements shall be provided for all proposed utilities and technology (public and private), including but not limited to water, electric, sewer, fiber optic, cable, telecommunications, etc. to the satisfaction of the utility provider and the Town Planning Commission.

    b.   Except as otherwise specifically provided herein, all building or building areas on lots within the Town shall have permanent and direct access to a public easement for utilities and/or telecommunication.

    c.   No building may be constructed within the Town without such access. Access shall be suitable to provide ingress and egress to the buildings and other structures for water, sewer, telephone, cable, internet or any other similar telecommunication service, whether such service is offered through public and/or private entities. Any obstruction or encumbrance on such access, including any private easement that purports to prohibit or restrict access, shall be deemed a nuisance and in violation of this ordinance.

    d.   Easements a minimum of five (5) feet in width shall be provided for dry utilities, and easements a minimum of ten (10) feet in width shall be provided for wet utilities. The subdivider shall take such actions as necessary to ensure the coordination and continuation of utility easements established on adjacent properties. All easements, including but not limited to water, sewer, electric, cable, telecommunications, etc. shall be indicated on the plat.

## 4.5   Lot Use Restrictions

4.5.1   General to all zones:

    a.   Lot use and building type is limited according to Table 4.1, Table 4.2, Table 4.3 and Table 4.4. Any use not listed may be considered a permitted use under the broad categories of residential, lodging, office, retail, service, institutional, agriculture, automotive, civil support, education, and industrial by the Planning Commission.

    b.   Home occupations in compliance with Table 4.1, Table 4.2, and Table 4.4 shall be permitted in all zoning districts pursuant to the restrictions of Table 4.5 Building Intensity.

    c.   Uses permitted by Table 4.1, Table 4.2, Table 4.3 and Table 4.4 may be limited further by the restrictions of Table 4.5 Building Intensity.

    d.   Coexistence of Uses. All of the uses permitted by Table 4.1, Table 4.2, Table 4.3 and Table 4.4 shall be permitted to coexist on a lot simultaneously.

4.5.2   General Transect Zone Restrictions.

    a.   Accessory Buildings in T4 and T5 are limited to housing related to the principal dwelling, rental housing, home office, and lodging uses.

4.5.3   Transect Zone Restrictions for Residential Use.

    a.   G3 Sector Residential Use:

        i.   Apartments in any building type except garden apartments are permitted by right in the G3 sector.

    b.   O2, G1, G2 Sectors Residential Use:

74

i.  No residential building type on the list below may represent more than 60 percent of the total number of residential buildings within a pedestrian shed.

   a)  Apartment building

   b)  Condominium building

   c)  Townhouse

ii.  Apartment buildings may be permitted pursuant to the requirements of the Village of Thompson's Station Design Guidelines.

iii.  Apartments in mixed use buildings are permitted by right in all sectors.

## TABLE 4.1   G3 SECTOR TRANSECT ZONE RESIDENTIAL USES

| USE | T1 | T2 | T3 | T4 | T4O | T5 |
|---|---|---|---|---|---|---|
| RESIDENTIAL | | | | | | |
| Accessory dwelling unit | | | P | P | P | P |
| Apartment building | | | | P | P | P |
| Assisted living | | | | S | P | P |
| Convalescent care | | | | | S | P |
| Day care in home (adult, child, group) | | S | S | S | P | P |
| Duplex | | | | P | P | |
| Garden apartment | | | | | | |
| Group home | | | P | P | P | P |
| Live-work unit | | | | P | P | P |
| Mixed use building | | | | | P | P |
| Single family | | | P | P | P | |
| Senior housing | | | P | P | P | P |
| Triplex | | | | P | P | |
| Townhome | | | | P | P | P |

KEY: "P" = Permitted by Right; "S" = Special Exception (BZA Approval required); " " = Prohibited

## TABLE 4.2   O2, G1, G2 SECTORS TRANSECT ZONE RESIDENTIAL USES

| USE | T1 | T2 | T3 | T4 | T4O | T5 |
|---|---|---|---|---|---|---|
| RESIDENTIAL | | | | | | |
| Accessory dwelling unit | | | P | P | P | P |
| Apartment building | | | | P | P | |
| Assisted living | | | | S | P | P |
| Convalescent care | | | | | S | P |
| Day care in home (adult, child, group) | | S | S | S | P | P |
| Duplex | | | | P | P | P |
| Garden apartment | | | | | | |
| Group home | | | P | P | P | P |
| Live-work unit | | | | P | P | P |
| Mixed use building | | | | | P | P |
| Single family | | | P | P | P | P |
| Senior housing | | | P | P | P | P |
| Triplex | | | | P | P | P |
| Townhome | | | | P | P | P |

KEY: "P" = Permitted by Right; "S" = Special Exception (BZA Approval required); " " = Prohibited

## TABLE 4.3   TRANSECT ZONE NON-RESIDENTIAL USES

| USE | T1 | T2 | T3 | T4 | T4O | T5 |
|---|---|---|---|---|---|---|
| LODGING | | | | | | |
| Bed & Breakfast (up to 6 rooms) | | P | P | P | P | P |
| Hotel (no room limit) | | | | | P | P |

KEY: "P" = Permitted by Right; "S" = Special Exception (BZA Approval required); " " = Prohibited

**TABLE 4.3   TRANSECT ZONE NON-RESIDENTIAL USES**

| USE | T1 | T2 | T3 | T4 | T4O | T5 |
|---|---|---|---|---|---|---|
| Inn (up to 12 rooms) | | | | P | P | P |
| COMMERCIAL | | | | | | |
| Adult business | | | | | | |
| Animal services | | | | | | |
|   Breeding | | P | S | S | | |
|   Day care | | P | P | P | P | |
|   Grooming | | P | | | P | P |
|   Kennels | | P | | | P | P |
|   Riding and livery stables | | P | S | S | S | S |
|   Veterinarian hospital/clinic | | P | | | P | P |
| Commercial laundries | | | | | P | P |
| Day care | | | | | | P |
| Drive through facility | | | | | | S |
| Equipment rental | | | | | | |
| Financial service | | | | | P | P |
| Food truck | | | | P | P | P |
| Funeral homes and crematory services | | | | | | |
| Gallery | | | | | P | P |
| Kiosk | | | | | P | P |
| Large format retail, over 50,000 sq. ft. | | | | | | |
| Live-work unit | | | | P | P | P |
| Medical clinic | | | | | P | P |
| Microbrewery | | | | | P | P |
| Microdistillery | | | | | P | P |
| Mixed use building | | | | | P | P |
| Non-banking financial services | | | | | | |
| Office building | | | | | P | P |
| Open market building | | P | | P | P | P |
| Personal service | | | | P | P | P |
| Recording studios | | | | | P | P |
| Retail building | | | | P | P | P |
| Restaurant | | | P | P | P | P |
| Self-storage | | | | | | |
| INSTITUTIONAL | | | | | | |
| Cemetery | | S | P | | | |
| Clubs – public or private | | | | | | P |
| Community buildings, public or private | | | P | P | P | P |
| Convention or exhibition halls | | | | | | |
| Correction and detention institutions | | | | | | |
| Cultural centers | | | | | P | P |
| Education | | | | | | |
|   College | | | | | | |
|   Elementary, middle school | | | P | P | P | |
|   High school | | | | | | |
| Entertainment facilities, not adult | | | | | P | P |
| Exhibition center | | | | | | P |
| Farmers market | | S | S | S | P | P |
| Heliport / helipad | | | | | | |
| Hospital | | | | | | |
| Library | | | P | P | P | P |
| Museum | | | | | P | P |
| Park (See Table 3.1.) | | | | | | |

KEY: "P" = Permitted by Right; "S" = Special Exception (BZA Approval required); " " = Prohibited

76

**TABLE 4.3    TRANSECT ZONE NON-RESIDENTIAL USES**

| USE | T1 | T2 | T3 | T4 | T4O | T5 |
|---|---|---|---|---|---|---|
| Nature conservancy | P | P | P | P | | |
| Park | | P | P | P | | |
| Green | | | P | P | P | P |
| Square | | | P | P | P | P |
| Plaza | | | | | P | P |
| Playground | | P | P | P | P | P |
| Community garden | | P | P | P | P | P |
| Neighborhood multipurpose field | | | P | P | P | |
| Ramble | | | P | P | | |
| Recreation and sports facility | | P | | | | |
| Parking facilities | | | | | | P |
| Religious institution | | S | S | P | S | S |
| Theater | | | | | P | P |
| Utility substation | | P | P | P | P | P |
| Sports stadium | | | | | | |
| Wireless communications facility | | | | | | |
| AGRICULTURE | | | | | | |
| Beekeeping | | P | P | P | | |
| Crop production other than community gardens | | P | P | P | | |
| Dairy | | S | | | | |
| Equestrian facility | | P | S | S | | |
| Horticulture | | P | | | P | P |
| Plant and forest nursery | | P | | | P | |
| AUTOMOTIVE | | | | | | |
| Automotive sales | | | | | | |
| Auto cleaning and repair | | | | | | |
| Auto painting | | | | | | |
| Auto towing | | | | | | |
| Auto wash | | | | | | |
| Boat sales and repair | | | | | | |
| Commercial storage | | | | | | |
| Gasoline sales | | | | | | |
| INDUSTRIAL | | | | | | |
| Light industrial | | | | | | |
| Medium industrial | | | | | | |
| Recycling facilities | | | | | | |
| Warehousing | | | | | | |

KEY: "P" = Permitted by Right; "S" = Special Exception (BZA Approval required); " " = Prohibited

**TABLE 4.4    O2, G1, G2 USE ZONES LAND USE**

| USE | D1 | D2 | D3 | NC | CC | IL | IM |
|---|---|---|---|---|---|---|---|
| RESIDENTIAL | | | | | | | |
| Accessory dwelling unit | P | P | P | | | | |
| Apartment building | | | | | | | |
| Assisted living | | S | S | S | P | | |
| Convalescent care | | S | S | S | P | P | |
| Day care in home (adult, child, group) | S | S | S | S | | | |
| Duplex | | P | P | | | | |
| Garden apartment | | | | | | | |
| Group home | P | P | P | P | | | |
| Live-work unit | | | P | | | | |
| Mixed use building | | | | P | P | P | |

KEY: "P" = Permitted by Right; "S" = Special Exception (BZA Approval required); " " = Prohibited

**TABLE 4.4   O2, G1, G2 USE ZONES LAND USE**

| USE | D1 | D2 | D3 | NC | CC | IL | IM |
|---|---|---|---|---|---|---|---|
| Single family | P | P | P | | | | |
| Senior housing | P | P | P | | | | |
| Townhome | | | P | | | | |
| LODGING | | | | | | | |
| Bed & Breakfast (up to 6 rooms) | | P | | S | P | | |
| Hotel (no room limit) | | | | P | P | | |
| Inn (up to 12 rooms) | | | | S | P | | |
| COMMERCIAL | | | | | | | |
| Adult business | | | | | | | S |
| Animal services | | | | | | | |
|   Breeding | S | S | | | | | |
|   Day care | P | P | | | | P | |
|   Grooming | | | | P | P | | |
|   Kennels | | | | | | P | |
|   Riding and livery stables | S | S | | | | | |
|   Veterinarian hospital/clinic | | | | P | P | P | |
| Commercial laundries | | | | P | P | P | |
|   Coin operated laundromat | | | | | P | P | |
|   Dry cleaner | | | | | P | P | |
| Day care | | | | P | P | P | |
| Drive through facility | | | | | P | P | P |
| Equipment rental | | | | | | P | P |
| Financial service | | | | P | P | P | |
| Food truck | | | | P | P | | |
| Funeral homes and crematory services | | | | | P | P | P |
| Gallery | | | | P | P | | |
| Kiosk | | | | | P | | |
| Large format retail, over 50,000 sq. ft. | | | | | P | P | |
| Live-work unit | | | | | | | |
| Medical clinic | | | | P | P | P | P |
| Microbrewery | | | | | P | | |
| Microdistillery | | | | | P | | |
| Mixed use building | | | | P | P | P | |
| Non-banking financial services | | | | | P | P | |
| Office building | | | | P | P | P | P |
| Open market building | | | | | | P | P |
| Personal service | | | | P | P | P | |
| Recording studios | | | | P | P | P | P |
| Retail building | | | | P | P | P | P |
| Restaurant | | | | P | P | P | P |
| Self-storage | | | | | | S | S |
| INSTITUTIONAL | | | | | | | |
| Cemetery | | | | | | P | P |
| Clubs – public or private | | | | | P | P | |
| Community buildings, public or private | P | P | P | P | P | | |
| Convention or exhibition halls | | | | | P | P | |
| Correction and detention institutions | | | | | | | P |
| Cultural centers | | | | P | P | | |
| Education | | | | | | | |
|   College | | | | | | P | |
|   Elementary, middle school | P | P | P | | P | P | |
|   High school | | | | | P | P | |

KEY: "P" = Permitted by Right; "S" = Special Exception (BZA Approval required); " " = Prohibited

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 81 of 163 PageID #: 90

**TABLE 4.4   O2, G1, G2 USE ZONES LAND USE**

| USE | D1 | D2 | D3 | NC | CC | IL | IM |
|---|---|---|---|---|---|---|---|
| Entertainment facilities, not adult | | | | | P | P | |
| Exhibition center | | | | | P | P | |
| Farmers market | S | | | P | P | | |
| Heliport / helipad | | | | | | P | P |
| Hospital | | | | | P | P | |
| Library | | | | P | P | | |
| Museum | | | | P | P | P | |
| Park (See Table 3.1.) | | | | | | | |
| Nature conservancy | P | | | | | | |
| Park | P | | | | | | |
| Green | | P | P | P | | | |
| Square | | P | P | P | | | |
| Plaza | | | | P | P | P | |
| Playground | P | P | P | P | | | |
| Community garden | | P | P | P | | | |
| Neighborhood multipurpose field | | P | P | P | | | |
| Ramble | | P | P | | | | |
| Recreation and sports facility | | | | | P | P | |
| Parking facilities | | | | | P | P | P |
| Religious institution | S | S | S | S | P | P | P |
| Theater | | | | | P | P | P |
| Utility substation | P | P | P | P | P | P | P |
| Sports stadium | | | | | P | P | P |
| Wireless communications facility | | | | | P | P | P |
| AGRICULTURE | | | | | | | |
| Beekeeping | | P | P | | | | |
| Crop production other than community gardens | | P | P | | | | |
| Dairy | | | | | | | S |
| Equestrian facility | S | S | | | | | |
| Horticulture | | | | | P | P | |
| Plant and forest nursery | S | S | S | | | P | P |
| AUTOMOTIVE | | | | | | | |
| Automotive sales | | | | | | | P |
| Auto cleaning and repair | | | | | P | P | P |
| Auto painting | | | | | | | P |
| Auto towing | | | | | | | P |
| Auto wash | | | | | S | P | P |
| Boat sales and repair | | | | | | | P |
| Commercial storage | | | | | | | P |
| Gasoline sales | | | | | P | P | P |
| INDUSTRIAL | | | | | | | |
| Light industrial | | | | | | P | P |
| Medium industrial | | | | | | | P |
| Recycling facilities | | | | | | | P |
| Warehousing | | | | | | P | P |

KEY: "P" = Permitted by Right; "S" = Special Exception (BZA Approval required); " " = Prohibited

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 82 of 163 PageID #: 91

**TABLE 4.5   BUILDING INTENSITY**

| USE | RESTRICTED | | LIMITED | | OPEN | |
|---|---|---|---|---|---|---|
| RESIDENTIAL | The number of dwellings on each lot is restricted to one principle residence and one accessory residence. Both dwellings shall be under single ownership. The habitable area of the accessory unit shall not exceed 900 sq. ft. of living area. | T2<br>T3<br>D1<br>D2<br>D3 | | | The number of dwellings on each lots is only restricted by the bulk standards of this Article. | T4<br>T4O<br>T5 |
| LODGING | The number of bedrooms available for lodging per lot is limited to six. The lodging shall be owner occupied. Food service may be provided in the morning. The maximum length of stay shall not exceed ten days. | T2<br>T3 | The number of bedrooms available for lodging per lot is limited to six. Food service may be provided in the morning. The maximum length of stay shall not exceed fourteen days. | T4 | The number of bedrooms available for lodging per lot are only restricted by the bulk standards of this Article. Food service may be provided at all times. | T4O<br>T5<br>NC<br>CC |
| OFFICE | The building area available for office use on each lot is restricted to 600 sq. ft. within the principal building or to the accessory building. | T2<br>T3<br>D1 | The building area available for office use on each lot is limited to the first story of the principal building and/or to the accessory building. | T4<br>D2<br>D3 | The office area within a building or a lot is only restricted by the bulk standards of this Article. | T4O<br>T5<br>NC<br>CC |
| RETAIL | The building area available for retail use may not exceed 1,500 square feet.<br>Food service is limited to no more than 600 square feet of seating area. | T3 | Food service is limited to no more than 1,800 square feet of seating area. | T4 | The retail area within a building or a lot is only restricted by the bulk standards of this article. | T4O<br>T5<br>NC<br>CC |

## 4.6   Building Placement Standards

4.6.1    Buildings shall be setback from the boundaries of the lot as specified in Table 4.3 through Table 4.13.

4.6.2    For lots with more than one frontage, front setback requirements pertain to the primary frontage and secondary front setback requirements pertain to the secondary frontages. See Table 3.2 Facades, Elevations, and Lot Lines Illustrated.

4.6.3    Lot coverage by buildings shall not exceed the percentage of net lot area specified in Table 4.3 through Table 4.13.

4.6.4    Building facades shall occupy a minimum percentage of the primary frontage as specified in Table 4.3 through Table 4.13 as minimum frontage buildout.

4.6.5    Setbacks for principal buildings shall be as shown in Table 4.3 through Table 4.13. Setbacks may be adjusted by up to 10% by administrative waiver to accommodate specific site conditions. The Town

80

Planner or designee shall make the following written findings:

    a.  The waiver is consistent with the provisions of §1.2 Intent.

    b.  The waiver is consistent with the General Plan.

    c.  The building placement will not materially endanger the public health or safety.

    d.  The building placement will not substantially injure the value of adjoining property; or that the use is a public necessity.

    e.  The location and character of the building placement, if developed according to the plans and information approved, will be in harmony with proximate land uses, and consistent with the purposes of the district.

    f.  The building placement will not adversely affect the district by altering its character.

4.6.6    Rear setbacks for accessory buildings shall be a minimum of 5 feet measured from the property line. In the absence of rear alley or rear lane, the rear setback shall be as shown in Table 4.3 through Table 4.13.

4.6.7    Fireplaces and bay windows may encroach side setbacks up to 2.5 ft. in all zones. Distances between structures shall meet building and fire code restrictions.

## 4.7   Height Restrictions

4.7.1    Building height is limited according to Table 4.3 through Table 4.13, measured as follows:

    a.  Building height is measured in above ground stories and feet.

    b.  Stories are measured from finished floor to finished ceiling.

    c.  Stories above the ground floor are limited to 14 feet after which height they are counted as two stories.

    d.  For residential uses, a ground floor story of 18 feet or less is counted as one story. Ground floors exceeding 18 feet in height are counted as two stories.

    e.  For non-residential and mixed-uses a ground floor story shall be no less than 11 feet in height. A ground floor story of 25 feet or less is counted as one story. Ground floors exceeding 25 feet in height are counted as two stories.

    f.  Height limits do not apply to unfinished attics, masts, belfries, clock towers, chimney flues, water tanks, or elevator bulkheads.

4.7.2    Parking structure height is measured as follows:

    a.  Parking structure height is measured in feet above average adjacent grade but in no case shall exceed 45 feet in height.

    b.  Parking structures lined for a minimum of 80% along frontages may exceed height restrictions and are limited in height to the eave of lining buildings.

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 84 of 163 PageID #: 93

**TABLE 4.6    T2 LOT STANDARDS**



| MAIN BUILDING SETBACKS | | | PARKING AND STORAGE SETBACKS | | |
|---|---|---|---|---|---|
| A | Primary Frontage | 50 ft. min. | H | Primary Frontage | 50 ft. min. |
| B | Secondary Frontage | 20 ft. min. | I | Secondary Frontage | 20 ft. min. |
| C | Side Lot Line | 20 ft. min. | J | Side Lot Line | 20 ft. min. |
| D | Rear Lot Line | 50 ft. min. | K | Rear Lot Line | 50 ft. min. |

| ACCESSORY BUILDING SETBACKS | | | LOT REQUIREMENTS | |
|---|---|---|---|---|
| E | Secondary Frontage | 20 ft. min. | Lot Coverage | 5% max. |
| F | Side Lot Line | 10 ft. min. | Primary Building Frontage | n/a |
| G | Rear Lot Line | 12 ft. min. | Lot Width | no minimum |
| L | Access Drive Width to setback | 12 ft. max. | Lot Size | 8 acres |

| BUILDING FRONTAGE |
|---|

| REQUIRED PRIVATE FRONTAGE TYPES (SEE TABLE 4.14 PRIVATE FRONTAGES) | |
|---|---|
| Primary Frontage | common lawn, fenced lawn, stoop |
| Secondary Frontage | common lawn, fenced lawn, stoop |
| Additional Requirements | n/a |

| ENCROACHMENTS |
|---|
| n/a |

| MINIMUM GLAZING | | AMBIENT STANDARDS | |
|---|---|---|---|
| Ground Floor | n/a | Light Level | n/a |
| Upper Floors | n/a | Noise: 12am to 7am | n/a |
| | | Noise: 7am to 10pm | n/a |
| | | Noise: 10pm to 12am | n/a |

| BUILDING HEIGHT |
|---|

| BUILDING HEIGHT | |
|---|---|
| A.  Main Building | 2 stories |
| B.  Accessory Buildings | 2 stories |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 85 of 163 PageID #: 94

## TABLE 4.7   T3 LOT STANDARDS

| BUILDING SETBACKS AND LOT REQUIREMENTS | | |
|---|---|---|



| MAIN BUILDING SETBACKS | | | PARKING AND STORAGE SETBACKS | | |
|---|---|---|---|---|---|
| A | Primary Frontage | 24 ft. min. | H | Primary Frontage | 30 ft. min. |
| B | Secondary Frontage | 12 ft. min. | I | Secondary Frontage | 8 ft. min. |
| C | Side Lot Line Aggregate | 20 ft. total, 5 ft. min | J | Side Lot Line | 3 ft. min. |
| D | Rear Lot Line | 20 ft. min. | K | Rear Lot Line | 3 ft. min. |

| ACCESSORY BUILDING SETBACKS | | | LOT REQUIREMENTS | |
|---|---|---|---|---|
| E | Secondary Frontage | 12 ft. min. | Lot Coverage | 60% max. |
| F | Side Lot Line | 5 ft. min. | Primary Building Frontage | 30% min. |
| G | Rear Lot Line | 5 ft. min. | Lot Width | 50 - 150 ft. |
| L | Access Drive Width to setback | 12 ft. max. | | |

| BUILDING FRONTAGE | | |
|---|---|---|
| REQUIRED PRIVATE FRONTAGE TYPES (SEE TABLE 4.14 PRIVATE FRONTAGES) | | |
| Primary Frontage | common lawn, fenced lawn | |
| Secondary Frontage | common lawn, fenced lawn | |
| Additional Requirements | n/a | |

| ENCROACHMENTS | | | |
|---|---|---|---|
| Open porch | 50% max. | Stoop or terrace | n/a |
| Balcony and/or bay window | 25% max. | Fireplace | 2.5 ft. max. |

| MINIMUM GLAZING | | AMBIENT STANDARDS | |
|---|---|---|---|
| Ground Floor | 15% | Light Level | 1 fc. max. |
| Upper Floors | 15% | Noise: 12am to 7am | 55 dBa |
| | | Noise: 7am to 10pm | 65 dBa |
| | | Noise: 10pm to 12am | 55 dBa |

| BUILDING HEIGHT | | |
|---|---|---|

| BUILDING HEIGHT | | |
|---|---|---|
| A. | Main Building | 2 stories |
| B. | Accessory Buildings | 2 stories |

83

## TABLE 4.8   T4 LOT STANDARDS

| BUILDING SETBACKS AND LOT REQUIREMENTS | |
|---|---|
|  |  |

### MAIN BUILDING SETBACKS / PARKING AND STORAGE SETBACKS

| | MAIN BUILDING SETBACKS | | | PARKING AND STORAGE SETBACKS | |
|---|---|---|---|---|---|
| A | Primary Frontage | 10 - 20 ft. max. | H | Primary Frontage | 24 ft. min. |
| B | Secondary Frontage | 8 ft. min. | I | Secondary Frontage | 8 ft. min. |
| C | Side Lot Line Aggregate | 0 ft. or 12 ft. total min. | J | Side Lot Line | 0 ft. min. |
| D | Rear Lot Line | 5 ft. min. | K | Rear Lot Line | 3 ft. min. |

### ACCESSORY BUILDING SETBACKS / LOT REQUIREMENTS

| | ACCESSORY BUILDING SETBACKS | | LOT REQUIREMENTS | |
|---|---|---|---|---|
| E | Secondary Frontage | 8 ft. min. | Lot Coverage | 70% max. |
| F | Side Lot Line | 0 ft. min. | Primary Building Frontage | 60% min. |
| G | Rear Lot Line | 5 ft. min. | Lot Width | 20 – 96 ft. |
| L | Access Drive Width to setback | 12 ft. max. | | |

| BUILDING FRONTAGE | |
|---|---|

| REQUIRED PRIVATE FRONTAGE TYPES (SEE TABLE 4.14 PRIVATE FRONTAGES) | |
|---|---|
| Primary Frontage | fenced lawn, stoop, terrace |
| Secondary Frontage | fenced lawn, stoop, terrace |
| Additional Requirements | A primary frontage fenced lawn required a matching secondary frontage |

### ENCROACHMENTS

| Setback Encroachments | | Sidewalk Encroachments | |
|---|---|---|---|
| Open porch | 80% max. up to 10 ft. | Awning or gallery | 80% max. or within |
| Balcony and/or bay window | 80% max. up to 6 ft. | | 2 ft. of curb |
| Stoop or terrace | 80% max. up to 8 ft. | | |
| Fireplace | 2.5 ft. max. | | |

### MINIMUM GLAZING / AMBIENT STANDARDS

| MINIMUM GLAZING | | AMBIENT STANDARDS | |
|---|---|---|---|
| Ground Floor | 15% | Light Level | 1 fc. max. |
| Upper Floors | 15% | Noise: 12am to 7am | 55 dBa |
| | | Noise: 7am to 10pm | 65 dBa |
| | | Noise: 10pm to 12am | 55 dBa |

| BUILDING HEIGHT | |
|---|---|

| A. | Main Building | 3 stories |
|---|---|---|
| B. | Accessory Buildings | 2 stories |

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 87 of 163 PageID #: 96

## TABLE 4.9  T5 LOT STANDARDS

### BUILDING SETBACKS AND LOT REQUIREMENTS



| | MAIN BUILDING SETBACKS | | | PARKING AND STORAGE SETBACKS | |
|---|---|---|---|---|---|
| A | Primary Frontage | 12 ft. max. | H | Primary Frontage | 24 ft. min. |
| B | Secondary Frontage | 10 ft. max. | I | Secondary Frontage | 20 ft. min. |
| C | Side Lot Line Aggregate | 0 ft. min. or 6 ft. total min. | J | Side Lot Line | 0 ft. min. |
| D | Rear Lot Line | 5 ft. min. | K | Rear Lot Line | 3 ft. min. |

| ACCESSORY BUILDING SETBACKS | | LOT REQUIREMENTS | |
|---|---|---|---|
| Accessory buildings are subject to the setback standards of principal buildings. | | Lot Coverage | 90% max. |
| | | Primary Building Frontage | 70% min. |
| | | Lot Width | 20 – 240 ft. |
| L  Access Drive Width to setback | 24 ft. max. | | |

### BUILDING FRONTAGE

| REQUIRED PRIVATE FRONTAGE TYPES (SEE TABLE 4.14 PRIVATE FRONTAGES) | |
|---|---|
| Primary Frontage | stoop, terrace, common entry, gallery, forecourt, shopfront |
| Secondary Frontage | stoop, terrace, common entry, gallery, forecourt, shopfront |
| Entry Requirements | 1 per 50 ft. of primary frontage and 1 per 80 ft. of secondary frontage |

### ENCROACHMENTS

| Setback Encroachments | | Sidewalk Encroachments | |
|---|---|---|---|
| Open porch | 100% max. up to 10 ft. | Awning or gallery | 100% max. or within |
| Balcony and/or bay window | 100% max. up to 6 ft. | | 2 ft. of curb |
| Stoop or terrace | 100% max. up to 8 ft. | | |

| MINIMUM GLAZING | | AMBIENT STANDARDS | |
|---|---|---|---|
| Ground Floor | 50% | Light Level | 2 fc. max. |
| Upper Floors | 25% | Noise: 12am to 7am | 60 dBa |
| | | Noise: 7am to 10pm | 75 dBa |
| | | Noise: 10pm to 12am | 65 dBa |

### BUILDING HEIGHT



### BUILDING HEIGHT

| A. | Main Building | 3 stories |
|---|---|---|
| B. | Accessory Buildings | 3 stories |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 88 of 163 PageID #: 97

## TABLE 4.10    D1 LOT STANDARDS

| BUILDING SETBACKS AND LOT REQUIREMENTS |
|---|



| SETBACKS | | LOT REQUIREMENTS | |
|---|---|---|---|
| A | Primary Frontage | 25 ft. min. | Lot Coverage | 55% max. |
| B | Secondary Frontage | 20 ft. min. | Density (units per acre) | 1.0 |
| C | Side Lot Line Aggregate | 20 ft. total, 5 ft. min. | Access Drive Width to setback | 12 ft. max. |
| D | Rear Lot Line | 30 ft. min. | Lot Width | 85 ft. min. 65 ft. min. w/alleys |

| ENCROACHMENTS | | | |
|---|---|---|---|
| Fireplace | 2.5 ft. max. | Balcony and/or bay window | 3 ft. max. |

| BUILDING HEIGHT |
|---|

| BUILDING HEIGHT | |
|---|---|
| A. | Main Building | 3 stories |
| B. | Accessory Buildings | 3 stories |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 89 of 163 PageID #: 98

**TABLE 4.11    D2 LOT STANDARDS**

| BUILDING SETBACKS AND LOT REQUIREMENTS |
|---|



| | SETBACKS | | LOT REQUIREMENTS | |
|---|---|---|---|---|
| A | Primary Frontage | 20 ft. min. | Lot Coverage (single family) | 55% max. |
| B | Secondary Frontage | 12.5 ft. min. | Density (units per acre) | 1.5 |
| C | Side Lot Line Aggregate | 20 ft. total, 5 ft. min. | Access Drive Width to setback | 12 ft. max. |
| D | Rear Lot Line | 20 ft. min. | Lot Width | 65 ft. min. |
| | ENCROACHMENTS | | | |
| | Fireplace | 2.5 ft. max. | Balcony and/or bay window | 3 ft. max. |

| BUILDING HEIGHT |
|---|

| | BUILDING HEIGHT | |
|---|---|---|
| A. | Main Building | 3 stories |
| B. | Accessory Buildings | 3 stories |

87

## TABLE 4.12   D3 LOT STANDARDS

| BUILDING SETBACKS AND LOT REQUIREMENTS |
|---|



| | SETBACKS | | | LOT REQUIREMENTS | |
|---|---|---|---|---|---|
| A | Primary Frontage | 10 ft. min. | | Lot Coverage (single family) | 55% max. |
| B | Secondary Frontage | 10 ft. min. | | Density (units per acre) | 3.0 |
| C | Side Lot Line Aggregate | 15 ft. total, 5 ft. min. | | Access Drive Width to setback | 12 ft. max. |
| D | Rear Lot Line | 20 ft. min. | | Lot Width | 50 ft. min. |
| | | | | Townhome Lot Width | 20 ft. min. |

| ENCROACHMENTS | | | |
|---|---|---|---|
| Fireplace | 2.5 ft. max. | Balcony and/or bay window | 3 ft. max. |

| BUILDING HEIGHT |
|---|



| SINGLE FAMILY | | MULTI-FAMILY | |
|---|---|---|---|
| A.  Main Building | 3 stories | A.  Main Building | 3 stories. |
| B.  Accessory Buildings | 3 stories | B.  Accessory Buildings | 2 stories |

88

## TABLE 4.13   NC LOT STANDARDS

### BUILDING SETBACKS AND LOT REQUIREMENTS



| MAIN BUILDING SETBACKS | | | PARKING AND STORAGE SETBACKS | | |
|---|---|---|---|---|---|
| A | Primary Frontage | 12 ft. max. | H | Primary Frontage | 20 ft. min. |
| B | Secondary Frontage | 10 ft. max. | I | Secondary Frontage | 20 ft. min. |
| C | Side Lot Line | 0 ft. min. | J | Side Lot Line | 0 ft. min. |
| D | Rear Lot Line | 5 ft. min. | K | Rear Lot Line | 3 ft. min. |
| ACCESSORY BUILDING SETBACKS | | | LOT REQUIREMENTS | | |
| Accessory buildings are subject to the setback standards of principal buildings. | | | Lot Coverage | | 50% max. |
| | | | Primary Building Frontage | | 60% min. |
| | | | Density (units per acre) | | 12.0 |
| | | | Access Drive Width to setback | | 24 ft. max. |
| | | | Lot Width | | 50 – 200 ft. |

### BUILDING FRONTAGE

| REQUIRED PRIVATE FRONTAGE TYPES (SEE TABLE 4.14 PRIVATE FRONTAGES) | | |
|---|---|---|
| Primary Frontage | stoop, terrace, common entry, gallery, forecourt, shopfront | |
| Secondary Frontage | stoop, terrace, common entry, gallery, forecourt, shopfront | |
| Entry Requirements | 1 per 50 ft. of primary frontage and 1 per 80 ft. of secondary frontage | |
| **ENCROACHMENTS** | | |
| Balcony and/or bay window | 100% max. up to 6 ft. | Awning or gallery | 100% max. or within |
| Stoop or terrace | 100% max. up to 8 ft. | | 2 ft. of curb |
| Fireplace | 2.5 ft. max. | | |

| MINIMUM GLAZING | | AMBIENT STANDARDS | |
|---|---|---|---|
| Ground Floor | 50% | Light Level | 2 fc. max. |
| Upper Floors | 25% | Noise: 12am to 7am | 60 dBa |
| | | Noise: 7am to 10pm | 75 dBa |
| | | Noise: 10pm to 12am | 65 dBa |

### BUILDING HEIGHT

| BUILDING HEIGHT | |
|---|---|
| A. Main Building | 3 stories |
| B. Accessory Buildings | N/A |

**TABLE 4.14   CC LOT STANDARDS**

| BUILDING SETBACKS AND LOT REQUIREMENTS |
|---|



| SETBACKS | | | LOT REQUIREMENTS | |
|---|---|---|---|---|
| A | Primary Frontage | 10 ft. min. | Lot Coverage | 70% max. |
| B | Secondary Frontage | 10 ft. min. | Access Drive Width one-way | 12 ft. max. |
| C | Side Lot Line | 8 ft. min. | Access Drive Width two-way | 24 ft. max. |
| D | Rear Lot Line | 15 ft. min. | Lot Width | 100 ft. min. |

| BUILDING HEIGHT |
|---|



| BUILDING HEIGHT | | |
|---|---|---|
| A. | Main Building | 3 stories |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 93 of 163 PageID #: 102

**TABLE 4.15    IL LOT STANDARDS**

| BUILDING SETBACKS AND LOT REQUIREMENTS |
| --- |



| SETBACKS | | | LOT REQUIREMENTS | |
| --- | --- | --- | --- | --- |
| A | Primary Frontage | 15 ft. min. | Lot Coverage | 50% max. |
| B | Secondary Frontage | 15 ft. min. | Access Drive Width one-way | 12 ft. max. |
| C | Side Lot Line | 10 ft. min. | Access Drive Width two-way | 24 ft. max. |
| D | Rear Lot Line | 20 ft. min. | Lot Width | n/a |
| | | | Lot Size | 5 acres |

| BUILDING HEIGHT |
| --- |



| BUILDING HEIGHT | |
| --- | --- |
| A. | Main Building | 45 ft. |

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 94 of 163 PageID #: 103

**TABLE 4.16    IM LOT STANDARDS**

| BUILDING SETBACKS AND LOT REQUIREMENTS |
|---|



| | SETBACKS | | LOT REQUIREMENTS | |
|---|---|---|---|---|
| A | Primary Frontage | 30 ft. min. | Lot Coverage | 60% max. |
| B | Secondary Frontage | 20 ft. min. | Access Drive Width one-way | 12 ft. max. |
| C | Side Lot Line | 10 ft. min. | Access Drive Width two-way | 24 ft. max. |
| D | Rear Lot Line | 25 ft. min. | Lot Width | n/a |
| | | | Lot Size | 15 acres |

| BUILDING HEIGHT |
|---|



| BUILDING HEIGHT | |
|---|---|
| A. Main Building | 45 ft. |

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 95 of 163 PageID #: 104

### 4.8   Transect Zoning District Frontage Requirements

The private frontage of buildings shall conform to Table 4.14 Private Frontages and shall be permitted where indicated in Table 4.3 – Table 4.6 and Table 4.10. The principal entrance to the principal building shall be access via the primary frontage, and shall be located in the primary facade. See Table 3.2 Facades, Elevations, and Lot Lines Illustrated.

4.8.1   Regulations pertaining to primary frontages and secondary frontages, collectively frontage requirements, apply to the area of the lot within the primary front setback and secondary front setback including the following:

a.   Building facades.

b.   Structures that project from the facade such as porches, terraces, stoops, awnings, canopies, and bay windows.

c.   Landscape elements between the building facade and the lot line.

4.8.2   Where building facades do not occupy the entire frontage length in T4O or T5, a streetscreen is required as follows:

a.   Streetscreens shall be between 4 and 6 feet in height.

b.   Openings in the streetscreen for vehicular access shall be no wider than 30 feet.

c.   Streetscreen material are limited to the following: brick, stone, stucco over masonry, iron, steel or aluminum that appears to be iron. Non-opaque streetscreens require evergreen planting behind to provide opacity.

4.8.3   A shopfront frontage is required for all ground floor retail uses.

4.8.4   Loading docks and service areas up to a combined width of 30 feet may be incorporated into frontages as follows:

a.   At secondary frontages located towards the rear of the lot.

b.   At primary frontages where lots have no secondary frontage and lot width exceeds 120 feet.

c.   Loading docks and service areas shall be permitted on b-grid frontages and shall not be permitted on or within 100 feet of an a-grid frontage.

4.8.5   Frontage encroachments are permitted as follows:

a.   Roof overhangs, cornices, window and door surrounds and other facade decorations may encroach into the front setback up to 2 feet beyond the structure they are attached to but not beyond the lot line.

b.   Encroachments into the front setback are prohibited except where specifically permitted in this subsection and Table 4.3 – Table 4.6 and Table 4.10.

**TABLE 4.17   PRIVATE FRONTAGES**



| COMMON LAWN | |
|---|---|
| | Private Frontage   Sidewalk   Street |
| Permitted Elements | Porch or stoop |
| Surface Treatments | Landscaping, including produce gardens and a path or sidewalk leading to building entries |
| Special Requirements | Porches and stoops shall be 18 to 34 in. above average sidewalk grade at the frontages.<br>Porches shall be no less than 6 ft. deep. |
| Encroachments | Porches and stoops may encroach into the front setback up to 50% of their depth in T3 and 100% of their depth in T4 at the primary entrance. |

| FENCED LAWN | |
|---|---|
| | Private Frontage Sidewalk   Street |
| Permitted Elements | Porch, stoop, fence, hedge, wall |
| Surface Treatments | Landscaping, including produce gardens and a sidewalk leading to building entries |
| Special Requirements | Porches and stoops shall be 18 to 34 in. above average sidewalk grade at the frontages.<br>Porches shall be no less than 6 ft. deep.<br>Fences at primary and secondary frontages shall not exceed 42 in. in height. |
| Encroachments | Porches and stoops may encroach into the front setback up to 50% of their depth in T3 and 100% of their depth in T4, T4O, and T5 at the primary entrance.<br>Stairs providing access to a porch or stoop may encroach up to the front lot line. |

94

**TABLE 4.17    PRIVATE FRONTAGES**



**STOOP**

| Permitted Elements | Hedges, walls |
| --- | --- |
| Surface Treatments | Landscaped in T4. Paved in coordination with public frontage in T4O and T5. |
| Special Requirements | Stoops shall be 18 to 34 in. above average sidewalk grade at the frontage.<br>Stoop may be recessed into the building facade.<br>Stoop depth shall be 4 ft. min. – 6 ft. max. |
| Encroachments | Stoops may encroach into the front setback up to 50% of their depth in T3 and 100% of their depth in T4, T4O, and T5 at the primary entrance.<br>Stairs providing access to a stoop may encroach up to the front lot line. |

**TERRACE**

| Permitted Elements | Stoop, shopfront, awning, wall |
| --- | --- |
| Surface Treatments | Paved or landscaped |
| Special Requirements | Terraces shall be raised 12 in. min. above average sidewalk grade.<br>Terraces shall be a minimum of 8 ft. deep.<br>Awnings, if used, shall be a minimum of 6 ft. in depth and shall not extend beyond the terrace.<br>Awnings, if used, shall have a minimum 8 ft. clearance above the terrace. |
| Encroachments | Terraces may encroach into the front setback up to 100% of their depth. |

95

## TABLE 4.17   PRIVATE FRONTAGES

### COMMON ENTRY



Private Frontage  Sidewalk  Street

| | |
|---|---|
| Permitted Elements | Awning, planter, wall |
| Surface Treatments | Any area not within the planter shall be paved. |
| Special Requirements | Awnings, if used, shall be a minimum of 6 ft. in depth and shall have a minimum 8 ft. clearance above the sidewalk. |
| Encroachments | Awnings may encroach the right-of-way to within 2 feet of the curb. |

### FORECOURT



Private Frontage  Sidewalk  Street

| | |
|---|---|
| Permitted Elements | Shopfront, gallery, awning, planter, hedge, wall |
| Surface Treatments | Any area not within a planter shall be paved in coordination with the public frontage. |
| Special Requirements | Forecourt may recess 20 ft. max. for pedestrian entries or 30 ft. max. for vehicular access. |
| | Forecourt shall be located at the primary entrance. |
| | Forecourt shall be bounded by building facades on a minimum of two sides and shall not exceed 1,600 s.f. |
| | Driveways within forecourts are limited to 20 ft. in width. |
| | The width of the forecourt counts toward frontage buildout requirements. |
| | Awnings, if used, shall be a minimum of 6 feet in depth and shall have a minimum 8 foot clearance above the sidewalk. |
| Encroachments | Awnings may encroach the right-of-way to within 2 feet of the curb. |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 99 of 163 PageID #: 108

**TABLE 4.17   PRIVATE FRONTAGES**



| | |
|---|---|
| Permitted Elements | Shopfront |
| Surface Treatments | Paved |
| Special Requirements | Galleries shall be a minimum of 7 ft. in depth and shall have a minimum 10 ft. clearance above the sidewalk. |
| Encroachments | Galleries may encroach the right-of-way to within 2 feet of the curb but shall maintain a 5 ft. min. continuous, clear, paved pedestrian path. |

| | |
|---|---|
| Permitted Elements | Awning, display windows |
| Surface Treatments | Paved |
| Special Requirements | Facade shall be glazed with clear glass no less than 50% of the ground floor frontage, calculated separately for each facade.<br>Entries may be recessed from the facade up to 6 ft. in depth.<br>Awnings, if used, shall be a minimum of 6 feet in depth and shall have a minimum 8 foot clearance above the sidewalk. |
| Encroachments | n/a |

## 4.9   Specific Zoning District Standards

4.9.1   Regulations specific to the T1 zoning district.

Development shall be prohibited in the T1 zoning district, except for structures erected for parks, and park services, and other structures as approved by the Planning Commission, except where the Plan-

97

ning Commission has no jurisdiction.

4.9.2 Regulations Specific to the D1 Zone. The D1 zone is primarily for residential use at a light intensity.

4.9.3 Regulations Specific to the D2 Zone. The D2 zone is primarily for residential use at a medium intensity.

4.9.4 Regulations specific to the D3 Zone. The D3 zone is primarily for residential use at a high intensity.

    a. Recreational Space. 10 percent or 20,000 ft.² of the total development, whichever is less, shall be devoted to usable space for recreational activities. Ponding and drainage areas may contribute to this recreational space.

4.9.5 Regulations Specific to the NC Zone. The NC zone is primarily for neighborhood commerce.

    a. Driveways. Driveways may not exceed 150 feet in length without an approved turnaround unless reviewed and approved by the County Fire Marshal; 25 feet of driveway width for non-dedicated streets or driveways within a lot for two-way traffic and 20 feet for one-way traffic (measured perpendicular to the direction of travel).

4.9.6 Regulations Specific to the CC Zone. The CC zone is primarily for community commerce.

    a. Driveways. Driveways may not exceed 150 feet in length without an approved turnaround unless reviewed and approved by the County Fire Marshal; 25 feet of driveway width for non-dedicated streets or driveways within a lot for two-way traffic and 20 feet for one-way traffic (measured perpendicular to the direction of travel).

4.9.7 Regulations General to the IL, and IM zones. The IL, and IM zones are primarily for light and medium industry, respectively. (1) The two zones differ in their uses permitted, which are listed separately in Table 5.1. Land Use Classification Matrix (2) Setbacks for loading facilities from railroad tracks or airport taxiways may be reduced to 0 feet.

## 4.10 Use Residential Property Standards

These standards govern residential developments in the D1, D2, and D3. Multi-family developments are also subject to review and approval by the Design Review Commission.

4.10.1 Single-Family Residential Standards

    a. All accessory structures shall be located within the rear yard, shall be located a minimum of 5 feet from the primary residence and shall not be located within 5 feet of the side or rear property line.

    b. Required setback areas shall be landscaped and permanently maintained in a healthy manner and should include a minimum of one (1) two (2) inch caliper tree.

    c. New single family subdivisions shall have a two (2) car garage that meets interior dimensions of 22 feet by 22 feet. This interior dimension shall be free and clear of permanent obstructions, such as water heaters, washer/dryer hook up areas, stairs, etc. Single lot site plans for the development of a single family residence shall have a minimum of a two car garage. All front loaded garages shall be recessed from the front façade a minimum of 2 feet. Existing residential dwellings are exempt from this standard. Detached garages and carports shall be located toward the side or rear of the residence beyond the front wall plane of the residence. All driveways shall be a minimum of 20 feet in length, exclusive of sidewalks.

    d. Single family lots shall be developed with one dwelling unit consisting of a single kitchen facility, one front access point and shall have non-restricted interior access to all portions of the structure.

    e. Each residential subdivision over 50 lots shall incorporate a minimum of one (1) and any development over 100 lots shall incorporate a minimum of two of the following: children's playground, swimming pool with amenities center, passive recreation areas, and trails throughout the open space where feasible (significant slopes exceeding 20% may be excluded). All amenities provided for use of the residents of the subdivision shall be maintained by the HOA.

    f. With the exception of the driveway, a person shall not keep, store, park, maintain or otherwise al-

low any vehicle or vehicle parts in the required front yard or any additional area of a residential lot that is not predominantly screened from a public or private street by solid fencing, walls or vegetation.

### 4.10.2 Townhouse Residential Standards

a. Townhouses shall not exceed the maximum allowable density for the zone and shall be platted as individual lots.

b. Townhouses shall not contain more than six units within one structure and shall each have a minimum of a one-car garage with a driveway apron no less than 20 feet, exclusive of the sidewalk.

c. Front-loaded townhouses shall have adjacent overflow parking lots provided at a rate of .5 per unit.

d. Townhouses shall not exceed three stories or 35 feet, whichever is more restrictive.

### 4.10.3 Multi-family Residential Standards

a. Multi-family developments shall be located on a minimum of five (5) acres.

b. Required front and side yard setbacks shall be landscaped and permanently maintained in a healthy manner. Irrigation systems shall be utilized for all required landscaped areas. Landscape areas in excess of the requirements of this ordinance do not require irrigation systems.

c. Construction shall incorporate masonry and brick. No vinyl or metal siding is permitted. Building facades shall include varied wall planes, projections and recesses, window articulation and natural color schemes. All elevations facing roadways shall include additional design and landscaping to soften and improve the appearance of the building mass.

d. Groupings of buildings shall be used instead of long linear rows of buildings. Building massing shall incorporate varied rooflines, building heights and other architectural features. No residential building shall exceed 200 feet in length regardless of the number of dwelling units within the building.

e. Entry drives shall be designed to incorporate enhanced paving, landscaping and other features which complement the building architecture.

f. Masonry walls shall be required for noise attenuation between multi-family and single-family land uses. Masonry walls shall be designed to match the architecture of the residential structures.

g. Each multi-family development shall incorporate a minimum of two of the following: children's playground, swimming pool with amenities center, and trails throughout the open space where feasible (significant slopes exceeding 25% may be excluded), or other options approved by the Planning Commission.

h. Each unit shall have one (1) designated parking spaces located in proximity to the unit it serves. Long rows of garages shall be broken up into groupings to serve the units.

i. Each multi-family development shall include trash areas that will be designed to accommodate two (2) trash bins, one which will be designed for recycling. The trash enclosure shall be enclosed by a masonry wall that matches the architecture of the residential buildings. In addition, a landscape planter shall be utilized to provide screening around the trash enclosure.

### 4.10.4 Accessory Dwelling Unit Standards

a. One accessory dwelling unit (ADU) or guest house is permitted on all lots developed with a primary residence. The unit may be attached or detached. Attached units shall be limited to half the square footage of the primary dwelling or 900 square feet, whichever is less.

b. The secondary unit shall not exceed the height of the primary residence on the lot.

c. The height of an ADU shall not exceed the maximum height for accessory structures.

d. One additional paved, off street parking space shall be provided for an ADU.

e. The ADU shall be compatible with the primary residence and shall keep with the character of the

99

surrounding vicinity.

f.  An address shall be provided for all ADUs through Williamson County.

g.  All standards applicable to setbacks, lot coverage, etc. that pertain to residential development shall be adhered to with the development of ADUs unless otherwise addressed within this section.

## 4.11  Non-Residential Use Property Development Standards

These standards govern all non-residential developments. All non-residential developments are subject to review and approval by the Design Review Commission.

### 4.11.1  Non-Residential Standards

a.  Buildings should be located along road frontage with parking located in the rear.

b.  Lot coverage shall not exceed the standards of Table 4.10 through Table 4.13, and shall include the footprint of all structures on the site.

c.  Construction shall incorporate masonry and brick or shall match the character of the surrounding area. No vinyl is permitted. Metal siding is discouraged and shall be used only as an accent treatment. Building facades shall include varied wall planes and roof lines, projections and recesses, window articulation and natural color schemes.

d.  Groupings of buildings shall be used instead of long linear rows of buildings. Building massing shall incorporate varied rooflines, building heights and other architectural features.

e.  Entry drives shall be designed to incorporate enhanced paving, landscaping and other features which complement the building architecture.

f.  Each development shall include trash areas that will be designed to accommodate two trash bins, one which will be designed for recycling. The trash enclosure shall be enclosed by a masonry wall that matches the architecture of the buildings on site. In addition, a landscape planter shall be utilized to provide screening around the trash enclosure.

g.  All ground or building mounted mechanical equipment shall be landscaped to reduce visibility from adjacent properties, rights-of-way and parking areas.

h.  No temporary structures shall be permitted.

### 4.11.2  Home Occupations

The purpose of this Section is to establish standards for non-residential uses within residential dwellings by the permanent residents in a manner that protects the residential character of the area, while providing the flexibility of granting home based businesses.

a.  No home occupation shall be permitted in any residential zoning district without a home occupation permit. The consent of the property owner is required before any home occupation permit will be issued. A home occupation permit application must be submitted to the Town and be accompanied by the required fee. The application must include the following information:

   i.  A complete home occupation application.

   ii.  A site plan showing the location of all proposed business activities on the project site.

   iii.  Consent of the property owner.

   iv.  Any information that the Town may reasonably request in order to process the application.

b.  The principal structure on the site shall be maintained as a residential use occupied by the person(s) conducting/engaged in the business.

c.  For sites that are less than one acre in size, the home occupation shall be completely enclosed within a structure on site. Sites exceeding one acre in size that utilize outdoor areas or other structures exceeding 1,000 square feet shall be subject to the requirements for residential businesses.

100

d. No exterior alterations of the dwelling shall be made which would change the residential character of the house.

e. No business activities which would generate significant non-residential traffic or parking problems for the neighborhood shall be permitted.

f. Deliveries to the residence for business purposes shall not be in substantial excess to that of normally occurring to the residential use.

g. The residents of the dwelling unit and three additional non-residents may be permitted to be engaged in the home occupation providing all parking can be provided on site and the use does not become a nuisance to the community.

h. Any proposed signage shall be required to obtain a sign permit prior to the installation of any signs.

4.11.3   Residential Business

The purpose of this Section is to establish standards on larger residential properties which are conducive to both residential and business land uses. These regulations are intended to permit non-intrusive economic activity on residential properties while protecting the integrity of the community and to promote and protect the public health, safety and general welfare of the people of the Town of Thompson's Station.

a. Administration

Residential Business Permit Process

i. No residential business shall be permitted in any residential zoning district without a residential business permit. The consent of the property owner is required before any residential business permit will be issued. A residential business permit application must be submitted to the Town and be accompanied by the required fee.

ii. Residential businesses shall be subject to review and approval by the Planning Commission. The application must include the following information:

a) A complete application, including a justification statement explaining the proposed business in detail.

b) Ten (10) copies of a detailed site plan showing the location of all proposed business activities on the project site.

c) Ten (10) copies of detailed building elevations (for all new construction).

d) Written consent of the property owner.

e) Any information that the Town may reasonably request in order to process the application.

b. General Regulations

i. A residential business may not be permitted on lots less than one (1) acre in size.

ii. The residents of the property must be engaged in the business. Additional non-residents may be employed in the residential business providing all parking can be provided on site and the use does not become a nuisance to the community. Adequate parking for all employees shall be indicated on the site plan.

iii. With the exception of land uses that require cultivation of the land, all residential business uses shall be maintained within an enclosed building, not to exceed 5,000 square feet.

iv. All storage of materials used for the residential business shall be kept within an enclosed structure or shall be completely screened from the roadways and adjacent properties.

v. All buildings utilized for the business shall maintain a minimum setback of 50 feet from any property line.

101

vi. Any land alterations necessary for the installation of any accessory structures shall be subject to review and approval of a grading plan.

vii. All businesses shall comply with the code requirements for buffer yard performance standards.

viii. Any business that exceeds the thresholds within the Noise Ordinance shall be required to soundproof the building.

ix. No activities, materials or equipment related to the residential business may negatively impact visibility from the public right-of-way or neighboring residences.

x. Any proposed signage shall be required to obtain a sign permit prior to the installation of any signs.

## 4.11.4 Windmill Standards

These standards govern the installation of windmills or other similar electricity generating facilities intended for residential use. The Board of Zoning Appeals may, through the special exception permit process, determine that additional standards are necessary for the health, safety and welfare of the community as a whole.

a. Windmills shall not be located on any parcel which is less than five (5) acres. Prior to the subdivision of any land containing a windmill into less than 5 acre parcels, the windmill shall be removed. No more than one (1) windmill shall be permitted per five acre parcel.

b. Windmills shall not exceed 80 feet in height measured at grade to the highest point of the structure.

c. Windmills shall be located within the rear yard of the property.

d. Windmills shall be constructed of non-combustible materials.

e. The setback shall be determined by the total extended height, which shall include the height of the windmill plus the length of one turbine plus an additional 10 feet. This setback shall be maintained from all property lines, public rights-of-way, and any overheard utility line or structure.

f. No signs are permitted on any portion of the windmill.

g. Compliance with other codes. Windmills shall be constructed, and maintained in accordance with all applicable building and electrical codes. A letter from the utility company shall be obtained and submitted with the application for any windmills that are proposed to be connected to utility company infrastructure.

h. Any windmill that is inoperable for greater than six months shall be removed from the property. Failure to remove inoperable windmill may result in removal by the Town at the expense of the property owner.

## 4.11.5 Automotive Uses

Due to the high impact of automotive uses the following standards are established for the development of automotive repair/body repair shops, automotive service facilities, automotive washes, automotive fuel sales and accessory uses or any similar use or combination of the above uses.

a. Main buildings and structures shall be located as close as allowable to the public right-of-way, adjacent to landscaping, and the front façade of the main structures shall orient toward the public right-of-way. Automotive bays, canopies, and gasoline pumps, and other garage space access shall be oriented away from public rights-of-way

b. Lot coverage for automotive facilities shall include all buildings and canopies on site and shall not exceed 25%. Total amount of impervious surface shall be limited to 40%.

c. Parking shall be predominantly located in the rear of the site behind the main structure, where feasible. In cases where a portion of the parking fronts a public right of way, a landscaped hedge shall be provided to screen all parking spaces. The overnight parking or storage of any vehicles shall be fully screened from all public rights-of-way.

102

d.  A maximum height of 25 feet is permitted for all structures.

e.  Car washes and other automotive uses that require vehicle stacking for quick service functions shall have a minimum queuing or stacking of three (3) cars or 60 feet. The queue cannot block any ingress/egress, drive aisles or parking.

f.  Temporary display is permitted. Displays may not be located within any vehicular or pedestrian path of travel or any parking areas.

g.  Internal pedestrian access shall be provided and shall consist of paved walkways, decorative treatments, etc. to clearly identify the pedestrian path.

h.  Uses Not Associated with the Business. No sale of merchandise such as, cars, motor vehicles, etc. by private parties shall be permitted on the premises.

i.  All buildings shall be reviewed by the Design Review Committee.

j.  Canopy fascia shall match the color and materials of the other buildings on site. No more than two points of ingress/egress shall be permitted and no more than 35% of the street frontage shall be dedicated to curb cuts. Driveways shall be located a minimum of 200 feet from any intersection.

k.  Automotive uses shall be operated and maintained in accordance with all applicable state and building codes.

## 4.11.6   Self-Storage

These standards are a minimum set forth to govern the development of self-storage facilities. The Board of Zoning Appeals may, through the special exception permit process, determine that additional standards are necessary for the health, safety and welfare of the community as a whole.

a.  Self-storage facilities shall not be located on any parcel which is less than two (2) acres.

b.  All self-storage facilities shall maintain a minimum of a 25 foot landscaped front yard setback, a 15 foot landscaped setback and a 20 foot landscaped setback.

c.  No building shall exceed 20 feet in height unless the additional height is for architectural features for the visual enhancement of the structure. No additional storage will be permitted within areas exceeding 20 feet in height.

d.  All self-storage facilities shall be enclosed by a solid masonry wall with a minimum height of six (6) feet. All self-storage facilities shall have additional landscaping to screen the sides and rear of the facility to provide a visual buffer between land uses.

e.  All noise shall be sound attenuated so that the noise level measured at the property line that does not exceed 85 decibels during the day and 65 decibels at night when adjacent to residential districts.

f.  All self-storage facilities shall be designed and developed in a complementary architectural style to surrounding developments. Other design features that are consistent with the Town's Design Guidelines shall be utilized to increase the overall appearance of self-storage facilities. All self-storage facilities shall be reviewed by the Design Review Committee.

g.  No uses other than storage and a related office are permitted within the self-storage facility.

h.  All storage shall be contained with each individual storage unit. Outdoor storage shall be subject to outdoor storage requirements.

i.  Self-storage facilities shall be operated and maintained in accordance with all applicable state, county and local building codes and regulations.

## 4.11.7   Wireless Communications Facilities

These standards govern the development of wireless communications facilities.

a.  Review Process for Wireless Communication Towers ("WCT"). All applications to construct a WCT within the Town shall include a detailed site plan of the proposed WCT, in addition to information

103

required for a building permit, and shall obtain the approval of the Planning Commission, unless specifically exempted as provided herein.

b. Permitted Locations. WCTs are permitted within the IM zoning district subject to these standards; however, the placement of such towers in areas and specific locations to minimize the visual impact of WCTs is strongly encouraged.

c. Low-impact WCTs. Proposed WCTs meeting the following requirements shall not require Planning Commission review and approval, but may be approved by Town staff:

i. Antennae located on existing non-residential structures that do not extend more than ten (10) feet above the existing structure and that are camouflaged or placed in a manner so as to minimize visibility.

ii. Monopoles of less than forty (40) feet in height located within areas of public right-of-way as permitted by the Town or located on existing utility poles within the Town.

iii. The co-location of antennae on existing WCTs, whether they were constructed before the effective date of this ordinance or approved in accordance with this ordinance, provided no additional height is added to the WCT.

d. Medium-impact WCTs. Proposed WCTs meeting the following requirements are permitted upon Planning Commission review and approval. In addition to the following requirements, the Planning Commission may also impose such other conditions as reasonably necessary to protect the surrounding property uses:

i. Applications proposing medium-impact WCTs shall demonstrate that (a) they have exhausted all reasonable efforts to co-locate with existing facilities and (b) that a low-impact WCT is not feasible for the their needs and purposes.

ii. Medium-impact WCTs shall be located where the existing topography and land features provide screening to the maximum extent feasible from the public viewshed.

iii. Unless the proposed WCT is an accessory use on a non-residential property as described in (2) above, the height of a medium-impact WCT shall not exceed twenty (20) feet over the average tree height within a 100 foot radius of the proposed ground mount location and in no event may a medium-impact WCT exceed a height of eighty (80) feet.

iv. All new medium-impact WCTs shall be designed to accommodate the co-location of at least three (3) other users, including all necessary above-ground and underground infrastructure.

v. Medium-impact WCTs shall be separated by not less than 750 feet, measured by a straight line from the base of an existing tower, to the base of a proposed tower.

e. High-impact WCTs. Any proposed WCT not meeting the conditions for low- or medium-impact WCTs require site plan review and approval by the Planning Commission and must meet the following additional conditions:

i. An applicant for a high-impact WCT shall provide an inventory of existing WCTs or sites approved for WCTs that are within the Town, and WCTs outside of the Town which serve areas within the Town, as well as within the coverage area of the proposed WCT. The inventory shall include specific information about the design, height, and location of each WCT and demonstrate that their needs and the needs of the public cannot be adequately served by co-location or installation of a low- or medium-impact WCT. High-impact WCTs will only be approved if the Planning Commission determines based on the evidence presented by the applicant that no existing WCT or structure can accommodate the proposed antenna.

ii. High-impact WCTs shall be no separated by not less than 1,500 feet, measured by a straight line from the base of an existing tower, to the base of a proposed tower.

iii. Site plans applications for high-impact WCTs shall include a detailed landscaping plan sufficient to screen the entire perimeter of the fence of the WCT and to provide for the installation

104

and future growth of large trees and other vegetation. The Planning Commission may require the applicant to post a landscaping bond as a condition of approval.

    iv.    Applications for high-impact WCTs shall also include detailed construction drawings and plans approved by a licensed engineer and a schematic drawing of the proposed WCT and accessory structures, fencing and landscaping.

    v.    A high-impact WCT shall require an additional two-foot setback from the base of the tower to the property line for each vertical foot over the maximum height of structures permitted within that zone district. No WCT shall be permitted by the Planning Commission of a height of more than 125 feet.

f.    Requirements for all WCTs. All WCTs shall meet the following requirements:

    i.    Minimum siting distances to habitable structures required for compliance with the Federal Communications Commission (FCC) regulations.

    ii.    Shall be designed using non-reflective materials and shall be compatible with and match the building architecture and colors to the maximum extent feasible and be located to minimize visual impacts.

    iii.    No signs are permitted on a WCT other than necessary warning or certification signs.

    iv.    No lighting is permitted on a WCT except as required to comply with federal regulations.

    v.    All ground mounted mechanical equipment shall be housed underground or within a structure that shall be fenced and screened from public view with an 8 foot fence. The fenced shall be locked at all times and the perimeter of such fence shall be completely screened from adjacent properties either by existing trees and vegetation or newly installed landscaping.

    vi.    Wireless communications facilities shall be operated and maintained in accordance with all applicable federal, state, county and local building codes and regulations. Any abandoned facilities or structures shall be removed within 30 days.

g.    Abandonment and removal. Any WCT that is not operated for a continuous period of 12 months or more shall be considered to have been abandoned, and the owner shall remove the same within 90 days of receipt of notice from the Town. Failure to remove an abandoned tower or antenna within said 90 days shall be grounds to remove the WCT at the owner's expense. If there are multiple users of a WCT, then this provision shall not become effective until all users abandon the tower. The Planning Commission shall require that a Performance Agreement be established for all High-Impact WCTs, with appropriate financial security to defray the costs of removal.

## 4.11.8   Outdoor Display and Sales

a.    Outdoor displays and sales shall be shown on the site plan for approval of a retail sales or service land use for review and approval by the Planning Commission.

b.    All outdoor displays and sales shall not exceed 25% of the linear feet of store frontage, shall not be stacked in excess of six (6) feet.

c.    Outdoor displays and sales shall not be located within required setbacks or landscaped areas and shall not obstruct any fire lanes, loading/unloading zones, drive aisles or pedestrian walkways.

d.    All furniture used for displays and sales shall be kept clean and in good repair.

## 4.11.9  Outdoor Storage

a.    Outdoor storage shall not be located on any parcel which is less than two (2) acres.

b.    All outdoor storage shall be delineated on the site plan for approval of any use proposed to have outdoor storage. All materials and supplies shall be only be located in approved designated areas and shall not be placed within parking areas, drive aisles, landscaped areas or other similar loca-

Case 3:16-cv-02845   Document 1-1   Filed 11/07/16   Page 108 of 163 PageID #: 117

tions.

4.11.10   Garage/Estate Sales

     a.   All materials or goods sold must be the personal property of one of the persons conducting the sale.

     b.   All garage sales shall be conducted on the residential property and shall be occupied by one of the people conducting the sale.

     c.   No more than six (6) garage sales shall be permitted at any one (1) location each calendar year and shall not exceed three (3) consecutive days.

     d.   Any temporary signage for garage sales shall not be placed in the right-of-way and shall not be erected more than one (1) week in advance of the sale and shall be removed within three (3) days of the sale.

4.11.11   Hotels

     a.   All hotels shall have an indoor lobby that has 24-hour customer service with lobby.

     b.   Internal access shall be provided to each room/suite.

     c.   A minimum of a 3,000 square foot indoor common area shall be incorporated into all hotels.

4.11.12   Model Homes/Office Trailers for Subdivision Sales

     a.   Model homes shall be permitted on recorded lots and shall be constructed meeting all plat requirements for the subdivision.

     b.   Office trailers shall be allowed for a maximum of two (2) years or until ninety percent (90%) of the homes within the subdivision are sold. Vacant trailers in excess of 90 days shall be removed from the site and the site restored to its previous condition.

     c.   A paved parking area with landscaping shall provide three (3) parking spaces to accommodate the model home or the sales office.

     d.   Necessary drainage structures shall be installed to accommodate storm water runoff.

4.11.13   Adult Oriented Establishments

     a.   Adult-oriented establishments shall be permitted only by special exception within the IM zoning district and subject to such conditions as the BZA may impose but shall not be permitted on any property within 500 feet of the following:

         i.   A church or similar place of public assembly used primarily for religious worship and related religious activities;

         ii.   A public or private child care or educational facility, including, but not limited to, day care facilities; continuing, elementary, high, intermediate, junior high, middle, nursery, secondary, special education, or vocational schools; kindergartens; preschools; private schools; post-secondary educational institutions, and the grounds of any such facility, provided that the requirement shall not apply to facilities used primarily for another purpose and only incidentally as a school;

         iii.   A boundary of any residential zoning district or the property line of a lot devoted to a residential use;

         iv.   A public park or recreational area that has been designated for park or recreational activities, including, but not limited to, an athletic field, basketball court, bicycle/pedestrian path, nature trail, park, playground, swimming pool, tennis court, wilderness areas, or similar public land that is under the control, management, or operation of any government park and recreation authority;

         v.   An entertainment business that is oriented primarily towards entertainment for children or families; or

106

      vi.  Any establishment that sells beer or alcoholic beverages, including restaurants, grocery, convenience or packaged liquor stores

b.  Measurements related to this subsection shall be made in a straight line, without regard to intervening objects or structures, from the nearest portion of the building or structure used as part of the premises where an adult-oriented establishment is conducted to the nearest property line of the premises of a use listed in subsection a. above. The presence of a city jurisdictional boundary shall be irrelevant for the purposes of calculating and applying the distance requirements of this subsection. An adult-oriented establishment lawfully operating as a conforming use shall not be rendered a nonconforming use by the location, subsequent to the commencement of operations of said establishment, of a use listed in subsection a. above within 500 feet of the adult-oriented establishment.

## 4.12  Parking Standards

All multi-family and non-residential developments require a parking plan that will be submitted and reviewed with the site plan for development. The parking plan shall identify all parking areas, required landscaping, bicycle parking and loading areas throughout the project site.

4.12.1  Minimum Required Automobile Parking

Use district parking requirements are determined by lot use(s) according to Table 4.16 Use District Parking Requirements. Transect zoning district parking requirements are governed by market demand and have no minimums.

4.12.2  Required parking may be adjusted downward by shared parking according to Table 4.15 Parking Occupancy Rates. Shared parking is determined as follows:

a.  Shared parking is available for two or more uses on one lot or within one block.

b.  Parking facilities may utilize shared parking for uses within 500 feet of the facility.

c.  The adjusted required parking resulting from the shared parking table is the highest daily shared parking requirement determined by completing the shared parking table.

d.  A written agreement shall be drawn to the satisfaction of the Town Attorney and executed by all parties concerned assuring the continued availability of the number of spaces designated for the joint use.

### TABLE 4.18   PARKING OCCUPANCY RATES

| USES | M - F 8 AM-6 PM | M - F 6 PM-12 AM | M - F 12 AM-8 AM | SAT & SUN 8 AM-6 PM | SAT & SUN 6 PM-12 AM | SAT & SUN 12 AM-8 AM |
|---|---|---|---|---|---|---|
| RESIDENTIAL | 60% | 100% | 100% | 80% | 100% | 100% |
| LODGING | 70% | 100% | 100% | 70% | 100% | 100% |
| OFFICE | 100% | 20% | 5% | 5% | 5% | 5% |
| RETAIL | 90% | 80% | 5% | 100% | 70% | 5% |
| RESTAURANT | 70% | 100% | 100% | 70% | 100% | 100% |
| THEATER | 40% | 80% | 10% | 80% | 100% | 10% |
| ENTERTAINMENT | 40% | 100% | 10% | 80% | 100% | 50% |
| INSTITUTIONAL | 100% | 20% | 5% | 10% | 10% | 5% |
| RELIGIOUS | 20% | 20% | 5% | 100% | 50% | 5% |

Planning Staff shall provide a spreadsheet that will perform calculations for specific applications based upon the occupancy rates in this table.

4.12.3  Required parking may be adjusted downwards where the following provisions for cyclists are provided:

a.  1 automobile parking space may be reduced for every 4 bicycle parking spaces provided in excess of that required up to a 10% reduction.

b.  1 automobile parking space may be reduced for every shower provided for non-residential uses, not

to exceed a reduction of 10 spaces.

4.12.4   Maximum Provided Automobile Parking

a.   Parking areas that exceed the allowable parking shall incorporate low impact design (LID). For up to a 5% increase in parking, 25% of the parking area shall be low impact design (LID). An increase between 5 - 10% shall require 35% of the parking area be LID. Any increase in parking over 10% shall require 50% of the parking area LID.

b.   Parking structures may exceed the allowable parking requirements upon site plan approval by the Planning Commission.

**TABLE 4.19   USE DISTRICT PARKING REQUIREMENTS**

| CATEGORIES | SPECIFIC USES | NUMBER OF PARKING SPACES |
|---|---|---|
| RESIDENTIAL | | |
| | Assisted Living, Treatment Facility & Other Group Living | .3 spaces per room |
| | Bed & Breakfast | 1 space per guest room & 2 for owner |
| | Rooming/Boarding House | 1 space per room |
| | Dormitories/Fraternities/Sororities | 1 space per 2 beds |
| | Single Family | 2 accessible (non-tandem) spaces per dwelling unit |
| | Townhomes | 0.5 overflow space per unit |
| | Multi-Family | 1.5 space per unit |
| | Model Homes | 3 spaces per model |
| | All Other Dwelling Units | 1 space per unit |
| INSTITUTIONAL | | |
| | Colleges | 1 space per 4 students |
| | Community Services | 1 space per 250 square feet |
| | Museums, Art Galleries, Opera Houses & Libraries | 1 space per 200 square feet or 1 per 4 seats |
| | Day Care | 1 space per 375 square feet |
| | Hospital or Medical Clinic | 1 per 200 square feet + 1 per physician or 3 per bed |
| | Neighborhood/Community Park | 5 per acre |
| | Parks With Athletic/Ball Fields | 20 per field/diamond or 1 per 4 seats |
| | Religious Assembly | 1 per 3 seats <br> 1 per 9 linear feet of fixed benches <br> 1 per 400 square feet of other areas |
| | Safety Services | 1 per 200 square feet of usable office space |
| EDUCATIONAL | | |
| | Elementary & Junior Highs | 1 per classroom + 1 per 200 square feet of public gathering areas |
| | High Schools | 5 per classroom, plus 1 per 200 square feet of public gathering areas |
| | Schools of Private Instruction | 1 per classroom, plus 1 per 200 square feet of public gathering |
| | Utilities, Basic | 1 per employee |
| COMMERCIAL | | |
| Animal Sales and Service | | |
| | Day Care | 1 space per each employee plus 1 space per 300 square feet of office space |
| | Kennels | 1 space per each 15 animals, plus 1 space per 300 square feet of office space |
| | Animal Shelter | 1 space per 250 square feet of area, excluding housing area for animals |
| | Riding Academies | 1 space per 3 animals |

108

**TABLE 4.19    USE DISTRICT PARKING REQUIREMENTS**

| CATEGORIES | SPECIFIC USES | NUMBER OF PARKING SPACES |
|---|---|---|
| | Veterinary Clinic/Hospital | 1 space per 300 square feet, excluding housing area for animals |
| | Office | 1 per 300 square feet |
| OUTDOOR RECREATION & ENTERTAINMENT | | |
| | Golf Course | 2 per hole + 1 per 200 square feet for club-house |
| | Driving Range | 1 per tee |
| | Miniature Golf | 2 per hole |
| | All other outdoor recreation including amusement parks, batting ranges & water slides | 1 per 600 square feet of outdoor recreation area |
| INDOOR RECREATION & ENTERTAINMENT | | |
| | Assembly/Auditorium | 1 per 6 seats or 1 per 50 square feet of floor area if no permanent seats |
| | Amusement Center | 1 per game table, video game, amusement device + 1 per 200 square feet of floor area |
| | Clubs/Lodges | 1 per 3 persons or 1 per 200 square feet |
| | Health Club/Fitness Center | 10 spaces + 1 per 200 square feet in excess of 1,000 square feet |
| | Skating Rinks & Dance Halls | 5 per 1,000 square feet of floor area |
| | Children's Indoor Play Facility | 1 space per 200 square feet, plus 1 space per 300 square feet of office area |
| RETAIL SALES & SERVICE | | |
| | Drive-Thru Facility | 1 per 250 square feet |
| | Fuel: Full/Self Service With/Without Repair/Service | 1.5 per 1,000 square feet |
| | Bars/Nightclubs | 1 per 2 seats |
| | Banks (Excluding Drive-Thru) | 1 per 1,500 square feet plus required stacking area for drive-thru |
| | Funeral Home, Mortuary, or Crematorium | 1 per 4 seats |
| | Restaurants | 1 per 4 seats |
| | Retail < 5,000 sf | 3 per 1,000 square feet |
| | Theaters | 1 per 6 seats |
| | Supermarkets, Clothing & Department Stores, Hardware Building supplies, Book Stores, Big Box Stores and Similar > 5,000 sf | 5 per 1,000 square feet |
| | Other Service Business, Stand Alone (e.g. beauty / barber shops, frozen food lockers, laundries & similar | 3 per 1,000 square feet |
| | Swap Meets/Farmers Markets | 5 per 1,000 square feet |
| | Hotels/Motels | 0.8 per room + 1 per 800 square feet of public meeting area and restaurant space |
| | Self Service Storage | 4 spaces + 2 for manager's quarters |
| | Auto Mechanical Repair, Body Shop, Car Wash, Gasoline Service Station , Quick Lubrication, Truck Repair, Truck Shop/Travel Plaza, Tire Recapping & Storage | 1 per 375 square feet including service bays, wash tunnels and retail areas + 1 per 100 square feet of patron waiting areas |
| INDUSTRIAL | | |
| | Manufacturing & Production, Warehouse & Freight Movement, Wholesales & Sales | 1 space per 1,000 square feet of GFA to 10,000 square feet then 1 space per 10,000 square feet |

**TABLE 4.19    USE DISTRICT PARKING REQUIREMENTS**

| CATEGORIES | SPECIFIC USES | NUMBER OF PARKING SPACES |
|---|---|---|
| | Waste-Related Uses | 1 per employee |

4.12.5   Off-street Parking Design Standards for All Zoning Districts

Required off street parking spaces shall be at least nine (9) feet in width and at least eighteen (18) feet in length, exclusive of access drives or aisles, ramps, columns, or office or work areas. The length of parking spaces can be reduced to sixteen and one half (16.5) feet including wheel stop if one and one half (1.5) feet in length is provided for the front overhang of the car. The parking space shall have a vertical clearance of at least seven (7) feet. Horizontal widths for parking rows, aisles, and modules shall be provided pursuant to the following table:

**TABLE 4.20    REQUIRED PARKING LOT DIMENSIONS**

| Horizontal Widths for Parking Rows, Aisles and Modules | One Way | Degree Angle from Perpendicular | | | |
|---|---|---|---|---|---|
| | | 30 | 45 | 60 | 90 |
| Single Row | 9 Ft. | 17 Ft. | 18 Ft. | 18 Ft. | 18 Ft. |
| Dividing Aisle | 12 Ft. | 12 Ft. | 13 Ft. | 18 Ft. | 24 Ft. |
| Minimum Module Width | 21 Ft. | 29 Ft. | 31 Ft. | 36 Ft. | 42 Ft. |
| Double Row | 18 Ft. | 34 Ft. | 36 Ft. | 36 Ft. | 36 Ft. |
| Dividing Aisle | 12 Ft. | 12 Ft. | 13 Ft. | 18 Ft. | 24 Ft. |
| Minimum Module Width | 30 Ft. | 46 Ft. | 49 Ft. | 54 Ft. | 60 Ft. |

If asphalt or concrete is used, then the following standards apply:

a.  Concrete surfaces shall be a minimum thickness of four (4) inches with all necessary infrastructure to support that parking area.

b.  Asphalt surfaces shall be two (2) inches after compaction and shall be laid over crushed rock or gravel to a minimum of four (4) inches. Asphalt surfaces shall be rolled smooth.

c.  All spaces shall include striping to meet the minimum dimensions for parking stalls.

d.  Handicap parking shall be provided for in compliance with State and Federal requirements.

e.  Access width limitations per Table 4.3 through Table 4.13 shall be to the front setback. Behind the front setback paving is limited only by lot coverage maximums.

4.12.6   Off-street Parking Design Standards for Transect Zoning Districts

a.  Parking shall not be located within 20 feet of the primary frontage.

b.  Required parking may be fulfilled in the following locations:

    i.  Parking spaces provided within the lot.

    ii.  Parking spaces provided along a parking lane (on-street) corresponding to lot frontages.

    iii.  For lots in T5, parking spaces may be leased from a private or public parking facility within 500 feet of the lot.

c.  Off-street parking shall be accessed by rear alleys or rear lanes where available.

d.  Where rear alleys or rear lanes are not available, off-street parking may be accessed from the following locations:

    i.  From secondary frontages; driveways should be located near the rear lot line.

    ii.  Where secondary frontages are not available, parking may be accessed from the primary frontage in T3 for all lots, in T4 for lots with a minimum width of 45 feet, in T4O and T5 for lots with a minimum width of 60 feet.

e.  For buildings on b-grids, open parking areas may be allowed unmasked on the frontage by admin-

110

istrative waiver, except for corner lots within 100 feet of the a-grid. The Town Planner must make the following written findings:

    i.    The waiver is consistent with the provisions of §1.2 Intent.

    ii.    The waiver is consistent with the General Plan.

    iii.    The open parking area will not materially endanger the public health or safety or constitute a public nuisance if located where proposed and developed according to the plans and information submitted and approved.

    iv.    The open parking area will not substantially injure the value of adjoining property; or that the use is a public necessity.

    v.    The location and character of the open parking area, if developed according to the plans and information approved, will be in harmony with proximate land uses, and consistent with the purposes of the district.

    vi.    The location and character of the open parking area will not adversely affect the district by impeding walkability.

  f.    Driveways providing access to off-street parking are limited to 10 feet in width in T3 and T4 and 24 feet in T4O and T5.

  g.    Pedestrian access to off-street parking should be directly from a frontage.

  h.    Multi-family and Commercial Design Standards

    i.    All off-street parking spaces and aisles shall meet AASHTO size and configuration standards.

    ii.    Parking lots and structures visible from frontages require one of the following screening methods or a combination of methods:

      a)    Liner buildings, optional at parking lots and required at parking structures. A minimum of 70% of parking structures shall be screened ground floor frontages.

      b)    A masonry wall no less than 4 feet in height.

      c)    A metal fence with a hedge or other landscape element to screen the view of parking.

4.12.7   Off-street Parking Design Standards for Use Zoning Districts

  a.    Parking areas located adjacent to any public right-of-way shall be screened by a masonry wall or landscaping not to exceed 42 inches in height. Masonry walls shall be designed to reflect the architectural character of the buildings on site.

4.12.8   Minimum Required Bicycle Parking

Bicycle parking requirements vary by transect zoning district for non-residential use categories pursuant to Table 4.18 Required Bicycle Parking —Transect Zoning Districts and by number of automobile parking spaces in non-residential use zones pursuant to Table 4.19 Required Bicycle Parking — Use Zoning Districts. Bicycle parking required at the frontage may be provided within the front setback or within the public right-of-way in coordination with the Town.

| TABLE 4.21   REQUIRED BICYCLE PARKING —TRANSECT ZONING DISTRICTS | | |
| --- | --- | --- |
| ZONING DISTRICT | RETAIL BICYCLE SPACES (MIN) | OFFICE BICYCLE SPACES (MIN) |
| T3 | n/a | n/a |
| T4 | Frontage: 1 rack (2 spaces) for every 30 feet of frontage<br>Off-street: n/a | Frontage: 1 rack (2 spaces) for every 30 feet of frontage<br>Off-street: n/a |
| T5 | Frontage: 1 rack (2 spaces) for every 50 feet of frontage<br>Off-street: n/a | Frontage: 1 rack (2 spaces) for every 25 feet of frontage<br>Off-street: 1 space for every 20 automobile parking spaces provided |

111

### TABLE 4.22   REQUIRED BICYCLE PARKING — USE ZONING DISTRICTS

| TOTAL PARKING SPACES | MINIMUM NUMBER OF BICYCLE SPACES |
|---|---|
| 10 – 20 | 2 |
| 21 – 40 | 3 |
| 41 – 60 | 4 |
| 61 – 80 | 6 |
| 81 and greater | 10% of the total required parking |

4.12.9   Bicycle Parking Configuration

Bicycle parking provided within the front setback or within the public right-of-way is subject to the following restrictions:

a.   Bicycle racks shall be configured to provide two points of contact for locking bicycles.

b.   Bicycle racks may not be located within the following areas:

i.   Within 5 feet of fire hydrants.

ii.   Within 4 feet of loading zones and bus stop markers.

iii.   Within 3 feet of driveways and manholes.

iv.   Within 2 feet of utility meters and tree boxes.

c.   Bicycle racks installed parallel to the curb shall be set back from the curb a minimum of 2 feet.

d.   Bicycle racks installed perpendicular to the curb shall allow for a minimum setback of 2 feet between the curb and a 56cm bicycle properly locked to the rack.

e.   Bicycle rack placement may not reduce the pedestrian sidewalk path to less than 4 feet accounting for a 56cm bicycle properly locked to the rack.

f.   Bicycle racks should be spaced a minimum of 48 inches when installed parallel to the curb and 30 inches when installed perpendicular to the curb.

4.12.10   Off-street Loading Standards

Any use with a gross floor area of ten thousand 10,000 square feet or more that requires deliveries or shipments shall provide off-street loading facilities in accordance with the following table:

### TABLE 4.23   OFF-STREET LOADING REQUIREMENTS

| GROSS FLOOR AREA (IN SQ. FT.) | NUMBER OF BERTHS |
|---|---|
| 1,000 – 24,999 | 1 |
| 25,000 -79,999 | 2 |
| 80,000 – 127,999 | 3 |
| 128,000 – 198,999 | 4 |
| 199,000 – 255,999 | 5 |
| 256,000 – 319,999 | 6 |
| 320,000 – 391,999 | 7 |

For each additional 100,000 square feet (or fraction thereof) of gross floor area, one (1) additional off-street berth shall be provided. The minimum area for each off-street loading space, excluding area for maneuvering, shall be two-hundred-fifty (250) square feet. At no time shall any part of a truck or van be allowed to extend into a public right-of-way while the truck or van is being loaded or unloaded. When a loading area abuts a residential use a 25 foot buffer-yard shall be established. A 10 foot buffer-yard is required in all other situations.

## 4.13   Lighting Standards

The purpose of this section is to regulate outdoor lighting to minimize light trespass and spill-over of light and glare on operators of motor vehicles, pedestrians, and land uses in the proximity of a light source while permitting adequate and safe lighting for non-residential and multi-family developments. This Section does

not apply to public street lighting.

4.13.1 All developments proposing lighting shall require an exterior lighting plan be submitted and reviewed by the Planning Commission with the site plan for development. The lighting plan shall include all lighting within parking and landscaped areas, and shall provide the following:

    a. All lighting shall be designed to minimize light trespass and spillover onto adjacent rights-of-way and other properties.

    b. Lighting shall be consistent on the project site and designed to match the scale and the architectural style on the site.

    c. A photometric survey shall be required to evaluate lighting.

        i. Transect zoning district lighting shall meet the standards pursuant to Table 4.3 through Table 4.6.

    d. All lighting shall comply with the provisions of this ordinance and any applicable electrical and energy codes.

    e. All lighting installations shall be designed and installed to be fully shielded, except as exempted below, and shall have a maximum lamp wattage of 250 watts HID (or approximately 1,600 lumens) for commercial lighting.

    f. Residential lighting shall be shielded such that the lamp itself or the lamp image is not directly visible outside the property perimeter.

    g. Exemptions:

        i. Lighting in swimming pools and other water features governed by the Electrical Code.

        ii. Exit signs and other illumination governed by the Building Code.

        iii. Lighting for stairs and ramps, as required by the Building Code.

        iv. Holiday and temporary lighting, less than thirty days use in any one year.

        v. Ball field lighting, except lighting shall be shielded to prevent trespass onto adjacent properties.

        vi. Low voltage landscape lighting, but such lighting shall be shielded to eliminate glare and light trespass.

    h. Temporary Lighting

        i. Lighting for temporary uses may be permitted as part of a temporary use as issued with a permit.

        ii. Lighting may not be located in proximity to residences and shall be oriented away from residences.

## 4.14 Landscaping Standards

Landscaping is required on lots, in parking areas, in open spaces and as buffers around certain specified uses or between specific zoning districts. Landscaping requirements for individual non-residential uses or expansions to existing non-residential uses and conversions of residential structures to commercial uses shall be applicable only to the portion of the site affected by the use.

4.14.1 General to all zoning districts

    a. The spacing and placement of plants shall be adequate and appropriate for the typical size, shape and habit of the plant species at maturity.

    b. Proposed canopy trees and understory trees shall be centered horizontally and minimally:

        i. Two (2) feet from walkways, curbing, and other impervious pavements when planted in a tree well or continuous planter;

113

    ii. Three (3) feet from walkways, curbing and other impervious pavements when planted in a continuous swale;

    iii. Five (5) feet from street lights, underground utilities, utility meters and service lines, fences, walls and other ground level obstructions;

    iv. Six (6) feet from porch eaves, and awnings and similar overhead obstructions associated with the ground level of buildings;

    v. Eight (8) feet from balconies, verandas, building eaves and cornices, and similar overhead obstructions associated with the upper stories of buildings.

c. Ground vegetation or shrub planting with spines, thorns or needles that may present hazards to pedestrians, bicyclists or vehicles are prohibited in the first two (2) feet of the first layer.

d. Artificial plants or artificial turf are prohibited, excluding active recreation sports fields that are typically subject to intense use and soil compaction which prohibits the establishment of turfgrass, and where paving or grass paving systems will not suffice given the area's purpose and level of use.

e. An existing vegetation site preservation plan must be submitted with the landscaping plan. This plan must show measures being proposed to insure protection and survival of all vegetation proposed as contributing to landscaping requirements or as required by the Planning Commission.

4.14.2 Landscape Standards Specific to Transect Zoning District Lots

a. Specific to districts T2, T3, T4

    i. The front setback may not be paved, with the exception of driveways and sidewalks as specified in Table 4.14 Private Frontages.

    ii. Preservation of on-site existing trees and vegetation is encouraged and may be used to fulfill the landscape requirements.

        a) Noxious or invasive plants species identified on the prohibited plant list shall be removed.

        b) Priority shall be given to preserving and protecting significant trees that provide screening, buffering, wildlife habitat and/or linkages to wildlife habitat.

b. Specific to district T3

    i. Two (2) trees shall be planted within the front setback.

        a) Substitutions:

            1) One (1) tree may be substituted for two (2) understory trees;

            2) One (1) understory tree may be substituted for ten (10) Shrubs.

        b) Tree Preservation Credit:

            1) Trees may be substituted for an existing tree to be preserved provided that:

                • They are four (4) inches diameter at breast height (DBH) or greater;

                • Possess a healthy and full canopy;

                • Has an unmolested critical root zone (CRZ);

                • Has incurred no damage that would undermine it's long-term vitality and quality.

    ii. Trees may be of single or multiple species.

    iii. Trees shall be naturalistically clustered in conjunction with adjacent street trees.

c. Specific to district T4

    i. One (1) understory tree shall be planted within the front setback

114

       ii.    Trees, if planted, should match the type of adjacent street trees on the public frontage.

    d.    Specific to districts T4O, T5

       i.    Trees shall not be required in the front setback.

       ii.    The front setback may be paved to match the pavement of the public frontage.

       iii.    Porous paving materials should be used in order to increase storm water infiltration on site.

4.14.3    Landscaping Standards for Use Zone Parking Lots

For any development with a minimum requirement of 20 or more parking spaces and parking areas proposed within 150 feet of an arterial or collector road, there shall be a minimum of 250 square feet of green space provided for every ten parking spaces located in the affected area. This green space shall be reasonably distributed inside the perimeter of the affected parking area. All parking lot islands shall have a minimum required width of ten feet, measured from the back of curb. All parking spaces affected by this standard shall be located within 55 feet of a parking lot island. Parking lot islands shall be planted with trees that are three caliper inches or greater in size and properly spaced for future growth and urban conditions. In addition, all parking areas located within 25 feet of an arterial or collector road must be screened by a permanent landscaped berm and evergreen hedge, containing plant species suitable for urban conditions and measuring at least 30 to 36 inches in height at the finished grade of the parking area.

## 4.15   Fencing Standards

4.15.1    No wall or fence shall exceed six (6) feet in height. Prohibited materials include chain link, barb wire, or temporary materials. Construction sites with temporary fencing are exempt. Pre-existing housing and agricultural uses may be exempt from the fencing requirements.

4.15.2    Front yard fences shall not exceed 42 inches in height.

4.15.3    Hedges in frontage fences shall be evergreen.

4.15.4    Wood frontage fences shall be painted or stained.

4.15.5    When erected on a lot line, all of the fence and any of its supporting structures shall be contained within the lot.

4.15.6    The supporting members and posts shall be on the inside, and the smooth or flat faces on the outside. If two faces are used, each face shall be of the same type and finish. Board on board fences is considered equal treatment.

## 4.16   Buffering Standards

4.16.1    Buffering, General

Buffering mitigates incompatibility between adjacent uses and within use zones. Buffers shall be assembled from landscaping, fencing or walls, or both, and shall provide privacy, visual buffering of unsightly views and visual conflicts, and acoustic attenuation of noise, as required in Table 4.21 Buffering Required.

4.16.2    Buffering, Construction

Buffers shall be constructed of vegetation, open materials, such as rail fencing, and opaque, solid materials, such as brick or rock.

4.16.3    Buffering, Location

Where vegetation is required, tree trunks shall be 7 feet from the lot line, shrubs shall be 2.5 feet from the lot line, and walls and fences shall abut the lot line.

    a.    The Town Planner may approve an alternate location for one of the following reasons: (1) the site is impractical due to terrain; (2) the landscaping is set back to avoid overshadowing or impinging on light and air for a neighboring residential property; or (3) to remain clear of a utility easement.

115

b. The alternate plan shall not be approved unless the Town Planner determines the following: (1) noise, lighting and sight buffering of the residential zone can be accomplished at least as well with the alternate plan, and (2) the alternate landscaping plan does not result in less landscaped area than would have been required with the normal buffer landscaping strip specified in Table 4.21 Buffering Required.

4.16.4    Buffering, Types

There are two types of buffers which may be required on the lot subject to this requirement. A solid wall or fence shall be required per §4.16.5 Buffering, Solid Wall Required. A solid wall or solid fence 5-6 feet high shall be erected between the following uses and lots subject to residential development (including all intensity zones): parking for more than 10 motor vehicles, loading zones, outdoor storage of vehicles and equipment, outdoor work yards, outdoor seating or entertainment space for restaurants, bars, and entertainment venues, and other similar uses as determined by the Town Planner. Where an alley or lane serves such uses, the lots abutting the alley may erect such a solid wall or solid fence. and landscape buffering per §4.16.6 Buffering, Required

4.16.5    Buffering, Solid Wall Required. A solid wall or solid fence 5-6 feet high shall be erected between the following uses and lots subject to residential development (including all intensity zones): parking for more than 10 motor vehicles, loading zones, outdoor storage of vehicles and equipment, outdoor work yards, outdoor seating or entertainment space for restaurants, bars, and entertainment venues, and other similar uses as determined by the Town Planner. Where an alley or lane serves such uses, the lots abutting the alley may erect such a solid wall or solid fence.

a. The height of the wall or fence shall be reduced or set back at a driveway or alley so as not to impinge on any clear sight triangle.

b. If the wall plus retaining wall have an effective height of over eight feet on the adjacent lot, the Town Planner shall decide the acceptable height.

4.16.6    Buffering, Required

a. Landscape buffer assemblies of the types in §4.16.7 shall be required within the subject zones per Table 4.21 Buffering Required.

### TABLE 4.24   BUFFERING REQUIRED

| ADJACENT ZONE | D1 | D2 | D3 | NC | CC | IL | IM |
|---|---|---|---|---|---|---|---|
| T1 | | | | | | | |
| T2 | | | | | | | |
| T3 | | 2 | 3 | 3 | 4 | 5 | 5 |
| T4 | | 2 | 3 | 3 | 4 | 5 | 5 |
| T4O | 2 | 2 | 3 | 3 | 4 | 5 | 5 |
| T5 | 2 | 2 | 3 | 3 | 4 | 5 | 5 |
| D1 | 2 | 2 | 3 | 3 | 4 | 5 | 5 |
| D2 | 2 | | 3 | 3 | 4 | 5 | 5 |
| D3 | 2 | 3 | 3 | 3 | 4 | 5 | 5 |
| NC | 2 | 3 | 4 | 1 | 2 | 4 | 4 |
| CC | 2 | 4 | 4 | 2 | 1 | 4 | 4 |
| IL | 3 | 4 | 4 | 4 | 2 | 1 | 1 |
| IM | 3 | 4 | 4 | 4 | 2 | 1 | 1 |

Legend: "1," "2," "3," "4," and "5" indicate the buffer types required, per §4.16.7.

4.16.7    Buffering, Landscape Buffer Type. The following buffer/screen types may be required:

a. Buffer type 1. A screen composed of intermittent visual obstructions from the ground to a height of at least 20 feet. The broken screen is intended to create the impression of a separation of spaces

without necessarily eliminating visual contact between the spaces. It may be composed of a combination wall, fence, landscaped earth berm, planted vegetation, or existing vegetation. Landscaping consisting of low-water-consumption plants is required. Trees and shrubs shall be located so that their outermost limbs touch at the time of maturity. Figure 4.1 Buffer type 1: Broken Screen Illustration Suggested planting patterns that will achieve this standard are included below.



**Figure 4.1   Buffer type 1: Broken Screen Illustration**

b. Buffer type 2. A semi-opaque screen: a screen that is opaque from the ground to a height of three feet, with intermittent visual openings from above the opaque portion to a height of at least 20 feet. The semi-opaque screen is intended to partially block visual contact between uses and to create a strong impression of the separation of spaces. The semi-opaque screen may be composed of a combination wall, fence, landscaped earth berm, planted and/or existing vegetation. All landscaping must be composed of native plants. Trees and shrubs shall be located so that their outermost limbs touch at the time of maturity. See Figure 4.2 Buffer 2 and 3: Semi-Opaque Screen Illustration



**Figure 4.2   Buffer 2 and 3: Semi-Opaque Screen Illustration**

c. Buffer type 3. A semi-opaque screen similar to that of type 2, but with a setback of not less than 25 feet: a screen that is opaque from the ground to a height of three feet, with intermittent visual openings from above the opaque portion to a height of at least 20 feet and a setback of not less than 25 feet. The semi-opaque screen is intended to partially block visual contact between uses and to create a strong impression of the separation of spaces. The semi-opaque screen may be composed of a combination wall, fence, landscaped earth berm, planted and/or existing vegetation. All landscaping must be composed of low-water-consumption plants. Trees and shrubs shall be located so that their outermost limbs touch at the time of maturity. See Figure 4.2 Buffer 2 and 3: Semi-Opaque Screen Illustration.

d. Buffer type 4. An opaque Screen with a setback of not less than 40 feet: a screen that is opaque from the ground to a height of six feet, with intermittent visual openings from above the opaque portion to a height of at least 20 feet. An opaque screen is intended to exclude all visual contact between uses and to create a strong impression of separation of spaces. The opaque screen may be composed of a combination wall, fence, landscaped earth berm, planted and/or existing vegetation. All landscaping must be composed of low-water-consumption plants. Trees and shrubs shall be located so that their outermost limbs touch at the time of maturity. See Figure 4.3 Buffer Type 4 and 5: Opaque Screen Illustration

117



**F i g u r e   4 . 3   B u f f e r   T y p e   4   a n d   5 :   O p a q u e   S c r e e n   I l l u s t r a t i o n**

    e.  Buffer type 5. An opaque screen similar to buffer type 4, but with a setback of not less than 50 feet: a screen that is opaque from the ground to a height of six feet, with intermittent visual openings from above the opaque portion to a height of at least 20 feet and a setback of not less than 50 feet. An opaque screen is intended to exclude all visual contact between uses and to create a strong impression of separation of spaces. The opaque screen may be composed of a combination wall, fence, landscaped earth berm, planted and/or existing vegetation. All landscaping must be composed of low-water-consumption plants. Trees and shrubs shall be located so that their outermost limbs touch at the time of maturity. See Figure 4.3 Buffer Type 4 and 5: Opaque Screen Illustration

4.16.8  Responsibilities for Installation of Peripheral Buffer Yards

Peripheral Buffer-yards shall be installed on the subject property at the time of its development. Existing plant material that will be preserved on the subject property following the completion of development may be counted as contributing to the required buffer-yard. Two potential situations exist.

    a.  Abutting a Vacant or Developing Parcel

        When a proposed use adjoins a vacant or developing parcel for which a buffer-yard is required, that use shall provide one-half (.5) of the buffer-yard width and materials as selected from Table 4.21 Buffering Required. At the time it develops, the abutting property shall install a buffer-yard equivalent to the previously installed buffer-yard.

    b.  Abutting a Previously Developed Parcel

        If the adjoining use had developed without a buffer-yard, the proposed use shall be responsible for installing the total required buffer-yard.

## 4.17  Sign Standards

This section establishes the standards for the number, size, placement, and physical characteristics of on-premises signs visible from a public way. These regulations do not restrict the content of on-premises signs nor signs invisible from a public way.

4.17.1  Permit Required. No sign shall be displayed, installed, altered or relocated within any zoning district without a sign permit or a temporary sign permit. The consent of the property owner is required before any sign permit will be issued and a permit must be issued prior to the installation of the sign. A sign permit application must be submitted to the Town and be accompanied by the required fee. The application must include the following information:

    a.  A drawing to scale showing the design of any proposed sign, the dimensions, square footage, colors, materials, any internal or external lighting components, and the location in which any sign will be placed.

    b.  A site plan showing the location of all proposed signs on the project site.

    c.  Consent of the property owner for the installation of the sign.

118

    d.   A master sign plan shall be prepared and submitted for approval for project sites which exceed five acres, have multiple road frontages, or have a minimum of five tenants or commercial spaces requesting greater flexibility. The master sign plan can include a request for additional signage, including sign area and height. The application must include all the information for a sign permit, in addition to the following:

    e.   A sign packet showing proposed signage for each tenant space or suite.

    f.   A justification statement for each request to increase sign area or height of all signs.

4.17.2   Permit Conditions

    a.   Ground signs are permitted with the following conditions:

        i.   Ground signs are permitted within frontages for health and support services and assembly uses.

        ii.   Ground signs are permitted within secondary frontages for transportation uses.

        iii.   Ground signs are permitted within forecourts for all uses.

    b.   Kiosk signs are permitted within forecourts only.

    c.   Marquee signs are permitted for assembly uses only.

    d.   Wall mural signs are subject to design review.

    e.   Yard signs are limited to advertisement of home occupations.

4.17.3   Prohibited signs

The following signs are prohibited:

    a.   Any sign built or displayed without a permit, if a permit is required.

    b.   Any sign not expressly allowed in this section.

    c.   Pylon signs.

    d.   Bandit signs.

    e.   Billboards.

    f.   Moving or flashing signs including but not limited to searchlights.

    g.   Inflatable signs, such as but not limited to balloons, gas inflated signs or similar inflated signs.

    h.   Streamers and spinners.

    i.   Electronic signs except fuel pricing signs.

    j.   Revolving signs except rotating barber poles at an approved barbershop.

    k.   Signs advertising illegal or unlawful acts or businesses.

    l.   Roof signs.

    m.   Signs, except sidewalk signs within 5' of a curb or edge of a roadbed, that obstruct vehicular or pedestrian traffic, or that obstruct the clear sight triangle.

    n.   Except as expressly permitted in this section, signs placed over the public right-of-way or public property or any sign that encroaches onto the right-of-way below 8 feet above the sidewalk or grade of the land.

    o.   Signs on vehicles or trailers whose primary use is as a sign.

    p.   Signs that pose a safety hazard or block a clear view of surroundings.

    q.   Signs affixed to public or utility poles, street furniture, fences, walls, retaining walls, or similar

features.

4.17.4   Exempt Signs

The following signs are exempt from obtaining a sign permit:

a.   Memorial signs and tablets displayed on public property or in cemeteries.

b.   Address numerals and signs bearing the same name of occupants of the premises not exceeding one (1) square foot in area.

c.   Legal notices.

d.   Traffic and parking signs which bear no advertising.

e.   Campaign signs.

   i.   The sign may not exceed 32 square feet.

   ii.   The signs shall not be erected or displayed earlier than 45 days prior to the election to which they pertain.

f.   Real estate signs.

   i.   Only one (1) real estate sign located on-site may be located adjacent to each separate street frontage of a lot and one "open house" sign when appropriate.

   ii.   The sign shall be removed within seven (7) days after a deed has been recorded for the sale, or a lease signed for the rental, or lease of the property.

g.   Temporary construction signs.

h.   Hand held signs.

i.   Seasonal decorations.

## TABLE 4.25   GENERAL SIGN RESTRICTIONS

| SIGN TYPE | T3 | T4 | T5 | D1 | D2 | D3 | NC | CC | IL | IM | NUMBER | MAX. SIGN AREA | MAX. COPY HEIGHT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Auxiliary | | | | | | | | | | | | | |
| Awning | P | P | | | | | P | P | P | | 1 sloping plane plus 1 valence per awning | 75% of sloping plane; 75% of valence | 16 in. on sloping plane; 8 in. on valence |
| Banner | | P | | | | | P | P | | | 1 per frontage | 48 s.f. | n/a |
| Canopy | | P | | | | | P | P | P | | 1 per canopy | 2 s.f. per linear foot of shopfront | 30 in. max. |
| Directional | P | P | | | | | P | P | P | P | n/a | 12 s.f. | n/a |
| Display Case | | P | | | | | P | P | | | 1 per business | 6 s.f. | n/a |
| Fuel Pricing | | | | | | | P | P | P | | 1 per business | 32 s.f. | n/a |
| Marquee | | P | | | | | P | P | | | 1 per entry | n/a | n/a |
| Monument | | P | | | | | P | P | P | P | 1 per frontage | 36 s.f. | n/a |
| Monument: Religious | P | | | | | | P | P | P | | 1 per frontage | 36 s.f. | n/a |
| Monument: Education | P | | | | | | P | P | P | | 1 per frontage | 36 s.f. | n/a |
| Projecting | P | P | | | | P | P | P | | | 1 per tenant | 6 s.f. | 8 in. |
| Sidewalk / Sandwich | P | P | | | | P | P | P | | | 1 per tenant | 9 s.f. | n/a |
| Suspended | P | P | | | | P | P | P | | | 1 per entry | 6 s.f. | 8 in. |

120

**TABLE 4.25 GENERAL SIGN RESTRICTIONS**

| SIGN TYPE | T3 | T4 | T5 | D1 | D2 | D3 | NC | CC | IL | IM | NUMBER | MAX. SIGN AREA | MAX. COPY HEIGHT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wall | | | P | | | | P | P | P | P | 1 per frontage | 3 s.f. per 1 linear ft. up to 90% of the building width | 18 in. / 36 in. for more than one line of copy |
| Window | | P | P | | | | P | P | P | | 1 per window | 25% of glazed area | 12 in. |
| Window: Neon | | | P | | | | P | | | | 1 per window | 25% of glazed area in aggregate | 12 in. |
| Yard | P | P | | | P | P | | | | | 1 per lot | 6 s.f. | 8 in. |

4.17.5 Permitted Signs and Sign Restrictions

a. Permitted sign types are limited by zoning district and the following restrictions according to Table 4.22 General Sign Restrictions:

i. The number of signs per sign type;

ii. The area of signs;

iii. Height of sign copy.

b. Additional sign restrictions apply per sign type according to Table 4.23 Specific Transect Zoning District Sign Regulations.

c. Height and Clearance

i. The height of a freestanding sign shall be measured from the mean ground level to the highest point of the sign area or its supporting structure, whichever is greater.

ii. The height of a wall sign shall be measured from the base of the sign to the top of the sign face. The top of the sign shall be neither higher than the maximum permitted building height and shall not extend above the roofline.

iii. The clearance of a projecting sign shall be measured from the base of the sign face to the ground below.

d. Location

i. Freestanding signs shall not be located within the site distance triangle. This area shall be free and clear of any signs to prevent visual obstruction to motorists.

ii. No more than one monument sign shall be permitted per site unless the site is greater than 3 acres.

iii. Monument signs shall be located a minimum of ten (10) feet from road edge pavement and off right-of-way.

iv. No signs, including traffic signs and similar regulatory notices except those of a duly constituted governing body shall be allowed to project or be located within road right-of-way lines.

e. Sign Area

Sign area shall be calculated as follows:

i. In the case of monument sign and off site signs having a permanent base, the entire surface area of the sign on which copy could be placed, including the supporting structure or bracing of a sign shall be counted as a part of a sign area. Signs containing two (2) display faces that are back to back, the area of only one (1) face shall be considered the sign area. Signs containing more than one (1) display face, all areas which can be viewed simultaneously shall be consid-

121

ered the sign area.

    ii.    For a wall sign whose message is fabricated together with the background which borders or frames that message, the sign area shall be the total area of the entire background.

    iii.    For a wall sign whose message is applied to a background which provides no border or frame, the sign area shall be the area of the smallest rectangle which can encompass all words, letters, figures, emblems, and any other elements of the sign's message.

f.    Sign Lighting

    Permitted methods of illumination may be divided into several types as described below.

    i.    General. The sign has neither an internal light nor an external source which is intended to specifically light that sign. Rather, the sign depends on the general lighting of the area (e.g., parking lot, traffic, or pedestrian areas) for illumination.

    ii.    Shielded Spot Light: The sign is lighted by spot lights specifically directed at it. The spot lights are fully shielded so that they are not visible from streets or adjoining property.

    iii.    Internal Message: The sign is made of metal, wood, or other material that is not translucent, and the message is cut out of the material and replaced with a translucent material. The sign's light source is located inside the sign.

    iv.    Back-Lighting: The message is raised beyond both the sign's background and the cover lighting sources which illuminate the background.

g.    Maintenance

    i.    Each sign shall be maintained in a safe and secure condition and in good repair. If the Town determines that the sign does not meet these criteria, written notice shall be provided to the property owner and the defect shall be corrected within 30 days. If the defect is not corrected, the Town may pursue abatement of the sign.

h.    All signs must provide the following clearance except where specified otherwise:

    i.    8 feet over pedestrian ways;

    ii.    13.5 feet over vehicular ways and parking aisles.

i.    Illuminated signs are permitted as follows:

    i.    All signs may be illuminated by a light source external to the sign;

    ii.    Internal sign illumination is limited to window and wall signs at shopfront frontages.

4.17.6    Specific Use Zoning District Sign Regulations

This subsection states the specifications for each of the sign performance standards according to sign type. These standards shall be subject to additional requirements as specified in other sections of this Section. For each sign type, the following standards are specified: the maximum total sign area permitted, the maximum permitted height, the permitted lighting source, and any additional requirements or limitations.

a.    Monument Sign

    Monument signs shall be permitted with the approval of a sign permit for commercial businesses with a minimum of 100 feet of linear road frontage. If more than one parcel makes up a commercial center, a monument sign may be placed on a property that does not meet the minimum standards providing approval of a master sign plan is granted. The monument sign will be required to provide identification for off-site businesses adjacent to the site in which the sign is located.

    i.    Height and Area

        A monument sign shall be limited to 8 feet in height.

A maximum area of 80 square feet per sign face, including the base, shall be permitted.

Increased height up to 10 feet may be granted for monument signs identifying five (5) or more businesses with approval of a master sign plan.

With the approval of a 10 foot high monument sign, the maximum area of the sign may be increased to 100 square feet.

All lighting shall be internal or shielded spot lighting.

ii.   Quantity

Two monument signs per frontage may be granted with the approval of a master sign plan for project sites consisting of:

a)   More than one road frontage exceeding 750 feet.

b)   Sites in excess of five (5) acres.

Monument signs located on the same project site shall be separated by a distance of 150 feet between signs.

b.   Wall Sign

i.   One wall sign is permitted on each elevation that has street or on-site parking lot frontage with a maximum of three wall signs. The wall sign will be a maximum of one and a half (1.5) square feet per linear building or store frontage on the elevation consisting of the primary entrance. Wall signs are permitted to be a maximum of two (2) feet in height for one line of text and three and a half (3.5) feet for two lines of text. Additional sign height may be permitted for buildings that are set back from the roadway by a minimum of 200 feet or for buildings with a greater linear building frontage. The applicant shall submit a master sign plan and shall be required to demonstrate that the added sign height is necessary to create a sign proportionate to the building and necessary for visibility to the general public.

ii.   A business with two entrances and a minimum of 150 linear feet of building frontage may be permitted a second wall sign subject to review and approval of a sign permit. The second sign shall be a maximum of half the square footage of the primary sign, not to exceed the maximum allowable sign area.

iii.   Two secondary signs may be permitted for accessory businesses located within the primary business. Secondary signs shall not exceed 10 square feet, not to exceed the maximum allowable sign area. The secondary signs shall be located only on the building elevation consisting of the primary entrance.

iv.   Lighting for wall signs may consist of internal lighting, back lighting or shielded spot lighting.

v.   All painted signs shall comply with the sign standards for wall signs and shall be designed to contain the distinct character of the business and professionally painted.

c.   Projecting Signs

i.   A projecting sign may be used instead of a wall sign; however maximum permitted sign area shall not exceed that which is permitted for wall signs.

ii.   A projecting sign shall not extend greater than 36 inches from the building face and may not extend over a right-of-way or above the plateline or roofline. The sign shall have a minimum clearance of ten feet from the bottom of the sign to the ground.

iii.   Lighting for wall signs may consist of internal lighting, back lighting or shielded spot lighting.

d.   Window Signs

Window signs with a maximum square footage of 25% of total window area may be permitted with the approval of a sign permit.

e. Fuel Pricing Signs

    i. One (1) fuel pricing sign may be approved per gas service station and shall be located within a landscape planter a minimum of 15 feet from the right-of-way.

    ii. The fuel pricing sign may not exceed 32 square feet in sign area and shall not exceed five (5) feet in height.

    iii. Fuel pricing signs are prohibited on the pump canopy.

f. Directional Signs

On-site directional signs shall be no more than two (2) square feet in sign area and shall not exceed four (4) feet in height. A maximum of four (4) directional signs will be allowed to provide physical direction to drive-thrus, entrances, etc.

Sites with complex internal circulation, multiple entrances/exits, or five acres or more may be permitted additional signage under a sign plan.

g. Auxiliary Signs

Auxiliary signs may be permitted for ancillary uses and shall not exceed 10 square feet in sign area. A maximum of two signs may be allowed and shall be placed on the elevation with the primary entrance.

h. Development Signs — Residential and Non-residential

    i. Lighting of a development sign may be provided by internal lighting, back-lighting, the general lighting of the area, or by shielded spot-lights.

    ii. All development signs must be located on-site or within the common area of the development. The use of off-site development signs is not permitted.

    iii. Residential

        a) All residential development signs shall be monument signs. One (1) monument sign per entry shall be allowed for new developments consisting of ten (10) or more than units. The sign shall have a maximum of 60 square feet and a maximum height of six (6) feet. Signs shall be located a minimum of 15 feet from the street right-of-way and shall not be located within the site distance triangle.

        b) Residential development signs shall only provide the name of the subdivision.

        c) The residential development sign shall be located within a landscape planter.

    iv. Non-residential

        a) All non-residential development signs shall be monument signs. One (1) monument signs per major entrance shall be allowed for developments consisting of more than 15 units or three (3) buildings. The sign shall have a maximum of 80 square feet and a maximum of six (6) feet in height. Signs shall be located a minimum of 15 feet from the street right-of-way and shall not be located within the site distance triangle.

        b) Non-residential development signs shall contain only the name of the development, center or business park.

        c) The commercial development sign shall be located within a landscape planter.

i. Off-Site Signs

Off-site signs shall only be permitted as directional or temporary signs except as allowed within federal, state and local road rights of way.

    i. Off-site Directional Signs

Off site directional signs are permitted to give sufficient notice of the location of governmental

124

facilities, hospitals, colleges, schools, unincorporated communities, and general commercial areas. Legal business, institutional, or industrial uses located on a Town road may request approval of an off-site sign which shall not exceed 20 square feet and shall be designed to include multiple tenants.

j.   Temporary Signs

Temporary signs must obtain a temporary sign permit prior to installation and shall conform to the following:

i.   On-site Temporary Event Sign

One sign or banner may be temporarily installed in order to advertise a specific event, such as a grand opening, Christmas tree sales, garage sale, etc.

a)   A temporary sign permit may be granted for a maximum of 30 days.

b)   If a banner is used for the temporary sign, it shall be affixed to a wall. Signs hanging between columns, trees or other structures such as poles will not be permitted.

c)   If a freestanding sign is used for the temporary sign, it shall be placed on-site, and shall not exceed four (4) square feet in area and four (4) feet in height.

ii.   Off-site Temporary Event Sign

In order to grant flexibility in advertising special events within the Town limits and the Urban Growth Boundary, up to four off-site signs may be granted to provide date, time, location and direction to special events.

a)   An off-site temporary sign may be granted for a maximum of 14 days prior to an event and shall be removed the day after the event has occurred.

b)   The sign shall not exceed four (4) square feet in area and four (4) feet in height.

iii.   Future Development Temporary Sign

Each new development under construction within the Town limits and the Urban Growth Boundary may be granted signage in which to advertise the development of a subdivision, commercial center or business park.

a)   One (1) on-site may be permitted up to one (1) year. Two additional one (1) year extensions may be granted by the Town Planner. Any other time extensions shall be reviewed by the Planning Commission. Signs may not be installed until an approved final plat is recorded and shall be removed at 85% buildout.

b)   The sign shall not exceed 32 square feet in sign area and eight (8) feet in height.

c)   The sign shall include the name of the development, the location and a contact number for additional information.

d)   No external lighting shall be permitted.

4.17.7   Specific Transect Zoning District Sign Regulations

Table 4.23 Specific Transect Zoning District Sign Regulations states the specifications for each sign type.

**TABLE 4.26    SPECIFIC TRANSECT ZONING DISTRICT SIGN REGULATIONS**

| AWNING SIGN | | |
|---|---|---|
| Requirements | A. Valence sign area must maintain a 1 in. border. |  |

| CANOPY SIGN | | |
|---|---|---|
| Requirements | A. Canopy signs copy may not exceed 30 in. in height.<br>B. Canopy signs may be externally illuminated or neon.<br>C. Fixtures must be shielded to prevent glare.<br>D. Conduit, raceways, and wiring may not be exposed to view from the sidewalk. |  |

| MARQUEE SIGN | | |
|---|---|---|
| Requirements | A. Marquee signs copy may project to within 2 ft. of the curb.<br>B. Marquee signs must maintain 10 ft. clearance above sidewalk.<br>C. Marquee signs may be combined with a canopy sign or projecting sign.<br>D. Fixtures must be shielded to prevent glare.<br>E. Conduit, raceways, and wiring may not be exposed to view from the sidewalk. |  |

| MONUMENT SIGN | | |
|---|---|---|
| Requirements | A. Monument signs may not exceed 8 ft. in height or width.<br>B. Monument signs must be located at or behind the setback.<br>B. Fixtures must be shielded to prevent glare.<br>C. Conduit, raceways, and wiring may not be exposed to view from the sidewalk. |  |

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 129 of 163 PageID #: 138

| TABLE 4.26   SPECIFIC TRANSECT ZONING DISTRICT SIGN REGULATIONS | | |
|---|---|---|
| **PROJECTING SIGN** | | |
| Requirements | A. Projecting signs may project up to 2 ft. from the facade.<br>B. Projecting signs must maintain 8 ft. clearance above sidewalk.<br>C. Projecting signs may be double sided. |  |
| **SIDEWALK SIGN** | | |
| Requirements | A. Sign height may not exceed 42 in.<br>B. Sign width may not exceed 30 in.<br>C. Signs may not be located within 3 ft. of curb. |  |
| **WALL SIGN** | | |
| Requirements | A. Wall signs copy may not exceed 18 in. in height.<br>B. Wall signs may be up to 90% of the building width.<br>C. Wall signs may be externally il-luminated.<br>C. Fixtures must be shielded to pre-vent glare.<br>D. Conduit, raceways, and wiring may not be exposed to view from the sidewalk. |  |
| **WALL MURAL SIGN** | | |
| Requirements | A. Only text or graphics painted directly on the wall or a graphic mural are permitted.<br>B. Sign width is restricted to 50 ft. maximum.<br>C. Sign height is restricted to 56 ft. maximum. |  |

127

**TABLE 4.26    SPECIFIC TRANSECT ZONING DISTRICT SIGN REGULATIONS**

| WINDOW SIGN | | |
|---|---|---|
| Requirements | A. Window signs may not exceed 25% of the glazed area.<br>B. Copy text may not exceed 12 in. in height.<br>C. The following window signs are permitted: letters painted directly on the window, neon signs, LED signs, signs hung behind the glass, vinyl applique letters applied to the window. |  |

4.17.8   Removal of Signs

Any unsafe or illegal sign may be removed by the Town without notice to the permit holder, property owner or any person in control of the said sign. The permit holder, property owner or other may incur a fee for the removal and disposal of the sign based on the adopted fee schedule.

## ARTICLE 5   ADMINISTRATION AND PROCESS

### 5.1  General

#### 5.1.1   Penalties

It shall be unlawful to erect, construct, reconstruct, alter, maintain or use any building or structure, or to use any land in violation of any regulation in this ordinance. Any person violating any of the provisions of this zoning regulations article shall be guilty of a Class C misdemeanor, and conviction shall result in a monetary penalty not to exceed fifty dollars ($50.00) and the repayment of administrative costs incident to the correction of the municipal violation in the amount of two hundred fifty dollars ($250.000) for each separate offense. Each day any violation of this ordinance shall continue shall constitute a separate offense.

#### 5.1.2   Remedies

In addition to the penalties reference above, upon the recommendation of the Town Planner or Building Official, or upon the request of a property owner who would be specifically damaged by a violation of this ordinance, the Town Administrator may direct the Town Attorney to institute an injunction, mandamus, or other appropriate action or proceeding to prevent such unlawful erection, construction, reconstruction, alteration, repair, conversion, maintenance, or use; or to correct or abate such violation; or to prevent occupancy of such building, structure, or land.  Where construction, excavation, demolition, grading or any other activity has begun on any building, dwelling, structure, sign or use in violation of this ordinance or any other Town ordinance, the Town Administrator may, in addition to taking other authorized enforcement action, issue a stop work order pending the responsible party or parties bringing such construction, use or other activity into compliance with the ordinances of the Town.  The party or parties may appeal the issuance of a stop work order to the Board of Zoning Appeals and the BZA shall hold a hearing on the order in accordance with § 5.5.4 of this ordinance.  The BZA hearing on an appeal of a stop work order shall be heard as soon as possible after publishing the required notice, but not sooner than fifteen (15) days after the filing of such appeal with the Town Planner, and not greater than thirty (30) days from the filing of such appeal.

#### 5.1.3   Severability

The provisions of this zoning ordinance are hereby intended to be severable. If any of its sections, provisions, exceptions, or parts should be held unconstitutional or void, then the remainder of the ordinance shall continue to be in full force and effect, it being the legislative intent now hereby declared that this ordinance would have been adopted even if such unconstitutional or void matter had not been included herein.

#### 5.1.4   Interpretation

If any provision of this ordinance conflicts or is inconsistent with another provision herein, or another applicable ordinance, the more restrictive provision (the provision that imposes more stringent controls upon a use or development) shall govern and control.

#### 5.1.5   Effective Date

This ordinance shall take effect from and after the effective date of its passage and publication as required by law, the public welfare requiring it.

#### 5.1.6   Repealer

All prior zoning ordinances and maps previously enacted are hereby repealed.

### 5.2  Subdivision Process

#### 5.2.1   General Procedures

Unless otherwise specifically provided for herein, before any lot is sold or before any permit for erection of any structure in a proposed subdivision shall be granted, the owner or his authorized agent shall apply for and secure the Planning Commission's approval of the proposed subdivision in accordance with the procedures of this article.

      a.   Subdivision Plat. The subdivider shall follow the following procedure to secure plat approval.

129

    i.    Pre-application conference on the subdivision with the Town Planner.

    ii.    Submittal of a concept plan, prepared in accordance with §5.4.2 Concept Plan and Article 3 Subdivision Regulations of this Ordinance, for Town Planner consideration.

    iii.    Submittal of a Preliminary Plat prepared in accordance with §5.4.3 Preliminary Plat and Article 3 Subdivision Regulations, for Planning Commission approval.

    iv.    Submittal of construction plans, prepared in accordance with §a Application procedure and requirements and Article 3 Subdivision Regulations, for Town Engineer approval.

    v.    Submittal of the final subdivision plat, prepared in accordance with §5.2.7 Final Subdivision Plat and Article 3 Subdivision Regulations of this Ordinance, for Planning Commission approval.

b.    Official Submission Date

All plat submittals meeting the application requirements and filed before the scheduled filing deadline shall be placed on the agenda of the Planning Commission's next regular scheduled meeting. The scheduled filing deadline shall be established by town staff. The planning commission shall approve or disapprove a plat within the statutory period required in Tenn. Code Ann. § 13-4-304.

## 5.2.2 Minor Subdivision

A minor subdivision shall be available for any subdivision that will divide land into four (4) or fewer lots and that does not include the construction and dedication of a public street. Minor subdivisions may be approved administratively by the Town Planner and shall not require concept plans or preliminary plats.

## 5.2.3 Concept Plan

a.    Purpose of the concept plan

The concept plan is used to discover all factors which may have an impact on the proposed development, including roads, drainage, and sewer for the entire property, and to advise the subdivider of various possibilities before substantial amounts of time and money have been invested in a very detailed proposal containing elements contrary to these regulations.

b.    Concept plan requirements

A concept plan shall be required for any subdivision that will divide land into five (5) or more lots or that include the construction and dedication of a public street. The concept plan shall include the information set forth in §5.4.2 Concept Plan.

c.    Concept plan consideration

The applicant shall submit the concept plan for Town staff review. The applicant shall provide one hard copy and one digital copy. The Town Planner shall present the concept plan and his or her report and findings to the Planning Commission at its next regularly scheduled meeting after completion of the report. As the concept plan is for informational and discussion purposes only, the Planning Commission shall take no formal action with respect to a concept plan.

## 5.2.4 Preliminary Plat

a.    Application procedure and requirements

The applicant shall file with the Planning Commission a preliminary plat. Failure of the applicant to satisfy the requirements of this Article or to provide full and correct information shall be cause for disapproval of such plat. The preliminary plat shall be prepared by individuals licensed to perform the necessary design services and shall be prepared in accordance with §5.4.3 Preliminary Plat, Article 3, and shall:

    i.    Be presented at the office of the Town Planner on or before the scheduled deadline as established by the town for consideration at a regular scheduled meeting of the Planning Commis-

sion.

  ii.  Be accompanied by the number of copies required by the Planning Commission for review and required application fee.

b.  Approval of Preliminary Plat

The Town Planner shall submit the application to the Planning Commission for review, approval, approval with conditions, or denial. Approval of the preliminary plat shall constitute authorization to prepare and present detailed construction drawings, plans and specifications for the proposed development. All preliminary plat approvals shall be conditioned upon the approval of construction plans.

c.  Effective period of approval

Approval of a Preliminary Plat vests the property rights as provided for a preliminary development plan as set forth in Tenn. Code Ann. § 13-4-310. For vesting purposes only, approval of a Preliminary Plat, shall be effective upon the date Planning Commission votes to approve the plat.

d.  Changes to approved preliminary plats

As a result of unforeseen conditions associated with a particular site, changes may be required in approved preliminary plats. No change shall be implemented and no construction associated therewith shall be initiated until a revised Preliminary Plat and construction plans have been submitted to the office of the Town Planner. The Town Planner, upon written recommendation of the Town Engineer, may approve changes that involve minor revisions including, but not limited to:

  i.  shifts in the location of lot lines, streets, or open space, provided they remain in compliance with the regulations of the Ordinance, or

  ii.  adjustments to Transect districts that remain in compliance with Table 2.3 Community Types, Areas and Civic Space, or

  iii.  changes in use zone lot or unit count, or redistribution of less than 10% of the total number of dwelling units among unit types, or

  iv.  other changes which do not significantly alter the overall layout of the plan and its basic development concept.

  v.  Revisions to the new community preliminary plat shall not subject the entire preliminary plat to review, but only that portion under revision.

  vi.  Revisions to the new community preliminary plat that do not require a variance may be approved administratively by the Town Planner pursuant to the standards of this Article and Article 3.

Major revisions, including those listed below, shall require the approval of the Planning Commission:

  vii.  change in use zone number of lots or units resulting in an increase (or decrease) of 10% or more in total lot or unit count, or

  viii.  modification(s) to the pattern of streets or street connections, internal and external to the project area, that decrease connectivity or significantly alter traffic patterns, excepting changes that result directly from discovery of topographical or environmental obstacles that could not reasonably have been known at the time of initial subdivision approval, or

  ix.  changes affecting 10% or more of the open space, including but not limited to its area, location, accessibility, or degree of contiguity, or

  x.  reduction in dedications to the public, or

  xi.  changes to subdivision boundaries that exceed 5% of the area of initial approval, or

  xii.  changes which will increase the area of disturbance of slopes of 25% or greater or increase the area of manipulation of the floodplain, or

    xiii. any change that alters the overall layout of the plan and its basic development concept.

5.2.5   Site Plans

    a.   Application procedure and requirements

Site plan review and approval shall be required for all multi-family and nonresidential developments. An authorized representative for a lot or tract of land shall submit a site plan in accordance with criteria pursuant to §5.4.4 Site Plan. The applicant shall also pay the site plan review fees as determined by the Board of Mayor and Aldermen at the time of submittal. The purpose of site plan review is to ensure compliance with the development and design standards of this ordinance. No building permits or grading permits shall be issued nor shall any development of land be initiated until such development has received Planning Commission approval.

    b.   Plan review and approval

Upon the receipt and review by the Town Planner, all site plans including all of the above information shall be placed upon the agenda of the next regularly scheduled meeting of the Planning Commission. The Town Planner shall prepare a staff report for such meeting recommending approval, approval with conditions, or denial of the proposed site plan. Upon a determination of a site plan by the Planning Commission, a notice of action will be sent to the project applicant with any applicable conditions of approval or deficiencies and findings for the denial of the plan.

    c.   Time Limits

Planning Commission approval for site plans shall be valid for one (1) year from the date of approval. If, in the opinion of the Town Planner substantial construction on the principal structure, including but not limited to foundations, walls, and roofs has not commenced within one (1) year, the site plan approval by the Town Planner shall expire and a new application will be required. The new application will be required to conform to then current code requirements at the time of the new application.

    d.   Construction in Accordance with Approved Plans

All site construction and development activities shall be completed in adherence to the approved concept plan. Minor modifications of the site plan may be requested and will be reviewed by the Town Planner and/or designee. Minor modifications will be determined on a case by case basis and will follow these general rules:

      i.   No modification will violate any provision of any Town ordinance.

      ii.   No modifications will be permitted that increase the size of the structure, the footprint or height that causes the project to exceed code requirements thereby requiring a variance.

    e.   Performance Guarantees.

Prior to the issuance of a grading or building permits, the developer shall be required to execute a performance agreement to secure the completion of required on-site and off-site improvements:

      i.   Performance Agreements. The Planning Commission may permit the delay of certain improvements through the execution of a Performance Agreement with a surety guaranteeing the construction of the remaining required improvements.

      ii.   The Performance Agreements shall be executed within 60 days of the approval of the site plan. Failure to execute the Performance Agreement and submit the surety will result in expiration of the Site Plan approval.

      iii.   The Performance Agreement shall be in the amount of 110% of the estimate of the cost to assure the completion of the work.

      iv.   A letter from a licensed Engineer or Landscape Architect, depending on the nature of the required improvements, is required to ensure the improvements will be monitored and completed in accordance with approved plans and code standards.

Case 3:16-cv-02845    Document 1-1    Filed 11/07/16    Page 135 of 163 PageID #: 144

    v.    One year is granted for the completion of the improvements. The Planning Commission may grant an extension or may reduce the surety based on the completion of the improvements.

    vi.    The Performance Agreement shall name the Town of Thompson's Station and shall be executed in a manner satisfactory to the Town Attorney.

## 5.2.6   Construction Plans

a.   Purpose, procedure and requirements

Construction plans are required to ensure that the improvements and infrastructure to be installed or constructed for a subdivision meet the Town's standards and provide for adequate protection of the public health, safety and welfare. The preparation and review of construction plans shall be coordinated with the Town Planner and Town Engineer and shall be presented concurrent with, or at any time after a Preliminary Plat has been approved. Construction plans shall at a minimum contain the information required by the Subdivision Regulations, any additional design and development standards adopted by the Town and any other matters deemed necessary for the public health, safety and welfare as may be required by the Town Engineer. Construction plans shall:

    i.    be presented at the office of the Town Planner;

    ii.    include the entire subdivision, or the entire phase or phases for which final approval will be sought.

    iii.    be accompanied by such copies of the construction plans as the Town may require.

b.   Construction plan preparation and content

Construction plans shall be prepared and submitted by a Tennessee Licensed Engineer engaged in the practice of civil engineering. At a minimum, such plans shall conform to Article 3 Subdivision Regulations. Because each development is different, the Town Planner and Town Engineer may require additional information to be included in the construction plans. All developments shall be required to submit phasing and construction traffic plans for the entire development at the time that preliminary plats are approved.

c.   Plan review and approval

The Town Engineer shall review the construction plans to determine whether they are in compliance with the provisions of these regulations and other appropriate town ordinances and standards. Where revisions may be required for plans to receive approval, such revisions shall be accomplished prior to final approval of the preliminary plat. In the event of plan disapproval, the Town Engineer shall provide notice of the disapproval to the developer in writing. Such notice shall include specific provisions of these regulations and/or other ordinances with which such plans do not comply.

d.   Dispute resolution

The Town Planner shall attempt to resolve any disputes concerning interpretation or the application of these regulations to the information contained within construction plans. In the event a dispute is not resolved to the satisfaction of the Town Engineer and the developer, the Town Planner shall make a final determination.

## 5.2.7   Final Subdivision Plat

a.   Purpose of final plat

The purpose of a final subdivision plat is twofold. First, such plat provides the legal instrument whereby transfer of the ownership of lots may be accomplished. Second, final plats constitute a means whereby the person subdividing property may offer streets and other infrastructure for acceptance and maintenance by the public.

b.   Application procedure and requirements

A subdivider shall file with the Planning Commission a final plat. The plat shall be prepared in accordance with §5.4.7 Final Subdivision Plat, Article 3 Subdivision Regulations, and shall:

    i.    include the entire subdivision, or phase, for which final approval is sought;

    ii.    be accompanied by the number of copies required by the Planning Commission for review and the required application fee;

    iii.    substantially conform to the approved preliminary plat;

    iv.    be presented at the office of the Town Planner on or before the scheduled deadline as established by the town for consideration at a regular (officially opened) meeting of the Planning Commission;

    v.    include all relevant plat certificates as per §5.4.8 Plat Certificates, including an owner's certificate which includes the owner's dedication of all easements and all rights-of-way, streets, alleys, walkways, parks and other open space as noted on the plat; (Improvements within the rights-of-way and easements shall not be accepted by the Town until completion in accordance with §5.2.18 Acceptance of Streets and Other Improvements.) and shall be accompanied by the following documentation for approval by the Planning Commission if the final plat contains jointly held open space, recreational facilities, or any portion of the site that is held in common ownership:

        a)    plans for improvement and maintenance of the open space or facilities located on the plat;

        b)    articles of incorporation and by-laws of the co-owners association or other legal entity (where open space or facilities are to be deeded to a co-owners association or similar organization acting on behalf of the joint owners of said property) charged with improving or maintaining the open space or facilities, and declaration of covenants and restrictions pertaining to each and every property within the subdivision; and

        c)    declaration of covenants and restrictions pertaining to open space and facilities which assure the continued use of said facilities for the purpose intended, where open space or facilities are to be retained by the developer.

    vi.    construction plans shall be substantially complete, as determined by the Town Engineer, prior to the granting of final plat approval by the Planning Commission.

c.    Endorsement of notations

The notations and certifications required by §5.4.8 Plat Certificates, to appear upon the final plat shall be endorsed by appropriate officials and other persons prior to application for final subdivision plat approval except that the certificate of Planning Commission approval shall be signed at the time specified in §5.2.11 Signing and Recording of Subdivision Plat.

d.    Hearing and decision on final plat

The Planning Commission shall consider all final plats submitted pursuant to this section in the time frame required by Tenn. Code Ann. § 13-4-304.

e.    Approval and recording of final plat; effective period of approval

Approval of a final plat authorizes the developer to obtain the required signatures and record plat. If the plat has not been recorded within one (1) year from the date of approval, such approval shall expire and the final plat shall be void. The applicant may request an extension of time to record the plat, not to exceed two 6-month extensions, before said plat expires.

f.    Changes to final plat

As a result of unforeseen conditions associated with a particular site, changes may be required in approved final plats. No change shall be implemented and no associated construction shall be initiated until a revised final plat and construction plans have been submitted to the office of the Town Planner.

The Town Planner may approve changes that involve minor shifts in the location of lot lines, easements, building lines, streets, open space, notes, or similar matters, provided that all such changes remain in compliance with the Subdivision Regulations. Otherwise, any other changes or any deviations shall require Planning Commission approval of said revised plat.

## 5.2.8 Development Agreement Required Prior to Preliminary Plat

No construction or installation of infrastructure, including but not limited to roads, drainage or wastweater infrastructure, may be installed prior to the approval of a development agreement. Applicant may begin preliminary site development and grading work only after:

    a.    Development Agreement;

    b.    Preliminary plat approval;

    c.    Construction plan approval by the Town Engineer(s) and Town Planner;

    d.    The issuance of a grading permit by the Town Planner.

Following the review of the concept plan, a draft development agreement shall be prepared by the Town Planner. The draft development agreement shall substantially conform to the Development Agreement contained in Appendix "A" and shall incorporate by reference both the approved plat, including any conditions on said approval, and the approved construction plans. The draft development agreement shall require that construction methods and materials meet or exceed minimum standards established by the Town.

The Town Planner shall send the draft development agreement to the applicant for approval. Upon acceptance and signature of the agreement by the applicant, the proposed development agreement shall be forwarded to the Board of Mayor and Aldermen for consideration at its next regularly-scheduled meeting.

## 5.2.9 Surety Required

Prior to recording the final subdivision plat, the applicant shall provide a surety conforming to §5.2.10. The amount and form of such surety shall be sufficient to guarantee to the Town, satisfactory construction, installation, and dedication, free and clear of any encumbrances, of the incomplete portion of required improvements. If a development agreement has not already been approved as specified in §5.2.8, such an agreement shall be provided at this time. The approval of the development agreement shall follow the same procedure as set forth in § 5.2.8. Such surety instruments shall comply with all statutory requirements and shall be satisfactory to the Town Attorney as to form, sufficiency, and manner of execution, as set forth in these regulations.

## 5.2.10 Surety Standards and Requirements

    a.    General

All improvements proposed in conjunction with any subdivision must be covered by an adequate surety. If such improvements are completed prior to filing of any final plat for any portion of the development site, the Town may elect to accept such improvements and require surety for the maintenance as set forth in this ordinance.

    b.    Amount of surety

The developer shall post a good and sufficient surety with the Town in the amount of one hundred ten (110%) percent of the Town Engineer's estimate of cost to assure completion of the work. Good and sufficient surety shall include the types of surety specified in §5.2.10.c. Each surety shall reference and secure compliance with the development agreement required by §5.2.8 where the developer agrees to make and install the improvements in accordance with the approved plans and specifications.

    c.    Types of surety

Subject to the standards and requirements of this Article and acceptance by the Planning Commission and approval by the Town Attorney, the following types of surety may be accepted for purposes of guaranteeing completion of improvements required by these regulations:

        1.    Irrevocable Standby Letter of Credit; or

Case 3:16-cv-02845     Document 1-1     Filed 11/07/16     Page 138 of 163 PageID #: 147

2. Cash Escro or bank assignment of certificates of deposit with a federally insured bank having assets of at least $50 million.

Notwithstanding the foregoing, any other surety accpeted by the Town under prior regulations may remain in effect and may be extended: however any developments approved after the effective date of this ordinance must be secured by the surety types herein.

Irrevocable standby letters of credit

An irrevocable standby letter of credit may be utilized as the means of providing surety for improvements required under the various provisions of these regulations provided it meets the following requirements:

a. Any letter of credit shall be drafted so as to represent an obligation of the financial institution to the town and not an obligation to the permittee;

b. Such letter shall be valid for one (1) year and shall be automatically renewed for successive one (1) year periods until released by the Town;

c. Said letters may be revoked only after giving the Town 90 days prior written notice with the opportunity to cash the letter and such notice shall be by certified mail, return receipt requested;

d. All letters of credit shall be cashable in Williamson County, or in a County which adjoins Williamson County (within a 60 mile radius), and shall be substantially in the form as shown in Appendix "B";

e. The financial institution issuing the letter of credit or bond must demonstrate its good standing with the State of Tennessee and shall not issue in excess of 10% of its total capital to an applicant; and

f. The branch of the issuing financial institution shall be located within a 60 mile radius of Thompson's Station, TN. This branch must also be available for contact and for making draws on the letter of credit or surety.

The Town Finance Director shall be the accepting authority for all letters of credit and surety and will make a determination on the above referenced items and shall also consider the Thomson Bank Watch or Schushenoff ratings of A. If an outside rating system is utilized a minimum or 2 major rating agencies shall be required of no less than BBB. In addition, the bank must have a passing grade by the FDIC with no deficiencies.  All letters of credit, shall be governed and construed in accordance with the Uniform Customs and Practice for Documentary Credit (1983 Revision), International Chamber of Commerce, Publication 400 and Tennessee Code Annotated § 47-5-101 through 47-5-118.

Upon acceptance and qualification of the letters of credit, the Town Finance Director shall forward said letters to the Town Attorney for final review.

Escrow deposits for improvements

a) Acceptance of Escrow Funds

The term "Cash Escrow," as used in these regulations, refers to two types of performance guarantees: cash escrows and bank assignment of funds. In the case of either cash or other near cash (i.e. certificates of deposit) guarantees, all funds shall be maintained in accounts that are beyond the reach of the developer and subject to an escrow agreement.

b) Procedures on Escrow Fund

All escrows shall be held by the town, kept in its bank accounts, and be totally under the control of the town. A detailed "Escrow Agreement" shall be prepared and approved by the Town Attorney and shall be appropriately endorsed by all parties to such agreement at the time of creation of any escrow account.  The Town Administrator may execute such escrow agree-

136

ment on behalf of the Town and designate the Finance Director to administer said account. The developer's tax identification number shall be used for the escrow and the developer shall be responsible for paying tax on any interest credited to the escrow account.

c)    Time to post surety

Surety Bond must be posted within 60 days of the Planning Commission action establishing the surety amount. Failure to post the surety within the allotted time period will require re-approval of the final plat. All review fees will apply.

## 5.2.11    Signing and Recording of Subdivision Plat

a.    Signing of plat

Upon posting of a bond or upon completion and acceptance of all required improvements, and upon all other required signatures on the plat, the secretary of the Planning Commission, or other designee, shall endorse approval on the final plat.

b.    Recording of plat

It shall be the responsibility of the applicant to file all approved final plats with the county register's office. The owner of the property or his authorized agent shall pay the appropriate filing fee and submit a mylar, digital and paper copy to the Town.

## 5.2.12    Issuances of Building Permits and Use and Occupancy Permits

Upon recording the plat, lots may be sold and building permits may be issued subject to any applicable conditions. The extent of public way improvements shall be adequate and safe for vehicular access by the prospective occupant and by police, fire, and emergency equipment prior to the issuance of a building permit. Before a use and occupancy permit will be granted, water, sewer, street name signs, and traffic signs must be installed.

## 5.2.13    Reduction of Bonds

The surety instruments guaranteeing installation of improvements may be reduced upon completion of the base asphalt and again upon completion, dedication and acceptance of such improvements and then only to the ratio that the cost of the public improvements dedicated bears to the total cost of public improvements included in said plat. As a general rule, a bond will not be reduced below fifteen (15) percent of the total estimated cost of the required improvements.

## 5.2.14    Completion of Improvements

All required improvements shall be completed in accordance with this Article, the Development Agreement, and the approved construction plans. As a general rule, final asphalt shall be completed after 75% of the houses are completed and prior to 90% completion. Likewise, all other remaining required improvements, except sidewalks, shall be completed prior to 90% completion. Building permits may be withheld on the final 10% of the houses if said improvements are not complete. Upon the recommendation of the Town Engineer and approval by the Planning Commission, the Town may require that the final asphalt be completed before 75% of the houses are complete if housing construction has been slow and the lack of final asphalt is presenting maintenance or safety problems. Likewise, the Town Engineer may specify that the final asphalt be completed after 90% of the houses are complete if said street(s) are used as a construction entrance.

If the Town requires a developer to complete the roads prior to 75% completion, the developer may dedicate said roads for acceptance by the Town and the Town shall not unreasonably refuse to accept said roads upon the installation of final asphalt. The Town may require property owners and/or builders within such development to post a cash bond as set forth in §5.2.18 Acceptance of Streets and Other Improvements to cover the cost of any damages to the Town's roads. The bond will be released by the Town when a certificate of Occupancy is issued and the Town has determined that no damage has incurred as a result of the builder and/or the builder's sub contractors.

## 5.2.15    Failure to Complete Improvements

In cases where a security instrument has been posted and required improvements have not been completed

137

within the terms of such security instrument, the requirements of the Subdivision Regulations or the Development Agreement, if applicable, Town staff may declare the security to be in default and require that all the improvements be installed regardless of the extent of the building development, or the expiration date of the security instrument, at the time the security is declared to be in default. The funds from the security shall be used to complete the improvements and/or reimburse the Town for any and all expenses that may be incurred to complete improvements. In the event the security instrument does not adequately cover the costs incurred by the Town to complete the improvements, the Town may place a hold on the issuance of building permits for those lots within the development, which have not had permits issued for construction until such time as the developer has reimbursed the Town for the total cost of the improvements, including legal and administrative.

### 5.2.16 Deferral or Waiver of Required Improvements

The Planning Commission may defer or waive at the time of final plat approval, subject to appropriate conditions, the provision of any or all such improvements as, in its judgment, are not requisite in the interest of the public health, safety, and general welfare, or which are inappropriate because of inadequacy or lack of connecting facilities.

Whenever it is deemed necessary by the Planning Commission to defer construction of any required improvement because of incompatible grades, future planning, inadequate or lack of connecting facilities, or other reasons, the developer shall either pay his share of the costs of the future improvements to the governing body prior to signing of the final subdivision plat or post a bond ensuring completion of said improvements.

### 5.2.17 Inspection of Improvements

The town may provide for inspection of required improvements during construction. If the appropriate governmental representative finds upon inspection that any of the required improvements have not been constructed in accordance with the accepting body's construction standards and specifications, the applicant shall be responsible for completing such improvements to the required standards. The fact that the town inspects the facilities in no way relieves the developer from designing or installing such facilities in accordance with the provisions of these regulations and the established development agreement. Preliminary approvals shall not be construed as acceptance of any improvements.

### 5.2.18 Acceptance of Streets and Other Improvements

Acceptance of streets and other public improvements for public maintenance, except utilities, shall be by action of BOMA. The Planning Commission may require the plat to be endorsed with appropriate notes to this effect.

Upon issuance of a building permit, a cash builders bond will be required for the repair of any damage that may incur by the builder and/or the builder's sub contractors. The cash bond will be determined as follows:

| PERMITS | AMOUNT |
|---------|-----------|
| 1 | $4000.00 |
| 2 | $3000.00 |
| 3 | $2000.00 |
| 4+ | $1000.00 |

Upon issuance of a certificate of occupancy, the Town will evaluate the condition of the roadways in the immediate vicinity of the project site and make a determination as to any damage that was incurred by the builder and/or the builder's sub contractors. The cash bond will be utilized to pay for any and all damage to Town infrastructure and any remaining money will be returned to the builder. Should multiple permits be applied for and multiple cash bonds are granted to the Town, the lowest cash bond will be released upon the issuance of a certificate of occupancy. All money will be released back to the builder upon Town acknowledgement that Town infrastructure is not damaged.

### 5.2.19 Maintenance of Improvements

The applicant shall be required to maintain all improvements for one (1) year after acceptance of the public

138

improvements by the governing authority. A portion of the developer's bond shall be retained to guarantee said maintenance. The amount retained shall be set by the Town Engineer.

### 5.2.20  Release of Bond

Upon completion of the one (1) year maintenance/warranty period, and upon correction of any and all defects in the required improvements, the remaining bond shall be released by the Town Engineer.

## 5.3  Zoning Process

### 5.3.1  Amendments to the Ordinance

The regulations, restrictions, and boundaries set forth in this ordinance may from time to time be amended, supplemented, changed, or repealed by the Thompson's Station Board of Mayor and Aldermen. Any member of the Board of Mayor and Aldermen may introduce such amendments or any official, board, or any other person may present a petition to the Planning Commission requesting an amendment or amendments to this ordinance.

No change or departure from the text or maps of this ordinance shall be made, unless such amendment be first submitted to the Planning Commission and approved by it, or, if not approved, received the favorable vote of a majority of the entire membership of the Town Board of Mayor and Aldermen.

Before finally adopting any such amendment, the Town Board of Mayor and Aldermen shall hold a public hearing thereon, at least fifteen (15) days notice of the time and place of which shall be given by at least one (1) publication in a newspaper of general circulation in the Town; and any such amendment shall be published at least once in a newspaper of general circulation in the Town.

A fee, as determined by the Thompson's Station Board of Mayor and Aldermen and payable at the time of filing of petition shall be posted with requests to amend a provision or provisions of this zoning ordinance. The fee is to be used by the Town to defray costs resulting from such petition and any subsequent amendment of the zoning ordinance.

### 5.3.2  Text Amendments

Proposed amendments to the text of this ordinance must be predicated by a finding that the proposed amendment is consistent with the intent of the Town's general plan and that the proposed amendment does not have a deleterious effect on surrounding properties or the Town as a whole. A finding must also be made as to whether the proposed amendment is correcting ordinance mistakes or adjusting the ordinance to changing area characteristics that might warrant review of the General Plan.

### 5.3.3  Map Amendments

Proposed zoning map amendments must be predicated by a finding that the proposed amendment is consistent with the intent of the Town's general plan and that the proposed amendment does not have a deleterious effect on surrounding properties or the Town as a whole. A finding must also be made as to whether the proposed amendment is correcting map mistakes or adjusting the ordinance to changing area characteristics that might warrant review of the General Plan.

### 5.3.4  Procedure for Map and/or Text Amendments

Applications for any change, either of district boundaries or classification of property as shown on the Zoning Map, shall be submitted to the Planning Commission at its public office.

  a.  Applications or petitions for zoning map amendments shall be submitted in the form established by Town staff, in compliance with §5.4 Plans and Applications below, along with the fees established by the Board of Mayor and Aldermen. In addition to the notice and public hearing requirements of state law, any property owner or approved representative requesting an amendment to the zoning map shall be required, upon the filing of their petition, to identify (including the name(s) and mailing addresses) all adjacent property owners including any properties that are separated only by a public right of way. The Town shall then send by certified mail, notice of the proposed rezoning and of the scheduled public hearing time and date. Failure to obtain service upon an adjacent property owner may result in the rescheduling of the public hearing and postponement of the vote

139

on the zoning map amendment. The applicant shall be responsible for all costs related to notice of the public hearing, including costs of certified mail and advertising. The applicant shall also post notification sign(s) in a prominent place or places on the property subject to the proposed zoning map amendment. Whenever any petition for an amendment of the zoning map has been denied by the Board of Mayor and Aldermen, no new petition covering the same property (or the same property plus any additional property) can be filed with the Board of Mayor and Aldermen until one (1) year has elapsed from the date of the filing of a previous petition, provided that nothing herein shall prevent the Planning Commission or Board of Mayor and Aldermen from initiating a zoning map amendment.

b. Multiple community units may be included in one rezoning request, provided each community unit meets its acreage requirements.

c. Once BOMA approves a new community rezoning under this ordinance, the parcel(s) shall be designated TC (Transect Community) on the Thompson's Station zoning map until approval of the preliminary plat by the Planning Commission pursuant to §5.2.3 and §5.4.2. Once the Planning Commission approves the preliminary plat, specific zoning districts shall replace the TC designation on the official zoning map as part of the Planning Commission's approval of the preliminary plat, so long as the allocation of zoning districts within the preliminary plat are consistent with Table 2.3 Community Types, Areas and Civic Space and the original rezoning to TC. The parcel(s) shall be designated T1 (Natural), T2 (Rural), T3 (Sub-Urban), T4 (General Urban), or T5 (Urban Center) on the Thompson's Station zoning map. The replacement of specific transect zoning districts on the official zoning map shall not be considered a zoning amendment; thus, the placement of transect zoning districts does not require further action of the Planning Commission or BOMA. Transect zoning district placement shall be considered a continuation of the original TC rezoning process that was originally approved by official action of the Planning Commission and BOMA pursuant to Tenn. Code Ann. § 13-7-201 et. seq. So long as the applicant complies with Table 2.3 Community Types, Areas and Civic Space of this ordinance, the Transect zoning districts may be relocated within the parcel(s) administratively and on the official zoning map until final plat approval. Once the final plat is approved pursuant to §5.2.7 and §5.4.7, Transect zoning districts may not be relocated and may only be amended through the Thompson's Station rezoning process. In the event a final plat within an approved Transect Community is not approved due to the expiration of the preliminary plat or vested rights, the withdrawal of the plat by the property owner or developer, or any for any other reason, the property shall revert to the prior zoning without further action of the Planning Commission or Board of Mayor and Aldermen. Notice shall be sent to the property owner(s) and the Town's zoning map shall be amended to reflect such reversion.

d. All zoning map and text amendments and any subdivision regulation amendments, shall follow the procedure as set forth under state law as may be amended from time to time.

## 5.4 Plans and Applications

5.4.1 Re-zoning Application Requirements

a. Application for rezoning shall include all of the following:

    i. applicant's name, address, interest in affected property. If the applicant is not the owner, a letter from the owner, a signature on the application, or a power of attorney shall be required for the applicant to act as agent with full authority.

    ii. description of property

    iii. map of property to be rezoned including topography at a maximum of 20-foot contour intervals, using USGS topography or other available topographic survey and established or approximated 100-year flood plain limits as shown on the official FEMA flood insurance maps.

    iv. existing property lines with dimensions

    v. adjoining streets and widths

    vi.   existing structures

    vii.   existing use of land

    viii.  current zoning of land and adjoining properties

    ix.   proposed points of connection for off-site thoroughfares

    x.   proposed community unit type(s)

    xi.   proposed designation of zoning districts

    xii.  statement as to how the re-zoning request is consistent with the Thompson's Station General Plan.

### 5.4.2  Concept Plan

Concept plans submitted to the Town Planner shall be drawn to a convenient scale no smaller than two hundred (200) feet to an inch. Concept plan applications shall be submitted with an owner affidavit and concept plans shall show:

    a.  title, scale, date, and approximate north arrow.

    b.  name and address of the applicant/owner and professional consultant responsible for preparation of the plan. If the applicant is not owner, a letter from the owner, signature on the application, or power of attorney shall be required for applicant to act as agent with full authority.

    c.  existing conditions plan:

        i.   existing land conditions and existing topography at a maximum of 5-foot contour intervals, using USGS topography or other available topographic survey and established or approximated 100-year flood plain limits as shown on the official flood insurance maps.

        ii.   soil types from USDA data.

        iii.  boundary lines of the property (certified boundary not required at this stage).

        iv.  location map at a scale of 1″ = 2,000 feet with north arrow

        v.   natural features to be preserved and or removed (i.e. trees, floodplains, wetlands, items on the National Register of Historic Places or within designated historic districts, known sinkholes, etc. per §3.3 Resource Management).

        vi.  the location and width of each existing easement within the concept plan boundaries.

        vii.  the location, width, and name of each existing improved or unimproved street, easement, or alley within 250 feet of the proposed subdivision.

        viii. existing zoning and names of the owners of all abutting properties

    d.  Statement as to how the concept plan is consistent with the Town of Thompson's Station General Plan.

    e.  Proposed transect community (TC) concept plan:

        i.   designation of community unit type

        ii.   boundaries of community units based on adjusted pedestrian sheds

        iii.  total site acreage

        iv.  transect district and/or use district locations with acreages and percentages

        v.   block sizes

        vi.  thoroughfares: location and designation of thoroughfare types and statement as to how thoroughfares, sidewalks, paths, and passages coordinate with bordering land development.

141

    vii.   civic space types, acreages, percentage and location

    viii.  special requirements, if applicable (See §4.3 Special Requirements.)

f.   stormwater management:

    i.   narrative description of stormwater control measures

    ii.  estimate of total impervious surface

g.   utilities

    i.   statement demonstrating availability of utilities, including water and sanitary sewer service (guarantee not required at this time)

h.   environmental resources.

    i.   contact department of natural resources regarding presence of rare, threatened or endangered species.

## 5.4.3   Preliminary Plat

a.   Site Analysis

Preliminary plats submitted to the Planning Commission are intended to provide an analysis of each site's special features and the designer's response to those features. Such plans are required for all subdivisions as these plans form the basis of the design process for green way lands, house locations, street alignments, and lot lines.

A site analysis shall accompany each preliminary plat. At a minimum, the site analysis shall include:

    i.   A contour base map at least upon topographical maps published by the U.S. Geological Survey;

    ii.  The location of severely constraining elements such as steep slopes (over 15 percent) wetlands, watercourses, intermittent streams and 100-year floodplains, and all existing rights-of-way and easements;

    iii.  The location of significant features such as woodlands, tree lines, open fields or meadows, scenic views into or out from the property, watershed divides and drainageways, fences or stone walls, rock outcrops, and existing structures, roads, tracks, and trails per the natural and cultural resource evaluation requirements set forth in Article 4 Zoning.

b.   Features of Preliminary Plats

The preliminary plat shall be prepared at a convenient scale no smaller than one hundred (100) feet to an inch. The scale shall be no smaller than fifty (50) feet to an inch for developments with lots 15,000 square feet or smaller. The plat shall be prepared by electronic means and submitted as electronic and printed copies. The sheets shall be numbered in sequence, if more than one sheet is used, and the first sheet shall be an index sheet showing how all other sheets fit together. The plat shall be prepared and certified by a Licensed Land Surveyor licensed to practice land surveying in the State of Tennessee. The preliminary plat shall include:

    i.   The location of the property to be subdivided with respect to surrounding property(s) and public way(s). Include the entire subdivision, or section when phasing is being requested, for which the preliminary approval is sought and all land immediately adjacent extending two hundred (200) feet from the property or adjacent public way. The lot pattern of surrounding development shall be shown.

    ii.  The topographic contours with an interval of not more than two (2) feet.

    iii.  The names of all adjoining property owners of record, with the deed or record book and page reference or the names of adjoining developments.

    iv.  The names of adjoining public ways.

142

v. The bearing, shown to the nearest second, length of all tangent boundary lines of the property figured to the nearest one-hundredth (1/100th ) of a foot, and complete curve data for all curved boundary lines.

vi. Bearings shall be referenced to true north or add adequate notes as to the reference.

vii. The location of existing public ways, easements, water bodies, streams, and other prominent features, such as wetlands, railroads, buildings, parks, cemeteries, drainage ditches, sink holes, bridges, and other features as determined by §3.3 Resource Management.

viii. The width of all existing easements, alleys, and other public ways, and building setback lines.

ix. Evidence of compliance with §3.8 Block Standards and §3.9 Thoroughfares including:

     a) block face dimensions, and

     b) thoroughfare network.

x. The location, dimension, and area (to the nearest square foot) of all proposed or existing lots.

xi. Within proposed condominium developments, the position of all existing or proposed buildings.

xii. Preliminary storm drainage design noting approximate volumes, direction of flows and location of proposed detention or retention areas.

xiii. Proposed extension(s) of water and/or sanitary sewer service to the property along with the proposed routing of such within the subdivision including fire hydrants.

xiv. Culverts and associated drainage structures located and sized along with necessary drainage easements; all other required utility easements.

xv. The location of all "Land Unsuitable for Development" as specified in §3.2.1.

xvi. The location and boundary of all open space with the proposed owner and designating the entity responsible for care, operation and maintenance.

xvii. Assignment of civic space type for transect community (TC) plans pursuant to Table 3.1 Civic Space Types.

xviii. The limits of floodway and floodway fringe areas and the associated regulatory flood elevation and regulatory flood protection elevation, as determined according to flood maps or flood studies as required per §3.4 Floodplain Regulations.

xix. The minimum finished floor elevation of houses to be constructed on lots within the floodway fringe areas.

xx. The date of the plat, approximate true north arrow, scale, and title flood elevation and regulatory flood protection elevation as determined according to flood maps or flood studies as required.

xxi. Sufficient data to determine readily the general location, bearing, and length of all lines necessary to reproduce such lines upon the ground.

xxii. Name of subdivision and all new public ways, as approved by Williamson County Emergency Communications Agency.

xxiii. The zoning classification of all zoned lots, as well as an indication of all uses proposed by the subdivider.

xxiv. The distance and bearing of one of the corners of the boundary of the subdivision, to the boundary of the existing public ways and to the original corner of the original survey of parcel of which it is a part.

xxv. Key map showing relation of the subdivision to all public ways, railroads and water courses in

143

all directions to a distance of at least one-half (1/2) mile (suggested scale: one (1) inch to one thousand (1,000) feet).

xxvi. Phasing plan, for all mutli-phase developments, including a construction traffic plan for such phases.

xxvii. Property tax map parcel numbers as recorded on the land tax maps of the county.

xxviii. The following notations:

    a) Classification of easement: (public use; access, drainage, utility, telecommunications, etc.);

    b) Explanation of site easements;

    c) Explanation of reservations;

    d) For any lot where public sewer or water systems are not available, the following:

        1) Areas designated for use as septic fields by the Williamson County Department of Sewage Disposal Management;

        2) Water wells (existing and proposed); and

        3) Rock outcroppings, marshes, springs, sinkholes, natural storm drains, and other outstanding topographical features.

        4) Statement of compliance with Concept Plan.

xxix. The name and address of the owner(s) of land to be subdivided, the subdivider if other than the owner, and the land surveyor or other person preparing the plat.

### 5.4.4    Site Plan

This Section sets forth the procedure for site plan review and approval for resource conservation developments, planned resource conservation developments, and nonresidential developments. An authorized representative for a lot or tract of land shall submit a site plan in accordance with criteria set forth by the Planning Commission. The applicant shall also pay the site plan review fees as determined by the Board of Mayor and Aldermen at the time of submittal. The purpose of site plan review is to ensure compliance with the development and design standards of this ordinance. No building permits or grading permits shall be issued nor shall any development of land be initiated until such development has received Planning Commission approval.

    a. Required Plans

      i. Site Plans.

      ii. Elevations.

      iii. Landscape Plans.

      iv. Engineering/Grading Plans.

      v. Roof Plans showing all mechanical equipment.

      vi. Maps, plans and documentation in the same manner as required for subdivision in Section 3.3 Resource Management of Article 3.

### 5.4.5    Construction Plans

Construction plans shall consist of complete construction drawings and specifications of all easements, streets, traffic control devices, street lights, sanitary sewers, stormwater facilities, water system facilities, sidewalks, parks and recreation facilities and other improvements required by this section. Such drawings shall have a maximum border size of 22 X 34 and shall be printed on 24 X 36 paper maximum.

    a. Each sheet shall be certified (sealed) by a professional engineer. Engineering plans shall be submitted to the Town Engineer for review and approval.

b. All improvements required pursuant to these regulations shall be constructed in accordance with the design standards and plan requirements of this article or as required by the town, and where applicable, the requirements and authorization of the appropriate state agency, utility company, or local franchisee.

c. Any modification of the construction drawings by the applicant or his engineer, either prior to or during construction, shall be transmitted to the town in writing.

d. Once the construction drawings have been approved, the applicant shall also submit an 11 X 17 of the approved set of construction drawings.

e. In addition, an electronic version in formats acceptable to the town shall be submitted. At a minimum, one electronic version shall be changeable, such as CAD, and one electronic version shall be non-changeable, such as PDF. These versions shall be available to the town for future computer application.

f. The construction drawings shall be accompanied by the following information:

   i. Site conditions:

      a) Vicinity map at a scale of 2,000 feet or more to the inch indicating the location of the property with respect to surrounding property and streets. The map shall show all streets and property within 1,000 feet of the applicant's property. All property held by the applicant in the area shall be identified.

      b) All existing pertinent features, either natural or man-made, that may influence the design of the subdivision, such as watercourses, tree groves, specimen trees (excluding those within tree groves to remain), swamps, rock outcrops, sink holes, floodplain, wetlands, outstanding natural topographic features, power transmission towers, archeological, scenic or historic areas, cemeteries, graveyards, grave sites, existing buildings, sewers, water mains, culverts, overhead utility lines, fire hydrants, and location of underground utilities within or adjacent to the tract.

      c) Existing topography with two-foot contour intervals. Where the terrain is rugged and hilly and where existing grades are ten percent or more, five-foot contour intervals will be permitted over the area where such grades exist. Contour lines shall be shown 50 feet beyond the subdivision boundary.

      d) Location, widths, and names of all existing improved or unimproved streets or alleys on or within 100 feet of the subdivision. Recorded, but unimproved streets shall be shown with dashed lines.

      e) Location of individual wells and/or septic tanks.

      f) Zoning classification and existing use of the tract and adjoining properties.

   ii. Proposed Subdivision:

      a) A drawing on a scale no smaller than 1" = 100 feet of proposed layout land use and lots.

      b) Subdivision boundaries with bearings and distances; all existing easements, railroad and utility right-of-way(s) and the purpose for which such easements and right-of-way(s) have been established; parks and other public open spaces.

      c) Copies of proposed deed restrictions.

      d) Tabulation of acreages:

         1) Total site acreage

         2) Civic space acreages, percentage and location

         3) Total number of each lots in each zoning district with acreages and %

    4) Number of units per lot and total units

e) The layout of all proposed and existing lots with lot widths for each lot and building setback lines.

f) Estimated Lot coverage

g) The locations, width, and names of proposed streets and alleys.

h) The approximate location, dimensions, and area of all property proposed to be dedicated or temporarily reserved for public use, or to be reserved by a blanket covenant for use of all property owners in the subdivision and conditions for such conveyance or reservation. Also, the location, dimensions, area, and purposes of any proposed easements.

i) Proposed public improvements, streets, or other major improvements planned by public bodies for future construction on or near the proposed subdivision or any street, park, or public improvement shown on the city comprehensive development plan.

j) A written offer of dedication of streets and other public property.

iii. Site Improvements

a) Street tree and Public Landscaping Plan

b) Public Lighting Plan

c) Utilities

    1) Proposed provision of water supply, fire protection, disposal of sanitary waste, storm drainage, stormwater management, sidewalks, landscaping, and other improvements.

    2) The location of existing and proposed gas lines, electric and telephone lines/poles, and streetlights.

d) Grading Plan

e) Sediment & Erosion Control Plan

f) Sequence of Construction

iv. Locations of existing survey monuments and proposed new monuments.

v. Map information:

a) The date and substance of any revisions to the plat are to be indicated in a revision block that is drawn on the plat.

b) The name and address of the owner(s) of the land to be subdivided, and the name and address of the applicant, if other than the owner.

c) A letter from the owner, signed application, or power of attorney, if different from the applicant, authorizing the applicant to act as agent with full authority.

d) The name, address, and seal of the registered engineer/land surveyor licensed in the state and responsible for the preparation of the plat.

e) The proposed name of the subdivision, which shall not duplicate or closely approximate the name of any other subdivision in the town.

f) North arrow, scale, and date.

vi. Intergovernmental agency review. As part of construction drawing review, the applicant shall obtain approvals from all affected outside agencies. Copies of approval letters and plans shall be provided to the city as part of this approval.

146

5.4.6    Development Agreement

The development agreement required by §5.2.8 Development Agreement Required Prior to Construction, shall be substantially as shown in Appendix "A" and shall be sufficient to assure construction of the following:

a.  All offsite improvements required to serve the development.

b.  All on-site improvements located within the section of the project contained within the construction plans, including improvements that are required to serve future portions of the development not contained within such plans.

c.  All improvements required to serve the lots shown on the plan that are not constructed and offered for public acceptance prior to or concurrently with submittal of final plats covering such lots.

5.4.7    Final Subdivision Plat

The final subdivision plat shall be prepared on transparent drafting material at a scale no smaller than one-hundred (100) feet per inch on sheets of county register plat book size. The use of an appropriate smaller scale may be permitted for lots larger than two (2) acres. The scale shall be no smaller than fifty (50) feet per inch for developments with lots of 15,000 square feet or smaller. When more than one (1) sheet is required, an index sheet of the same size shall be filed showing the entire subdivision with the sheets numbered in sequence. Provide to the Town, after approval by the Planning Commission, an electronic copy of the final plat and the documents to be recorded.

Final plats within subdivisions with common open space must include a proportionate amount of the open space within each section. No more than sixty (60) percent of the lots may be platted prior to the platting of all of the open space as determined on the concept plan.

The final plat shall include:

a.  The location of the property to be subdivided with respect to surrounding property(s) and public ways.

b.  The names of all adjoining property owners of record or the names of adjoining developments.

c.  The names of adjoining public ways.

d.  The exact boundary lines of the tract, determined by a field survey, showing angles to the nearest second and distance to the nearest one-hundredth (1/100th) of a foot. The adjusted accuracy of the survey shall meet or exceed the standards set forth in Tenn. Code Ann. Title 62, Chapter 18 for the category of survey required by these regulations. The category of survey shall be determined according to the average size of lots (see Table 5.1 Accuracy of Surveys below) within the proposed subdivision. The survey shall be tied into the Tennessee Grid Coordinate System.

### TABLE 5.1   ACCURACY OF SURVEYS

| AVERAGE LOT SIZE | UNADJUSTED ACCURACY |
| --- | --- |
| One (1) Acre or Less | Category 1 - Urban & Subdivision |
| Greater than One (1) Acre but Less than Ten (10) Acres | Category 2 - Suburban & Subdivision |
| Ten (1) Acres or More | Category 3 - All other land surveys |

A distance and bearing shall be provided which will link a point on the boundary of the subdivision to a reference point in the right-of-way of the nearest prominent public way intersection.

e.  The location of all public ways, easements, water bodies, streams or rivers, railroads, parks, and cemeteries.

f.  The limits of floodway and floodway fringe areas and the regulatory flood elevation and regulatory flood protection elevation; as determined by the Planning Commission.

g.  The location and width of all easements and rights-of-way for public ways, as well as the building setback lines on all lots.

h.  The location, dimensions, and area of all lots. All dimensions shall be field run to the nearest one

147

hundredth (1/100) of a foot and angles to the nearest second. Lot areas shall be shown to the nearest square foot. Provide three (3) monuments within the subdivision.

i. The location, area, and dimensions, to the accuracy set forth above, of all property to be set aside for park or playground use or other public or private reservation, with a designation of the purpose thereof, and conditions, if any, of the dedication or reservation.

j. The final plat of a condominium subdivision shall contain, in addition to the other information required by this section:

    i. an "as-built" building location and boundary survey, to "American Land Title Association" or other similar standards, showing complete and accurate dimensions and angles of the boundary of the parcel(s) on which the condominium is located, together with exterior dimensions and locations relative to those boundaries of the building(s) which constitute the condominium subdivision;

    ii. for vertical condominiums, some sort of datum plane or other suitable vertical location reference. In meeting these requirements, it is only necessary that the upper and lower limits of each level of each condominium unit be identified specifically in relation to the vertical reference, (e.g., an appropriate permanent monument or other acceptable reference datum or fixed known point). Elaborate exterior elevations and architectural detail are not necessary to satisfy this requirement; and

    iii. copies of deed covenants, the charter and by-laws of any homeowners' association established; and special information which the Planning Commission may require to protect the rights of future owners of the condominium or the public in general.

    iv. In addition to the other requirements of this section, construction plans for condominium subdivisions shall contain "as built" drawings of all underground utilities for each individual unit, regardless of proposed ownership, and the construction design of all public facilities which are proposed for dedication.

k. The name and address of the owner(s) of the land being subdivided.

l. The name and address of the developer if other than the owner.

m. The name and stamp of the land surveyor or other person preparing the plat.

n. The date of the plat, approximate true north point, scale, and title of the subdivision.

o. Sufficient data to determine readily the location, bearing, and length of all lines necessary to reproduce such lines upon the ground. This shall include the radius, central angle, and tangent distance for the centerline of the curved public ways and curved property lines that are not the boundary of curved public ways. The location of all monuments and pins shall be indicated on the plat.

p. The names of all public ways.

q. The zoning classification of all lots as well as an indication of uses other than residential proposed by the developer.

r. The total acreage within the subdivision.

s. Lot numbers and street numbers.

t. The line size and location of water and sewer facilities.

u. The location of all fire hydrants.

v. For any lot where public sewer or water system is not available, the following shall be shown:

    i. Areas to be used for sewage disposal; by the Williamson County Department of Sewage Disposal Management; as approved.

    ii. Water wells, existing and proposed.

w. Applicable certifications in the form reproduced in this section shall appear upon the final plat. All required certificates shall bear the signature of the approving or authorizing agent at the time of application for final plat approval, except that the form for endorsement of the Planning Commission's approval for recording shall appear unsigned at the time of application for approval.

x. Commitment notes may be printed or stamped on the final plat reflecting location and dimension of easements, or extent of other agreements or factual data, in lieu of drafted illustration, when applicable, and as approved by the Planning Commission.

y. For stormwater detention facilities:

    i. Show as a permanent drainage easement, and

    ii. Provide a note of reference to the deed book and page reference in which the Stormwater Detention Maintenance Agreement is recorded.

## 5.4.8 Plat Certificates

The plat shall contain signature blocks as identified in Appendix C.

## 5.4.9 Building and Sign Permits

All departments, officials, and public employees of the Town who are vested with the duty or authority to issue permits or licenses shall conform to the provisions of this ordinance and shall issue no permit or license for any use, building, or purpose if the same would be in conflict with provisions of this ordinance. All permits and licenses shall be revocable, subject to continued compliance with all requirements and conditions of this and other applicable laws and regulations. Any permit or license issued in conflict with the provisions of this ordinance shall be null and void.

a. Building Permits

    i. Need for a Building Permit. A building permit must be issued by the Town Planner or a designee before a property owner can locate, erect, or begin construction, reconstruction, extension, conversion, or structural alteration of any building, structure, or swimming pool; construct a well or sewage disposal system, other than the reconstruction, placement, or extension of any existing well or sewage disposal system.

    ii. Application. An individual lot site plan must accompany all authorized building permit applications. At a minimum the site plan must include the footprint of all existing and proposed structures, all driveways and parking areas, all utility line locations (inclusive of recorded easements), all public rights of way and all streams and drainage-ways. Applications shall include the following:

        a) Lot Standards (See §4.4 Lot Standards)

        b) Lot Use Restrictions (See §4.5 Lot Use Restrictions)

        c) Building Placement Standards (§4.6 Building Placement Standards)

        d) Parking Standards (§4.12 Parking Standards)

        e) Height Restrictions (§4.7 Height Restrictions)

        f) Frontage Requirements (§4.8 Transect Zoning District Frontage Requirements)

        g) Fencing Standards (§4.15 Fencing Standards)

        h) Signage Standards (§4.17 Sign Standards)

    iii. Commencement of Construction. Subsequent to a pre-construction conference with Staff, the installation of all required erosion control devices and the issuance of a grading permit, site grading may commence. A building permit may be issued subsequent to adequate site preparation such that construction activities will not create erosion or result in negative on or off site impacts. A foundation survey and staking may be required at the discretion of the Town

149

Planner.

iv.   Expiration. Individual lot site plan approvals and building permits issued in accordance with the provisions of this ordinance shall become void six (6) months after the date of approval/issuance, provided that the construction for which it was issued has not been started or if activity toward construction ceases for a period of six (6) months.

v.   A filing fee shall accompany each application for a building permit, in such amount as may be determined by the Board of Mayor and Aldermen.

b.   Sign Permit Required

A sign permit must be issued by the Town Planner or a designee before a property owner can; locate, erect, alter or relocate a sign. All applications for sign permits shall be made in writing to the Town Planner and shall contain or have attached thereto; the applicant name, address, and contact information, a scale drawing of the approved site plan and two drawings of the plans, specifications, and method of construction and attachment (i.e., either to a building or in the ground) of all proposed signs.

## 5.5  Approval Authority

The following positions and bodies are listed in a hierarchy in which each one provides review or approval for the actions of the proceeding one. Table 5.2 Approval Authority outlines the authority and appeal authority for this ordinance.

## TABLE 5.2 APPROVAL AUTHORITY

| | REVIEW AUTHORITY ROLE | | | |
| --- | --- | --- | --- | --- |
| | Town Planner | Planning Commission | Board of Mayor and Aldermen | Board of Zoning Appeals |
| **a. Administrative** | | | | |
| Verification of Zoning Compliance | S | | | X |
| Interpretation | S | | | X |
| **b. Application Review** | | | | |
| Rezoning | R | R | A | |
| Concept plan | S | | | |
| Preliminary plat | R | A | | |
| Final plat | R | A | | |
| Site plan | R | A | | |
| **c. Special Permits** | | | | |
| Special exception permit | R | | | A |
| Temporary use permit | S | A | | X |
| **d. Legislative** | | | | |
| Subdivision Regulation Amendments | R | A | | |
| Development Agreements | | R | A | |
| Zoning Reclassification | R | R | A | |
| Zoning Text Amendment | R | R | A | |
| **LEGEND** | | | | |
| Administrative | S | | | |
| Review | R | | | |
| Approval | A | | | |
| Appeal | X | | | |

### 5.5.1 The Town Planner

The Town Planner shall be responsible for administering and enforcing this ordinance. The Town Building Official shall be authorized to make inspections of structures and premises necessary to assist the Town Planner in addition to his or her duties under the building codes. The person or persons to whom these functions are assigned shall be referred to in this ordinance as the "Town Planner". The term "staff" or "Planning staff" is sometimes used interchangeably with the term "Town Planner." The Town Planner may delegate any function or responsibility assigned by this ordinance to another employee or agent acting at the direction of the Board of Mayor and Aldermen. In addition to administering and enforcing this ordinance, the Town Planner shall:

a.  Issue all Building Permits and make and maintain records thereof. It shall be unlawful to commence construction or alteration of any building until a building permit has been issued.

b.  Issue all Certificates of Occupancy and make and maintain records thereof.

c.  Issue and renew, where applicable, all Sign, Temporary Use and other Permits and make and maintain records thereof.

d.  Maintain and keep current zoning maps and records of amendments thereto.

e.  Receive, file and forward to the Board of Zoning Appeals all applications for variances or other matters on which the Board is required to act under the provisions of this ordinance.

f.  Receive, file and forward to the Planning Commission all matters on which the Planning Commission is required to act under this ordinance.

g.  Conduct inspections as required in this ordinance and such other inspections as are necessary to insure compliance with the various other general provisions of this ordinance. The Town Planner shall possess the right to enter upon any premises for the purpose of making inspections of buildings or premises necessary to carry out his authorized duties.

h.  Initiate any action, with the assistance of the Town Attorney if necessary, to enforce the provisions and/or to remedy any violation of this ordinance as set forth in §5.2 et seq.

5.5.2   Planning Commission

a.  Amendments

For the purpose of providing for the public health, safety, and general welfare the Planning Commission may from time to time amend, Article 3 Subdivision Regulations. Before adoption of any amendment to these regulations, a public hearing thereon shall be held by the Planning Commission, as required by Tenn. Code. Ann. § 13-4-303. Notice of any proposed amendments shall be forwarded to the Board of Mayor and Aldermen prior to the public hearing.

The Planning Commission may also from time to time, recommend amendments to the zoning text or map to the Board of Mayor and Aldermen.

b.  Codification and Distribution

Subsequent to adoption of any amendment to the subdivision regulations, such amendment shall be incorporated into the text of these regulations in the following manner.

i.   Replacement pages shall be prepared incorporating the new or changed language.

ii.  In Article 3 Subdivision Regulations,each adopted amendment shall be numbered consecutively and printed on pages separate from any other amendment and in a manner that fully states any language deleted from these regulations and any language added and the place in the text of each such change.

c.  Conditions

Regulation of the subdivision of land and the attachment of reasonable conditions to land subdivision are exercises of valid police power delegated by the state to the Planning Commission. The developer has the duty of compliance with reasonable conditions imposed by the Planning Commission for design, dedication, improvement, and restrictive use of the land so as to provide for physical and economical development of the jurisdictional area and for the safety and general welfare of future plot owners in the subdivision and of the community at large.

d.  Deviations

If the Planning Commission finds that extraordinary hardships or practical difficulties may result from strict compliance with the subdivision regulations, a deviation from these regulations may be granted provided such deviation shall not have the effect of nullifying the general intent and purpose of these regulations. Where the Planning Commission concludes that the purpose of these regulations may be specifically served to an equal or greater extent by an alternative proposal, condition, or circumstance, it may approve other deviations to these regulations.

e.  Deviation Procedures

Each and every deviation or modification of the subdivision regulations sought by a subdivider shall be specifically applied for.

i. Conditions

In approving deviations, the Planning Commission may impose such conditions as, in its judgment, will secure substantially the objectives, standards, and requirements of the regulations.

f. Recording of Plats

Pursuant to Tenn. Code Ann. § 13-4-302, no plat of a subdivision of land within the jurisdictional area shall be received or recorded by the county register until the plat has received final approval of the Planning Commission in accordance with these regulations, and such approval has been endorsed in writing on the plat by the Planning Commission secretary, or his designee, in the manner prescribed by 5.2.11 Signing and Recording of Subdivision Plat of these regulations.

g. Use of Unapproved Plats

Pursuant to Tenn. Code Ann. § 13-4-306, no owner or agent of the owner any land shall convey such land contrary to these provisions.

h. Public Ways and Utilities

Pursuant to Tenn. Code Ann. § 13-4-307, neither the Town nor or any public authority shall accept, lay out, open, improve, grade, pave, or light any public way, lay or authorize the laying of water mains or sewers, or construct or authorize the construction of other facilities or utili- ties in any public way located within the jurisdictional area unless such way shall have been accepted, opened, or otherwise received the legal status of a public way prior to the attachment of the Planning Commission's juris-diction, or unless such way corresponds in its location and lines to a way shown on a subdivision plat approved by the Planning Commission or on a public way plat made by the Planning Commission.

5.5.3 Board of Mayor and Aldermen (BOMA) shall:

a. Receive recommendations on requests for amendments to this ordinance from the Planning Com-mission, and hear and make final determinations upon zoning and development agreements in the manner prescribed by and subject to the procedures established herein; receive and hear recom-mendations, and make final determinations on requests for zone changes or initial zoning of lands, including the creation of zoning districts.

b. Instruct the Town Planner and the Planning Commission, from time to time, to make studies or initiate studies and draft reports concerning issues arising from this ordinance and from other land use practices.

c. Receive, review, modify and adopt amendments to the General Plan.

d. Perform any additional duties as required by this ordinance or state law.

5.5.4 Town Board of Zoning Appeals

A Thompson's Station Board of Zoning Appeals (BZA) is hereby established in accordance with 13-7-205 through 13-7-208, of the Tennessee Code, the Thompson's Station Board of Zoning Appeals shall consist of five (5) members. The Town Board of Mayor and Aldermen shall appoint members and may fix their compen-sation and their terms, which shall be so arranged that the term of one (1) member will expire each year. The Board of Mayor and Aldermen may remove any member upon cause. Vacancies shall be filled for an unexpired term in the same manner as the case of original appointment.

a. Procedure. Meetings of the BZA shall be held at the call of the chair, and at such other times as the Board may determine. Such chair, or in his absence, the Vice Chair, may administer oaths and compel the attendance of witnesses. All meetings of the BZA shall be advertised and open to the public. In addition to providing public notice as required by state law and as set forth in this or-dinance, town staff shall provide notice of the hearing matter, date and time, via certified mail, to the applicant or appellant and adjacent property owners of any property that may be affected by a decision of the BZA. The BZA shall adopt rules of procedure and shall keep records of applications and action taken thereon. The records and minutes shall be filed in the Thompson's Station Town Hall and shall be a public record.

153

b. Appeals to the BZA. An appeal to the Thompson's Station BZA may be taken by any person, firm, or corporation aggrieved by, any administrative decision made by town staff. Such appeal shall be taken by filing with the Town Recorder within 30 days of receiving notice of the administrative decision, a notice of appeal specifying the grounds thereof. The Town Planner shall transmit to the BZA all papers constituting the record upon which the appeal was taken. The BZA shall fix a reasonable time for the hearing of the appeal, give public notice thereof, as well as due notice to the parties in interest, and decide the same within a reasonable time. Upon the hearing, any person or party may appear in person, by agent, or by attorney.

c. Powers of the Board. The BZA shall have the following powers:

    i.  Administrative Review

    To hear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, permit, decision, determination or refusal made by the Town Planner or other administrative official in the carrying out of enforcement of any provision of this ordinance.

    ii.  Special Exceptions

    To hear and decide applications for special exceptions as specified in this ordinance, hear requests for interpretation of the zoning map, and for decision on any special questions upon which the BZA is authorized to pass.

    iii.  Variances

    To hear and decide applications for variances from the requirements of the Zoning Ordinance.

d. Rules and Regulations of the BZA. The BZA shall adopt rules for the conduct of its meetings. Such rules shall at the minimum require that:

    i.  The presence of three (3) members of the BZA shall constitute a quorum and the concurring vote of at least three (3) members of the BZA shall be necessary to deny or grant any application before the BZA.

    ii.  No action shall be taken by the BZA on any case until after a public hearing and notice thereof. Said notice of public hearing shall be a legal notice published in a newspaper of general circulation in Thompson's Station at least ten (10) days before the hearing by the BZA. No hearing shall be considered and heard by the BZA less than fifteen (15) days after filing such appeal. If new information is uncovered regarding an action of the BZA that could not have been reasonably presented in a public hearing before the BZA, the BZA shall establish a date for the purpose of rehearing in accordance with the appropriate procedures herein.

    iii.  The BZA may call upon any other office or agency of the Town government for information in the performance of its duties and it shall be the duty of such other agencies to render such information to the BZA as may be reasonably required.

    iv.  The Planning Commission shall be permitted to submit an advisory opinion on any matter before the BZA and such opinion shall be made part of the record of such public hearing.

    v.  Any officer, agency, or department of the Town or other aggrieved party may appeal any decision of the BZA to a court of competent jurisdiction as provided for by State law.

    vi.  Any decision made by the BZA on a special exception shall indicate the specific section of this ordinance under which the permit is being considered and shall state clearly the specific conditions imposed in granting such permit.

    vii.  Appeals will be assigned for hearing in the order in which they appear on the calendar thereof, except that appeals may be advanced for hearing by order of the BZA, good, and sufficient cause being shown.

    viii.  At the public hearing of the case before the BZA, the appellant shall appear in his own behalf or be represented by counsel or agent. The appellant's side of the case shall be heard first and

154

those in objection shall follow. To maintain orderly procedure, each side shall proceed without interruption from the other.

e. Stay of Proceedings

An appeal stays all legal proceedings in furtherance of the action appealed from, unless the Town Planner certifies to the BZA, after such notice of appeal shall have been filed, that by reason of facts stated in the certificate such stay would cause imminent peril to life or property. In such instance, the proceedings shall not be stayed otherwise than by a restraining order, which may be granted by the BZA or by a court of competent jurisdiction on application, on notice to the Town Planner, and on due cause shown.

f. Liability of BZA Members, Town Planner and Employees

Any board member, building commissioner, or other employee charged with the enforcement of this ordinance, acting for Thompson's Station within the scope of the responsibilities assigned under this ordinance shall not thereby render himself liable personally, and is hereby relieved from all personal liability and shall be held harmless by the Town of any damage that may occur to persons or property as the result of any act required or permitted in the proper discharge of their duties. Any suit brought against any BZA member, Town Planner, or employee, charged with the enforcement of any provision of this ordinance, shall be defended by legal representatives furnished by the Town until the final termination of such proceedings.

g. Right of Entry upon Land

Upon notice to property owners, the BZA, its members and employees in the performance of its work, may enter upon any land within its jurisdiction and make examinations and surveys and place or remove public notices as required by this ordinance.

h. Re-hearings

The BZA shall hold no rehearing except on motion to reconsider the vote or on a written request for a hearing. If the motion to reconsider receives a majority affirmative vote, the BZA may vote on the motion to grant the request for a rehearing, subject to such conditions as the BZA may stipulate. No request to grant a rehearing will be entertained unless new evidence is submitted which could not reasonably be presented at the previous hearing. If the request for a rehearing is granted, the case shall be put on the calendar for a rehearing. In all cases, the request for a rehearing shall be in writing, reciting the reasons for the request and shall be duly verified and accompanied by the necessary data and diagrams. The persons requesting the rehearing shall be notified to appear before the BZA on a date to be set by the BZA. No rehearing for a variance shall be granted an applicant found by a court of competent jurisdiction to be in willful violation of the express provisions of a prior variance granted under the authority of this article.

i. Variances

The purpose of this procedure is to modify the strict application of the specific requirements of this ordinance in the case of exceptionally irregular, narrow, shallow, or steep lots, or other exceptional physical conditions, whereby such strict application would result in practical difficulty or unnecessary hardship. The variance shall be used only where necessary to overcome some obstacle, which is preventing an owner from using his property under this ordinance.

    i. Application. After written denial of a permit, a property owner may make application for a variance, using any form, which might be made available by the BZA.

    ii. Hearing. Upon receipt of an application, the BZA shall hold a hearing to decide whether a variance to the ordinance provisions is, in fact, necessary to relieve unnecessary hardship. The Board shall consider and decide all applications for variances within thirty (30) days of such hearing and in accordance with the standards provided below. A fee, as determined by the Thompson's Station Board of Mayor and Aldermen, and included within the fee schedule posted in the Town Hall, shall be charged to cover review and processing of each application

155

for a variance.

iii. Standards for Variances. The BZA shall not grant a variance, except where special circumstances or conditions fully described in the findings of the BZA, do not apply generally in the district. The burden of showing that the variance should be granted shall be upon the person applying for the variance. In granting a variance, the BZA shall ascertain that the following criteria are met:

a) The particular physical surroundings, shape, are/or topographic conditions of the specific property involved would result in a particular hardship upon the owner as distinguished from a mere inconvenience, if the strict application of this ordinance were carried out, must be stated.

b) The conditions upon which the petition for a variance is based would not be applicable, generally, to other property within the same district.

c) The granting of the variance requested will not confer on the applicant any special privilege that is denied by this ordinance to other land structures, or buildings in the same district.

d) The variance is the minimum variance that will relieve such difficulties or hardship and thereby make possible the reasonable use of the land, building, or structure.

e) That the granting of the variance will not be detrimental to the public welfare, injurious to other property or improvements in the area in which the subject property is located, or a substantial impairment to the intent and purpose of the zoning district wherein such property is located or of the general provisions of this ordinance.

f) That the proposed variance will not impair an adequate supply of light and air to the adjacent property, or substantially increase the congestion in the public streets, or increase the danger of fire, or endanger the public safety.

g) That the alleged difficulty or hardship has not been knowingly and intentionally created by any person having an interest in the property after the effective date of this ordinance.

iv. Standards for Variances for Floodplain Regulations.

a) Variances may be issued for the repair or rehabilitation of historic structures as defined, herein, upon a determination that the proposed repair or rehabilitation will not preclude the structure's continued designation as a historic structure and the variance is the minimum necessary deviation from the requirements of this Ordinance to preserve the historic character and design of the structure.

b) In passing upon such applications, the Municipal Board of Zoning Appeals shall consider all technical evaluations, all relevant factors, all standards specified in other sections of this Ordinance, and:

1) The susceptibility of the proposed facility and its contents to flood damage;

2) The importance of the services provided by the proposed facility to the community;

3) The necessity of the facility to a waterfront location, in the case of a functionally dependent use;

4) The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use;

5) The relationship of the proposed use to the comprehensive plan and floodplain management program for that area;

6) The safety of access to the property in times of flood for ordinary and emergency

156

vehicles;

7)　The expected heights, velocity, duration, rate of rise and sediment transport of the flood waters and the effects of wave action, if applicable, expected at the site;

8)　The costs of providing governmental services during and after flood conditions including maintenance and repair of public utilities and facilities such as sewer, gas, electrical, water systems, and streets and bridges.

c)　Upon consideration of the factors listed above, and the purposes of this Ordinance, the Municipal Board of Zoning Appeals may attach such conditions to the granting of variances, as it deems necessary to effectuate the purposes of this Ordinance.

d)　Variances shall not be issued within any designated floodway if any increase in flood levels during the base flood discharge would result.

v.　Conditions for Floodplain Variances.

a)　Variances shall only be issued upon: a showing of good and sufficient cause, a determination that failure to grant the variance would result in exceptional hardship; or a determination that the granting of a variance will not result in increased flood heights, additional threats to public safety, extraordinary public expense, create nuisance, cause fraud on or victimization of the public, or conflict with existing local laws or Ordinances.

b)　Any applicant to whom a variance is granted shall be given written notice that the issuance of a variance to construct a structure below the Base Flood Elevation will result in increased premium rates for flood insurance (as high as $25 for $100) coverage, and that such construction below the Base Flood Elevation increases risks to life and property.

c)　The Administrator shall maintain the records of all appeal actions and report any variances to FEMA upon request.

vi.　Restrictions and Variances

No nonconforming use of neighboring lands, structures, or buildings in the same district, and no permitted or nonconforming use of lands, structures, or buildings in other districts shall be considered grounds for the issuance of a variance.

Under no circumstances shall the BZA grant a variance to allow a "USE" not permissible under the terms of this ordinance in the district involved, or any use expressly or by implication prohibited by the terms of this ordinance in said district.

The BZA may impose conditions and restrictions upon the premises benefited by a variance as may be necessary to comply with the provisions set out in 6601, C, above, to reduce or minimize the injurious effect upon surrounding property and better carry out the general intent of this ordinance. The BZA may establish expiration dates as a condition or as a part of any variances.

j.　Special Exceptions. The BZA establishes the following procedure to provide procedures for review of a proposed use as a conditional use or special exception. The procedure shall be the same whether review is required by this ordinance or whether a review is requested by the Town Planner to determine whether a proposed use is potentially noxious, dangerous or offensive.

i.　Application. An application shall be filed with the BZA for review. Said application shall show the location and intended uses of the site, the names of the property owners, existing land uses within two hundred (200) feet, and any other material pertinent to the request which the BZA may require.

ii.　Hearing. Upon receipt of an application, the BZA shall hold a hearing to decide whether the proposed special exception can be operated without detriment to the property or surround-

157

ing land uses. The Board shall consider and decide all applications for variances within thirty (30) days of such hearing and in accordance with the standards provided below. A fee, as determined by the Thompson's Station Board of Mayor and Aldermen, and included within the fee schedule posted in the Town Hall, shall be charged to cover review and processing of each application.

iii. Restrictions. In the exercise of its approval, the BZA may impose such conditions upon the proposed uses of buildings or land as it may deem advisable in the furtherance of the general purposes of this ordinance.

iv. Validity of Plans. All approved plans, conditions, restrictions, and rules made a part of the approval of the Board shall constitute certification on the part of applicant that the proposed use shall conform to such regulations at all times.

v. General Requirements. A special exception shall be granted provided the Board finds that the activity will not adversely affect area property and is so designed, located, and proposed to be operated so that the public health, safety, and welfare will be protected. Special exceptions must also conform to all applicable provisions of this ordinance for the district in which it is to be located and is within the provision of "Special Exceptions" as set forth in this ordinance.

vi. Special Exceptions Appeals. Any person or agency of the Town government may appeal to a court of competent jurisdiction from the BZA decision as provided under statutes of the State of Tennessee. The judgment and findings of the BZA on all questions of fact that may be involved in any appeal, cause, hearing or proceeding un- der this article shall be final, and subject to review only for illegality or want of jurisdiction. A fee, as per the Fee Schedule posted in the Town Hall of Thompson's Station, shall be charged to cover review and processing of each application for a special exception.

## 5.6 Interpretation

The provisions of this Section are intended to provide a simple and expeditious method for clarifying ambiguities in the text of this ordinance, the zoning map that it incorporates, and the rules and regulations adopted pursuant to it. It is also intended to provide a simple, yet circumscribed procedure for overcoming the inadvertent rigidities and limitations inherent in the promulgation.

### 5.6.1 Authority

The Town Planner may, subject to the procedures, standards, and limitations set forth in this Subsection, render interpretations of any provision of this ordinance or any rule or regulation issued pursuant to it, including interpretations of the various uses in any district not expressly mentioned in this ordinance.

### 5.6.2 Procedure for Interpretations

a. All applications for an interpretation of any provision of this Ordinance, the Zoning Map, or any rule or regulation adopted pursuant to this ordinance shall be submitted in writing to the Town Planner or a designee. Each application shall set forth the specific provision or provisions to be interpreted, the facts of the situation, giving rise to the request of an interpretation, and the precise interpretation claimed by the applicant to be correct. Before rendering any interpretation, the Town Planner shall receive any further facts and information judged by the Town Planner to be necessary for a meaningful interpretation of the provision in question.

b. Notice of Interpretation by the Town Planner. Within ninety (90) days following the receipt of a completed request or application for interpretation, the Town Planner shall mail a written copy of interpretation to the applicant. The Town Planner shall state the specific precedent, reasons, and analysis on which the interpretation is based. The Town Planner shall keep a copy of each interpretation on file and shall make a copy of each interpretation available for public inspection during reasonable hours.

c. Appeal. Appeals on interpretations rendered by the Town Planner pursuant to this Subsection may be taken to the Board of Zoning Appeals as provided in this Article.

158

5.6.3    Standards for Interpretations

    a.    The following standards shall govern both the Town Planner and the Board of Zoning Appeals' decision on appeals from the Town Planner's interpretation:

        i.    No interpretation shall allow the establishment of any land use, which was previously considered and rejected on application for amendment to the Zoning Ordinance or the Zoning Map.

        ii.    No interpretation shall permit a land use allowed in another district if the use is not listed as permitted in the subject property's district.

        iii.    No interpretation shall permit a land use in a particular district unless such use is substantially similar to other uses permitted in that same district.

        iv.    Any land use permitted or other interpretation rendered pursuant to this Subsection shall fully comply with all requirements and standards imposed by this ordinance.

    b.    Effect of Favorable Use Interpretation. A favorable interpretation does not relieve the applicant from complying with any of the other procedural requirements set forth in this ordinance or their associated fees.

    c.    Limitations on Favorable Use Interpretations. Interpretations shall be valid for twelve (12) months if from the date of the interpretation if a building permit is issued and construction is begun within that period and is thereafter diligently pursued to completion, or a certificate of occupancy is obtained and a use commenced within that period. Interpretations shall be for single uses/situations only.

THIS PAGE IS DELIBERATELY BLANK.